**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

APOLLOS PROPERTIES, LLC,

JAMES VANSTEENHOUSE,

ELIZABETH VANSTEENHOUSE,

MICAH CRAMER,

and

KYA CRAMER,

     Plaintiffs,

v.

LELAND TOWNSHIP, MICHIGAN,

CLINT MITCHELL, *in his official capacity as*
*Supervisor on the Township Board of Trustees*,

LISA BROOKFIELD, *in her official capacity as*
*Leland Township Clerk*,

SHIRLEY GARTHE, *in her official capacity as*
*Leland Township Board Treasurer*,

GREG KUNTZ, in *his official capacity* as
*Leland Township Trustee*,

STEVE SCALES, *in his official capacity as*
*Leland Township Trustee, and as Township*
*Board Representative to the Planning Commission*,

ROSS SATTERWHITE, *in his official capacity as former*
*chairman of Leland Township Planning Commission*,

LEE CORY, *in her official capacity as*
*Chairwoman of the Leland Township Planning Commission,*
*and as Planning Commission Representative to the*
*Zoning Board of Appeals*,

SKIP TELGARD, *in his official capacity as*
*Secretary of the Leland Township Planning Commission*,

Judge _____

No. 1:26-cv-2307

JURY TRIAL DEMANDED

SAM SIMPSON, *in his official capacity as Vice Chairman of the Leland Township Planning Commission*,

BRIAN FENLON, *in his official capacity as Member of the Leland Township Planning Commission and Representative to the Zoning Board of Appeals*,

BILL WHITE, *in his official capacity as Member of the Leland Township Planning Commission*,

KATHY DAWKINS, *in her official capacity as Chairwoman of the Leland Township Zoning Board of Appeals*,

BROOKS BUNBURY, *in his official capacity as Member of the Leland Township Zoning Board of Appeals*,

JAMES CARPENTER, *in his official capacity as Member of the Leland Township Zoning Board of Appeals*,

SUSAN OCH, *in her official capacity as Member of the Leland Township Zoning Board of Appeals*,

NANCY SMITH, *in her official capacity as Member of the Leland Township Zoning Board of Appeals*,

LAUREN CYPHER, *in her official capacity as a former Member of the Leland Township Zoning Board of Appeals*,

MARY LINGUAR, *in her official capacity as Member of the Leland Township Zoning Board of Appeals*,

LISA PSENKA, *in her official capacity as Member of the Leland Township Zoning Board of Appeals*,

TONY BORDEN, *in his official capacity as alternate Member of the Leland Township Zoning Board of Appeals*,

and

LYNN DUNN, *in her official capacity as alternate Member of the Leland Township Zoning Board of Appeals*,

Defendants.

ii

**VERIFIED COMPLAINT FOR
VIOLATION OF THE FIRST, FIFTH, AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION,
VIOLATIONS OF ARTICLE I OF THE MICHIGAN CONSTITUTION,
VIOLATIONS OF VARIOUS FEDERAL AND MICHIGAN CIVIL RIGHTS LAWS,
AND REQUEST FOR A PRELIMINARY INJUNCTION**

## SUMMARY[1]

*Leland Township adopted a land use scheme that imposes a religious gerrymander. "Churches and Religious Institutions" are prohibited from assembling at private property unless the Township first grants a permit and then a "Church" or "Religious Institution" may only assemble in certain areas of Leland Township. Leland Township enforces this prohibition against, and regulation of, "Churches and Religious Institutions" against "clubs" and assemblies of persons including high school students meeting to study the Bible and pray. Leland Township applied and enforced the Township's prohibition against "Churches and Religious Institutions" to deny Youth for Christ Club the right to assemble at private property on North Lake Street. Leland Township's Zoning Ordinance and regulation of Churches and Religious Institutions is not "neutral" nor is it "generally applicable." Leland Township's prohibition and regulation of "Churches and Religious Institutions" does not serve any "compelling" or even rational legitimate government interest.*

*Leland Township's Planning Commission issued two rulings concluding that Youth for Christ Club, an assembly of high school students meeting to pray and study the Bible at private property, is not a secular "club" allowed or permitted under the Township's Zoning Ordinance, but is a "Church or Religious Institution" that is absolutely prohibited from assembling at private property.*

*Leland Township adopted a zoning and land use scheme forbidding "Churches" and "Religious Institutions" from assembling for speech, worship, Bible study, religious gatherings, and fellowship in any part of Leland Township. As written and enforced, Leland Township's Zoning Ordinance and the Township's Master Plan only allow persons to assemble for religious speech and faith-based gatherings in certain designated areas of Leland Township and Leland Township requires those seeking to gather for prayer and Bible study in these designated zones to first pay Leland Township a permit fee, submit an application for a Special Use Permit, and satisfy "Special Performance Standards." The "Special Performance Standards" only apply to "Churches and Religious Institutions."*

*The "Special Performance Standards" Leland Township imposes on "Churches and Religious Institutions" include requirements that the "church" or "religious institution" finances comply with the Township's "Special Performance Standards" that prohibit "accrual of distributable profits" and "regulation of private gain." The Township's "Special Performance Standards" require that any salary or other compensation for services rendered in connection with a "Church's" or "Religious Institution's" activities are "reasonable and customary." These vague "Special Performance Standards" apply only to "Churches and Religious Institutions" and*

---

[1] This summary is provided for the convenience of the Court and parties.

*do not apply to other non-profit organizations or non-religious organizations, entities, businesses, or assemblies.*

*The Leland Township Planning Commission has interpreted and enforced the Zoning Ordinance prohibition against "Churches and Religious Institutions" to include any faith-based "club" at which students assemble for prayer and Bible study.  Under Leland Township's Zoning Ordinance, as written and as enforced, persons may not assemble at private property the Township designates to be in a commercial and mixed-use church-free zoning district.  Church-free zoning districts include all the private and public property in the central areas of the Village of Leland.*

*High school students were assembling for prayer and Bible study at private property Leland Township designated to be a church-free zoning district.  Youth for Christ Club is an evangelical Christian ministry established by Billy Graham and Torrey Johnson in 1944.  The VanSteenhouse family bought a building in the Village of Leland on North Lake Street overlooking Leland Harbor and invited Youth for Christ Club to meet at the North Lake Street property for prayer and Bible study.  The property the VanSteenhouse family bought is in one of the areas Leland Township designated a church-free zoning district.*

*A small, but vocal, group of activists opposed Youth for Christ Club's ministry to Leelanau County students. Among other demands, the activists demanded Leland Township deny Youth for Christ Club, its members, and students the right to assemble for prayer, Bible study, and fellowship at the private property on North Lake Street.  In response to the demands of the activists opposing Youth for Christ Club's ministry, the Township demanded Youth for Christ Club and Apollos Properties, LLC (the entity the VanSteenhouse family established to hold title to the North Lake Street property) submit an application for a Special Use Permit requesting the Township allow students to meet for prayer and Bible study at this private property on North Lake Street.  Apollos and Youth for Christ Club submitted an application for a Special Use Permit.  Leland Township's Planning Commission then denied the application for a permit - twice.*

*Leland Township's denial of Youth for Christ's right to assemble for prayer and Bible study violates the United States Constitution, the Michigan state constitution, and various federal and Michigan civil rights laws including the First, Fifth, and Fourteenth Amendments to the United States Constitution and the Equal Protection Clause of the United States Constitution.  Leland Township's decision to classify Youth for Christ Club as a forbidden "church" and not a "club" permitted to assemble at this private property is contrary to the text of Leland Township's Zoning Ordinance and is contrary to, and in excess of, any authority Michigan law granted Leland Township to regulate land use.*

*The Plaintiffs bringing this lawsuit ask this Court to affirm their constitutional and civil right to engage in Free Speech, the Free Exercise of Religion, the Right to Assemble and the Right to Worship.  The owner of the private property, Apollos, asks this Court to declare that Leland Township's denial of the owner's right to use (or allow its private property to be used) by students meeting for prayer and Bible study violates the Fifth Amendment's protection of private property.  The Plaintiffs ask this Court to declare Leland Township's Zoning Ordinance facially unconstitutional and unconstitutional as applied to, and enforced against, Youth for Christ Club and those persons participating in Youth for Christ Club activities at the North Lake Street property.*

iv

*Plaintiffs ask this Court to enjoin Leland Township from enforcing Leland Township's prohibition against, and regulation of, "Churches and Religious Institutions," (including clubs, and individuals) assembling for prayer, Bible study, and religious fellowship at private property in Leland Township.  Plaintiffs ask this Court to order Leland Township to allow Youth for Christ, and those students participating in Youth for Christ activities, to assemble, speak, worship, pray, and study the Bible at the private property on North Lake Street. The Plaintiffs also ask this Court to order Leland Township to pay the attorney fees and litigation expenses the Plaintiffs have had to incur defending these constitutional and civil rights, and the Plaintiffs ask this Court to order Leland Township to refund the fees and exactions the Township has required the Plaintiffs to pay the Township.*

*Plaintiffs have pled the specific detail and included relevant exhibits supporting the Plaintiffs' claims justifying this Court issuing a preliminary injunction.  The Plaintiffs' complaint contains the sufficient and specific detail under* Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and* Ashcroft v. Iqbal*, 556 U.S. 622, 679 (2009).  The Plaintiffs' complaint states a claim that is not speculative or blanket assertions of entitlement to relief without supporting factual allegations and thus satisfies Federal Rule of Civil Procedure 8(a).*

*Because the Plaintiffs are asking this Court to grant a preliminary injunction.  (Plaintiffs will be filing a separate motion and memorandum of law in support of a preliminary injunction). When "[a] plaintiff seek[s] a preliminary injunction [he] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."* Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, (2008) (Citing* Munaf v. Geren*, 553 U.S. 674, 689 – 690, (2008);* Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987);* Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–312, (1982).*

*Thus, to allow this Court to conclude that, on the basis of undisputed facts and established law, this Court may enter a preliminary injunction, the Plaintiffs have included in this complaint not just the minimum factual detail and allegations necessary to provide Leland Township fair notice of the Plaintiffs' claims and the grounds upon which the Plaintiffs' claims rest.  Doing so has resulted in this complaint being longer and more detailed and including more supporting exhibits. The Plaintiffs complaint, though lengthy, provides this Court with an organized, cogent and clear statement of the Plaintiffs' constitutional and statutory claims that not only satisfy Rule 8(a), but supports the Plaintiffs' request for a preliminary injunction under Rule 65.*

**TABLE OF CONTENTS[2]**

SUMMARY ................................................................................................................III

THE PARTIES...........................................................................................................1

    A.   Apollos Properties, LLC...............................................................................1

    B.   The Individual Plaintiffs...............................................................................1

            1.   James and Elizabeth VanSteenhouse ................................................1

            2.   Micah and Kya Cramer......................................................................1

    C.  Leland Township, Michigan.........................................................................2

    D.  The Leland Township officials......................................................................2

JURISDICTION AND VENUE ................................................................................3

THE GOVERNING CONSTITUTIONAL PROVISIONS,  FEDERAL AND MICHIGAN CIVIL RIGHTS LAWS,  AND TOWNSHIP ORDINANCES .......................................5

INTRODUCTION T*he* mise-en-scène *in which the present S*turm ünd Drang *arises.*..................10

FACTUAL BACKGROUND ....................................................................................20

    A.   Youth for Christ's Ministry in Leelanau County, Michigan. .........................20

        i)   Youth for Christ is an evangelical Christian ministry established by Torrey Johnson, Billy Graham, and others in the 1940s. .....................................20

        ii)  Youth for Christ Club's ministry to Leelanau County high school students. ...........21

        iii) Opposition to Youth for Christ's ministry to Leland Public School students. .........23

        iv) Leland Public School's Superintendent was hostile to Christianity and promoted a Progressive-Left political agenda. .........................................26

---

[2] Complaints in federal district court do not customarily include a table of contents.  But, because this complaint requests a preliminary injunction and pleads with particularity the facts and law supporting this Court issuing a preliminary injunction, this complaint is longer and more detailed than a typical complaint would be under the federal notice pleading standard.  For this reason, Plaintiffs provide this Table of Contents for the benefit of the Court and the parties.  See, for example, the complaint filed in *In Re: Vale S.A. Securities Litigation,* Case No. 1:15-cv-09539-GHW (Southern District of New York, April 29, 2016), that includes a table of contents.

B.  Apollos Properties, LLC purchased the North Lake Street property to provide a location where Leelanau County students could assemble for prayer, Bible study, and fellowship. ......................................................................................................32

C.  Leland Township's Zoning Ordinance and Master Plan. ...............................................37

D.  Leland Township's enforcement of the Township's Zoning Ordinance against Youth for Christ Club and Apollos. ...................................................................46

    1.  The Special Use Permit application. .............................................................46

    2.  The November 5, 2025 Planning Commission hearing. ................................47

    3.  The December 3, 2025 Meeting of the Planning Commission. ......................54

    4.  Thor Hearne's December 30 memorandum. ..................................................55

    5.  The January 7, 2026 Meeting of the Planning Commission. ..........................57

    6.  The Township counsel's February 3, 2026 Legal Opinion advised the Planning Commission that the Township should grant the Special Use Permit application and allow Youth for Christ Club to meet at the North Lake Street property. .....................................................................................65

    7.  Chris Bzdok's and Sean Clark's memorandum on behalf of Fishtown Preservation Society asking Leland Township to deny Youth for Christ Club the right to assemble at the North Lake Street property. .......................68

    8.  The February 11, 2026 Meeting of the Planning Commission. ......................70

    9.  The February 17, 2026 Memorandum to the Planning Commission. .............71

    10.  The February 18, 2026 meeting of the Planning Commission. ......................72

    11.  The Township's new attorney, Tom Grier, provided the Planning Commission two alternative proposals, one denying and one granting Youth for Christ the right to assemble at the Property. .................................76

    12.  The April 15, 2026 meeting of the Planning Commission. ...........................76

    13.  The aftermath of the Planning Commission's April 15 decision to deny Youth for Christ Club the right to assemble and the corrected Findings and Conclusions. ............................................................................................77

    14.  Jacob Danziger's March 17, 2026 and April 13, 2026 Letters to the Planning Commission. ..................................................................................77

    15.  Troposphere's April 9, 2026 Memorandum opposing Youth for Christ Club. ..............................................................................................................79

vii

16. Leland Township counsel, Tom Grier's, May 4, 2026 "Letter of Clarification." ...............................................................................79

17. Thor Hearne's May 5, 2026 Memorandum to Leland Township Planning Commission. ..............................................................79

18. The Planning Commission's May 6, 2026 meeting to correct the Planning Commission's April 15 Findings and Conclusions. ......................81

19. The appeal of the Planning Commission's denial of Youth for Christ Club's Special Use Permit application. ...........................................83

20. Leland Township's continued prohibition against students assembling for prayer and Bible study at the North Lake Street property. ......................85

**COUNT I** - Leland Township's Religious Gerrymander Prohibiting  "Churches And Religious Institutions" is a *per se* Facially Unconstitutional  Violation of the Free Exercise Clause of the First and Fourteenth Amendments...............................................92

    A. Leland Township's prohibition against persons assembling to pray, worship and study the Bible, is facially unconstitutional under the Free Exercise Clause..................92

    B. Relief requested to remedy Leland Township's violation of the First and Fourteenth Amendment protection of the Free Exercise of Religion..............................93

**COUNT II** - Leland Township's Zoning Ordinance is s *per se* Facial Violation of the  First and Fourteenth Amendments Guarantee of the Right of Free Speech...........................................93

    A. Leland Township's prohibition against "Churches and Religious Institutions" is a *per se*, facially unconstitutional, violation of Free Speech. ...........................................93

    B. Relief requested to remedy Leland Township's violation of the First and Fourteenth Amendments Right to Free Speech...............................................99

**COUNT III** - Leland Township's Zoning Scheme is an Unconstitutional  Prior Restraint Upon Those Freedoms Protected by the First Amendment.........................................100

    A. Leland Township's requirement that persons assembling for religious speech and worship may only do so if the Township grants a Special Use Permit is an unconstitutional prior restraint of those Freedoms guaranteed by the First and Fourteenth Amendments. ..........................................100

    B. Relief necessary to remedy Leland Township's unconstitutional prior restraint upon First Amendment freedoms. ...................................105

**COUNT IV** - Leland Township's Zoning Ordinance Violates the  First and Fourteenth Amendments Protection of the Right of Assembly ...................................106

viii

A. Leland Township's prohibition against persons assembling to pray, study the Bible and worship is facially unconstitutional under the First and Fourteenth Amendments.................................................................................................106

B. Relief requested to remedy Leland Township's violation of the First and Fourteenth Amendments' Right of Assembly...............................................109

**COUNT V** - Leland Township's Zoning Ordinance Violates the  Equal Protection Clause of the United States Constitution ..............................................................................110

A. Leland Tonwhip's discriminatory regulation of "Churches and Religious Institutions," including Youth for Christ Club, violates the Equal Protection Clause of the Constitution. .....................................................................................110

B. Relief requested because Leland Township's Zoning Ordinance violates the Equal Protection Clause of the United States Constitution. ....................................112

**COUNT VI** - Leland Township's Enforcement of its Zoning Ordinance as Applied  to Youth for Christ Club is Unconstitutional .....................................................................113

A. Leland Township's enforcement of is Zoning Ordinance, as applied to Youth for Christ Club, violates the United States Constitution. ....................................113

B. Relief requested because Leland Township's Zoning Ordinance as applied to Youth for Christ Club and its members is an unconstitutional violation of those freedoms guaranteed by the First Amendment...............................................114

**COUNT VII** - Leland Township Violated the Civil Rights Protected by the  Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA).........................................115

A. Leland Township's Zoning Ordinance and the Township's enforcement of the Zoning Ordinance prohibiting "Churches and Religious Institutions" violates RLUIPA.......................................................................................................115

    i) Congress adopted RLUIPA to prohibit states and local governments from using zoning laws to burden or discriminate against an individual's right to the free exercise of religion and religious assembly. .................................115

    ii) RLUIPA prohibits states and local government from imposing "substantial burdens" on religious assembly and speech and prohibits government from treating religious assemblies differently than nonreligious or secular assemblies. .................................................117

    iii) When a zoning ordinance expressly differentiates religious land uses from nonreligious land uses, the Plaintiff has established a *prima facia* violation of RLUIPA and the burden shifts to the government to justify, under the strict scrutiny standard of constitutional review..............................................119

B.    Relief requested to remedy Leland Township's violation of RLUIPA. ........................127

**COUNT VIII** - Violation of the Civil Rights Act of 1871 (The Ku Klux Klan Act), 42 U.S.C. § 1983 ................................................................................................................130

A.    Leland Township violated the Civil Rights Act of 1871. ...............................130

B.    Relief requested to remedy Leland Township's violation of the Civil Rights Act of 1871        ..................................................................................................134

**COUNT IX** - Leland Township Violated the Constitutional and Civil Rights Guaranteed by Article I of Michigan's State Constitution ..................................................................135

A.    Leland Township's Zoning Ordinance and enforcement of the Township's Zoning Ordinance against Youth for Christ Club violates Article I of the Michigan Constitution. ............................................................................135

B.    Relief requested to remedy Leland Township's violation of Article I of Michigan's state constitution. ..................................................................................137

**COUNT X** - Leland Township Violated the Elliott-Larsen Civil Rights Act, MCL 37.2101, *et seq*. .................................................................................................................138

A.    Leland Township violated the Elliott-Larsen Civil Rights Act when the Township discriminated against Youth for Christ because of Youth for Christ's religious beliefs and activities. ..................................................................138

B.    Relief requested to remedy Leland Township's violation of Michigan's Elliott-Larsen Civil Rights Act. ..................................................................140

**COUNT XI** - Leland Township's Prohibition Against "Churches and Religious Institutions" Exceeds the Lawful Authority Michigan's Zoning Enabling Act (MCL 125.301, *et seq*.)  Grants Leland Township ..................................................................141

A.    Leland Township exceeded and violated the Township's lawful authority under Michigan's Zoning Enabling Act. ..................................................................141

B.    Relief requested because Leland Township exceeded its authority under the Michigan Zoning Enabling Act. ..................................................................144

**COUNT XII** - Leland Township Planning Commission's Denial of Youth for Christ Club Special Use Permit to Assemble at the  North Lake Street Property is Contrary to Leland Township's Zoning Ordinance ..................................................................145

A.   Leland Township's Zoning Ordinance specifically allows "Clubs" to assemble at private property in the C-1 mixed-use district...............................................145

B.   Relief requested because Leland Township's Zoning Ordinance allows Youth for Christ Club to assemble at the North Lake Street Property...........................................151

**COUNT XIII** - Leland Township Violated Apollos's Fifth Amendment Right to Private Property.........................................................................................................................152

A.   Leland Township violated the Fifth Amendment by taking Apollos' right to own and use its private property without paying just compensation and without legitimate public purpose. ..................................................................................152

B.   Relief necessary to address Leland Township's taking and regulation of Apollos's private property in violation of the Fifth Amendment. ..................................................154

VERIFICATION OF COMPLAINT ..........................................................................................155

xi

**TABLE OF EXHIBITS**

Exhibit 1          Bluewater Thumb YFC Tax Exemption Materials

Exhibit 2          Transcript of Planning Commission November 5, 2025 Meeting

Exhibit 3          Michael Rice February 13, 2025 Memorandum

Exhibit 4          Stephanie Long's July 2020 Letter to Public School Students

Exhibit 5          September 6, 2022 *New York Times Magazine* Article

Exhibit 6          *Glen Arbor Sun* November 21, 2025 Article

Exhibit 7          Mead Treadwell and tenants Letters in Support of YFC Application

Exhibit 8-A        Leland Planning Commission's Findings and Conclusions Approval Draft

Exhibit 8-B        Leland Planning Commission's Findings and Conclusions Denial Draft

Exhibit 9-A        May 4, 2026 Letter from Tom Grier

Exhibit 9-B        Exhibits to May 4, 2026 Tom Grier Letter

Exhibit 10         Apollos and Youth for Christ Club Special Land Use Permit Application

Exhibit 11         Robert Parker's November 25, 2025 Memorandum in Support of YFC

Exhibit 12         November 5, 2025 Leland Planning Commission's Agenda

Exhibit 13         Brad Wierda's February 3, 2026 Memorandum

Exhibit 14         December 3, 2025 Leland Planning Commission Website Notification

Exhibit 15         *Glen Arbor Sun* February 18, 20026 Update Article

Exhibit 16         Thor Hearne Memorandum I - December 30, 2025

Exhibit 17         Thor Hearne's Biography

Exhibit 18         January 7, 2026 Planning Commission Transcript

Exhibit 19         February 11, 2026 Planning Commission Agenda

Exhibit 20         Troposphere Memorandum I – February 9, 2026

Exhibit 21         Thor Hearne Memorandum II - February 17, 2026

Exhibit 22         February 18, 2026 Planning Commission Agenda

Exhibit 23         February 18, 2026 Planning Commission Minutes

Exhibit 24         Transcript of Planning Commission's February 18, 2026 meeting

Exhibit 25         Bill White's resume as submitted to the Planning Commission

Exhibit 26         April 15, 2026 Planning Commission Agenda

Exhibit 27         April 15, 2026 Planning Commission Minutes

Exhibit 28         April 23, 2026 Youth for Christ Club's First Notice of Appeal

Exhibit 29        Jacob Danziger March 17, 2026 Letter.

Exhibit 30        Jacob Danziger April 13, 2026 Letter

Exhibit 31        Troposphere Memorandum II – April 9, 2026

Exhibit 32        Thor Hearne Memorandum III - May 5, 2026

Exhibit 33        May 6, 2026 Planning Commission Amended Agenda

Exhibit 34        Amended Findings and Conclusions of Denial

Exhibit 35        Leland Township Board of Trustees May, 11, 2026 Agenda

Exhibit 36        May 15, 2026 Youth for Christ Club's Second Notice of Appeal

Exhibit 37        Wierda Invoices, Grier Invoices, and Teichner EL

Exhibit 38        *Leelanau Enterprise*, LEGAL REPRESENTATION APPROVED FOR YFC APPEAL

Exhibit 39        Letter from Robert Parker to Tom Grier re: Resumption of Activities

Exhibit 40        Emails from Leland Township re: $8,000 deposit for appeal

Exhibit 41        Letter to Leland Township Clerk Enclosing Escrow Check

Exhibit 42        June 8 Leland Township Board of Trustees Agenda

Exhibit 43        *LEELANAU ENTERPRISE* Article re Concerns Pressed at Meeting

Exhibit 44        June 26 Letter from Lauren Teichner to R. Parker re: Apollos Appeal

Exhibit 45        June 10 Staff Report to Zoning Board of Appeals by Lauren Teichner

Exhibit 46        *Lee Cory v. Clint Mitchell* Complaint

Exhibit 47        July 15 Township Board Agenda

Exhibit 48        Social Media Posts re: Opposition to Youth for Christ Club

Exhibit 49        July 20 Township Board Agenda

Exhibit 50        July 20 Township Board Meeting Cancellation Post

Exhibit 51        July 28 Township Board Agenda

Exhibit 52        June 28 *EAGLE REPORTER* MLive Article

## THE PARTIES

### A. Apollos Properties, LLC.

1. Apollos Properties, LLC ("Apollos") is a Michigan limited liability company formed February 13, 2025. Apollos was created by the VanSteenhouse family to acquire, invest in and hold title to the property at 110 North Lake Street in Leland Michigan (the "Property" or the "North Lake Street property").

### B. The Individual Plaintiffs

#### 1. James and Elizabeth VanSteenhouse

2. James and Elizabeth VanSteenhouse are Michigan citizens and residents of Leelanau County and Leland Township.

3. James and Elizabeth VanSteenhouse own Apollos Properties, LLC, which is the entity they established to acquire title to the property at 110 North Lake Street.

4. James and Elizabeth VanSteenhouse support Youth for Christ Club.

5. James and Elizabeth VanSteenhouse participate in activities hosted by Youth for Christ Club at the 110 North Lake Street property including assemblies to pray and study the Bible.

#### 2. Micah and Kya Cramer

6. Micah and Kya Cramer are Michigan citizens and residents of Leelanau County and Leland Township.

7. Micah and Kya Cramer support Youth for Christ Club. Micah and Kya are campus life ministers with Youth for Christ ministering to high school students in Leelanau County, Michigan.

8. Micah and Kya Cramer participate in activities including prayer and Bible study hosted by Youth for Christ Club at the 110 North Lake Street property.

**C.        Leland Township, Michigan.**

9.        The Defendant, Leland Township, is a general law township in Leelanau County, Michigan. Leelanau County includes the Village of Leland.  Leland Township is a creature of statute and not an independent sovereign entity.

10.        Leland Township is a general law township governed by the General Law Township Act MCL 41.1 *et seq*.  The General Law Township Act defines the authority of Michigan townships including a township's "powers, privileges, immunities, and liabilities." Townships established under Michigan's General Law Township Act are distinguished from townships established and governed by the Michigan Charter Township Act (Act 359 of 1947, MCL 42.1).

11.        The General Law Township Act (MCL Section 41.1-41.1107) governing Leland Township provides that Leland Township's authority is limited to those expressly delegated powers with only limited police power and limited ordinance authority.  A general law township is granted less independence than a township established and governed under the Charter Township Act.

12.        Michigan's Zoning Enabling Act (MCL 125.3801 *et. seq*.) grants Leland Township the authority to create a township planning commission.  (MCL 125.3815(1)).  Leland Township established such a planning commission.  See Leland Township Zoning Ordinance adopted July 8, 1996, as subsequently amended.  Leland Township also adopted a Zoning Ordinance and Master Plan. See below, Paragraph 25(p), and n. 4.

**D.        The Leland Township officials.**

13.        Leland Township is governed by a five-member Board of Trustees.  The individuals currently serving as the Trustees of Leland Township are Clint Mitchell (Supervisor), Lisa Brookfield (Clerk), Shirley Garthe (Treasurer), Greg Kuntz (Treasurer), and Steve Scales (Trustee).

14.     The members of the Leland Township Planning Commission during the times relevant to this litigation are (or were) Ross Satterwhite (Chairman through December 2025 when he resigned), Lee Cory (member at all relevant times and successor Chairwoman after January 2026), Skip Telgard (Secretary), Steve Scales (Township Board Representative), Sam Simpson (Vice Chairman), and Brian Fenlon (member appointed in January 2026 to replace Ross Satterwhite). On May 11, Leland Township appointed Bill White to the Planning Commission.

15.     The members of the Leland Township Zoning Board of Appeals are: Kathy Dawkins (Chairwoman), Brooks Bunbury, James Carpenter, Lee Cory (Planning Commission Representative to the Zoning Board of Appeals), Susan Och, Nancy Smith, and Lauren Cypher who was appointed on May 11, 2026.  Lauren Cypher is the ex-daughter-in-law of former Leland Township Zoning Administrator, Tim Cypher.  In June Brooks Bunbury resigned from the Zoning Board of Appeals. On June 9, Lauren Cypher resigned from the Zoning Board of Appeals to become Interim County Administrator of Leelanau County.

16.     Leland Township scheduled a meeting on July 20 to meet and appoint Mary Linguar and Lisa Psenka to be members of the Zoning Board of Appeals and Tony Borden and Lynn Dunn to be alternate members of the Zoning Board of Appeals.  That meeting was cancelled due to "room overcapacity," and was rescheduled for July 28.  See **Exhibit 49** (Leland Township Board July 20 post on their website) and **Exhibit 51** (July 28 Township Board Special Meeting Agenda).  On July 28 the meeting was held at the Fire Station, where more than 100 people appeared.  At this meeting, Leland Township appointed Mary Linguar, and Lisa Psenka as members, and appointed Tony Borden and Lynn Dunn as alternate members.

## JURISDICTION AND VENUE

17.     This lawsuit arises under the Equal Protection Clause and the First, Fifth, and Fourteenth Amendments to the United States Constitution, the various federal civil rights laws

3

cited in this Complaint, including the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Religious Land Use and Institutionalized Persons Act (RLUIPA) (42 U.S.C. 2000 *et seq.*), and the Michigan Constitution and Michigan civil rights laws including the Elliott-Larsen Civil Rights Act.

18.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

19.    Title 28 § 1343 (a) (4) provides, "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: …(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

20.    Title 28 § 1367(a) provides, "...in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related ... that they form part of the same case or controversy under Article III of the United States Constitution."

21.    This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.  Section 2201 provides: "In a case of actual controversy within its jurisdiction, except with respect to [certain exceptions that are not relevant] … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." … "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

4

22. Plaintiffs' claim for attorney fees and costs is authorized by 42 U.S.C. § 1988 providing, "In any action or proceeding to enforce" certain federal civil rights laws, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs."

23. This Court possesses the authority to grant injunctive relief by reason of 28 U.S.C. § 1331, providing federal courts jurisdiction over federal questions and allowing courts to exercise equitable remedies. See also, *Ex Parte Young*, 209 U.S. 123 (1908), and Federal Rules of Civil Procedure 57 and 65.

24. Venue is proper in this Court under 28 U.S.C. § 1391(b) because: (i) Leland Township is located in Leelanau County, Michigan which is in the judicial district of the United States District Court for the Western District of Michigan, and (ii) the events, actions or omissions giving rise to the Plaintiffs' claims occurred in this judicial district. Title 28 U.S.C. § 1391 provides, "A civil action may be brought in - (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; …"

**THE GOVERNING CONSTITUTIONAL PROVISIONS,
FEDERAL AND MICHIGAN CIVIL RIGHTS LAWS,
AND TOWNSHIP ORDINANCES**

25. The following provisions of the United States Constitution, Michigan constitution, federal and Michigan civil rights law and Leland Townships Ordinances give rise to the Plaintiffs' claims.

a. **The First Amendment to the United States Constitution** provides,

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

5

b. **The Fifth Amendment to the United States Constitution** provides,

"No person shall…be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."[3]

c. **The Fourteenth Amendment to the United States Constitution, § 1** provides,

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

d. **The United States Constitution's Equal Protection Clause** states,

"No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

e. **The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)** (U.S.C. §§ 2000cc through 2000cc-5) provide in relevant part,

"No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution

f. **The Religious Freedom Restoration Act (RFRA) (**42 U.S.C. §§ 2000bb through 2000bb-4) provide,

"Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability…"

g. **The Civil Rights Act of 1871 (**42 U.S.C. §1983) provides,

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

---

[3] This provision applies to all state and local government entities through its incorporation by the Fourteenth Amendment.  See, *Chicago, Burlington & Quincy Railroad Co. v. City of Chicago,* 166 U.S. 226 (1897).

6

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

h. **The Civil Rights Attorney Fee Act**, (42 U.S.C. §1988) provides,

"In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, RFRA, RLUIPA, the Civil Rights Act or section 12361 of Title 34, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs…"

i. **The Michigan State Constitution 1963, Article 1 Section 2** provides,

"No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin."

j. **Michigan's Constitution, Article I Section 3** states,

"The people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances."

k. **Michigan's Constitution, Article I, Section 4**, states,

"Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes, or other rates for the support of any minister of the gospel or teacher of religion … The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief."

l. **Michigan Constitution, Article I, Section 5,** states,

"Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

m. **Michigan's Zoning Enabling Act. (**MCL 125.3101–125.3702) defines the authority townships and local Michigan officials are granted to regulate an owner's use of the owner's land.  The purpose of the Michigan Zoning Enabling Act is to promote "the public health, safety, and general welfare." The Michigan Zoning Enabling Act provides,

7

"A local unit of government may provide by zoning ordinance for the regulation of land development and the establishment of 1 or more districts within its zoning jurisdiction which regulate the use of land and structures to meet the needs of the state's citizens for food, fiber, energy, and other natural resources, places of residence, recreation, industry, trade, service, and other uses of land. …

Except as otherwise provided in this act, the regulations shall be uniform for each class of land or buildings, dwellings, and structures within a district."

n. **Michigan Planning Enabling Act,** (MCL 125.3801-125.3885) (as amended through 2024 PA 153, eff. Apr. 2, 2025), provides that,

"A township planning commission must consist of 5, 7, or 9 members. Members … generally serve three-year staggered terms ... the chief elected official shall appoint members of the planning commission, subject to approval by a majority vote of the members of the legislative body elected and serving ...

A city, village, or township planning commission shall consist of 5, 7, or 9 members ... Members of a planning commission … shall be appointed for 3-year terms. However, of the members of the planning commission, other than ex officio members, first appointed, a number shall be appointed to 1-year or 2-year terms such that, as nearly as possible, the terms of 1/3 of all the planning commission members will expire each year. If a vacancy occurs on a planning commission, the vacancy must be filled for the unexpired term in the same manner as provided for an original appointment. A member shall hold office until a successor is appointed.

The membership of a planning commission must be representative of important segments of the community, such as the economic, governmental, educational, and social development of the local unit of government, in accordance with the major interests of the local unit of government, such as agriculture, natural resources, recreation, education, public health, government, transportation, industry, housing, and commerce. The membership must also be representative of the entire territory of the local unit of government to the extent practicable.

o. **The Michigan Elliott-Larsen Civil Rights Act,** (MCL 37.2101 *et seq*.) (ELCRA) provides in relevant part,

"The opportunity to obtain employment, housing, and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, sexual orientation, gender

8

identity or expression, height, weight, familial status, or marital status as prohibited by this act, is recognized and declared to be a civil right."

p. **The Leland Township Zoning Ordinance and Master Plan.** Pursuant to its authority under the Michigan Zoning Enabling Act, Leland Township adopted and amended a Zoning Ordinance and Master Plan.[4] The current version of Leland Township's Zoning Ordinance (the Zoning Ordinance) was adopted July 8, 1996, as amended through October 2016. The current Master Plan was adopted September 4, 2004 (the Master Plan).

q. **The Leland Township General Code Penalty Ordinance** (ordinance 2016-02) provides,

"The penalty for a misdemeanor violation shall be a fine not exceeding $500 (plus costs of prosecution), or imprisonment not exceeding 93 days, or both… Each day on which any violation of an ordinance continues constitutes a separate offense and shall be subject to penalties or sanctions as a separate offense."

---

[4] The Zoning Ordinance is available at:
https://cms3.revize.com/revize/leelanaucounty/Documents/Townships/Leland/Service s/Ordinances%20Plans%20And%20Policies/complete_zo_october_2016_1.pdf?utm_ source=chatgpt.com.

The Master Plan is available at:
https://cms3.revize.com/revize/leelanaucounty/Documents/Townships/Leland/Services/Ordinanc es%20Plans%20And%20Policies/NEW%20LELAND_TWP_MASTER_PLAN_FEB_2025.pdf? t=202511261025090&t=202511261025090.

9

**INTRODUCTION**
*The* mise-en-scène *in which the present S*turm ünd Drang *arises.*

26.    Leelanau County is a peninsula in northern lower Michigan between the shores of Lake Michigan and Traverse Bay.  The Village of Leland is a small historic fishing village on Lake Michigan where weathered docks, waving American flags, patriotic parades, and generations of lakefront tradition create a Norman Rockwellian picture of small-town America.  According to the 2020 census, Leelanau County has a population of 22,301.  Leland Township has a year-round population of 2,126 persons.  Because of its amazing natural beauty and climate, over the past century many families established a summer residence in Leland.  Hence, the number of residents, summer residents, and tourists in Leland Township increase significantly during the summer months.

27.    Leland is a quintessential American village embodying the values Norman Rockwell captured in his famous series of four *Saturday Evening Post* covers, celebrating American virtues.  *Freedom of Speech,* depicting an ordinary man standing in a town meeting expressing his views while others listen respectfully.  *Freedom of Worship,* showing people of different faiths praying and emphasizing religious tolerance. *Freedom from Want*, often called the "Thanksgiving painting," portraying a family gathered around a holiday dinner table with a turkey.  And *Freedom from Fear* showing parents tucking their children into bed while holding a newspaper with headlines about the Second World War symbolizing safety and peace at home in the midst of world turmoil.

28.    No community, Leland, Michigan included, fully realizes the Rockwellian ideal.  But Leland comes close with patriotic Independence Day parades down Main Street and people of various political, ideological and religious views gathered in a common celebration of shared values.  The Leelanau County Republican Party parade float is followed by the Leelanau County

10

Democrat Party float, and the Methodist Church float follows the St. Mary's Catholic School float. This religious and political diversity, respect, and tolerance have historically been a celebrated characteristic of the Leland community and is the strength of this community.

29.     Following World War II, Torrey Johnson, Billy Graham, and others founded Youth for Christ to share the Gospel of Jesus Christ with troops returning from Europe.  Youth for Christ affirms and proclaims orthodox and traditional Christian beliefs in accordance with those declarations in the Nicene Creed and the Apostle's Creed.

30.     Youth for Christ is not a church, nor is Youth for Christ affiliated with a particular Christian denomination.   Rather, Youth for Christ is a "parachurch" youth ministry that compliments and comes along side Christian churches, and other like-minded partners, to serve youth seeking to learn about the Christian faith and Jesus Christ.  Some students participating in Youth for Christ Club activities attend Protestant and Catholic churches.   Other students participating in Youth for Christ Club activities have no affiliation with any organized religious congregation or institution.

31.     Youth for Christ sponsors local chapters and "clubs" in communities throughout the United States and internationally.  The youth leaders serving with local Youth for Christ Clubs are trained and supervised by senior staff with Youth for Christ.

32.     Bluewater Thumb Youth for Christ is a Michigan nonprofit and ecclesiastical corporation incorporated in 1975. (In this Complaint, we refer to Bluewater Thumb Youth for Christ, Inc. as the "Youth for Christ Club").  The Internal Revenue Service recognized Bluewater Thumb Youth for Christ to be a charitable organization under Section 501(c)(3) of the Internal Revenue Code.  See **Exhibit 1**. Bluewater Thumb Youth for Christ is a chartered affiliate of Youth

11

for Christ/USA, Inc.  Youth for Christ was established to proclaim the Gospel and teachings of Jesus Christ as declared in the Bible and traditional orthodox Christianity.

33.    James and Elizabeth VanSteenhouse live in Leland and own a home and property in Leland Township.  James and Elizabeth VanSteenhouse's children attended Leland Public School.

34.    James and Elizabeth VanSteenhouse recognized that Leelanau County lacked a countywide Christian youth ministry focused on serving high school students.  After evaluating several ministry models, including Young Life and Youth for Christ, they concluded that Youth for Christ's leadership structure, accountability, and organizational support were better suited to serve students and families in Leelanau County.  The VanSteenhouse family subsequently worked with Todd Cramer, Executive Director of Bluewater Thumb Youth for Christ, to establish a Youth for Christ Club ministry in Leelanau County.  Micah and Kya Cramer serve as Campus Life Directors with the Leelanau County Youth for Christ Club.

35.    Our Nation endured a season of political and cultural discord during the Civil Rights movement in the 1960s, including the assassinations of President John F. Kennedy, Bobby Kennedy and the Reverand Martin Luther King, Jr.  During that era our nation was riven by racial division and intolerance.  See, Shelby Steele, *WHITE GUILT: HOW BLACKS AND WHITES TOGETHER DESTROYED THE PROMISE OF THE CIVIL RIGHTS ERA,* and *THE CONTENT OF OUR CHARACTER: A NEW VISION OF RACE IN AMERICA,* Thomas Sowell, *CIVIL RIGHTS: RHETORIC OR REALITY?,* Paul Johnson, *A HISTORY OF THE AMERICAN PEOPLE* (1st US Ed. 1997), pp. 897-893, and Amity Shlaes, *GREAT SOCIETY, A NEW HISTORY* (1st Ed. 2019), pp. 113-121.

12

36.    The Civil Rights movement led to Congress adopting the Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 (1960), codified as 52 U.S.C. §§10101 *et seq.*, and the Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (1965), codified as 52 U.S.C. §§10101 *et seq*.

37.    Our Nation is, unfortunately, now experiencing a season of religious intolerance, bigotry, and disharmony.  The *2026 REPORT BY THE TASK FORCE TO ERADICATE ANTI-CHRISTIAN BIAS* (the *TASK FORCE REPORT*) and President Trump's Executive Orders describing the rise of antisemitism and anti-Christian bigotry. Executive Order 14202 - "*ERADICATING ANTI-CHRISTIAN BIAS*" (February 6, 2025), Executive Order 13798 - "*PROMOTING FREE SPEECH AND RELIGIOUS LIBERTY*" (May 4, 2017), Executive Order 13899 - "*COMBATING ANTI-SEMITISM*" (December 11, 2019), and Executive Order 14188 - "*ADDITIONAL MEASURES TO COMBAT ANTI-SEMITISM*" (January 29, 2025), explain and document specific instances of anti-Christian and antisemitic bias, bigotry, and suppression of Christians and Jews.

38.    Religious intolerance by individuals given to bigotry and antipathy against Christians, Jews, and persons that follow Judeo-Christian teaching and faith have incited and engaged in political violence against faith-based assemblies and those affiliated with Christian and Jewish faith-based organizations.  The assassination of Charlie Kirk of Turning Point USA, mass shootings of children and others at churches and Christian schools, and antisemitic violence directed against Jewish students are recent examples of this religious bigotry and intolerance.[5]

---

[5] See for example, Abundant Life Christian School in Madison, Wisconsin in December 2024; Annunciation Catholic Church and School in Minneapolis, Minnesota in August 2025; Richmond Road Baptist Church in Lexington, Kentucky in July 2025; the CrossPointe Community Church in Wayne Michigan in June 2025; and the Covenant Presbyterian Church School in Nashville Tennessee in March 2023 by a 28-year-old transgender individual who killed three nine-year old children and three adult staff members.  The Anti-Defamation League reported that 2025 saw one of the highest levels of antisemitic assaults recorded in decades including two Israeli Embassy staffers who were assassinated outside an event at the Jewish Museum in Washington, D.C.

39.     Religious intolerance and bigotry include efforts by public schools and local government officials to suppress speech and assembly of Christian and faith-based organizations and individuals.  The *TASK FORCE REPORT* found,

> Christians and other people of faith also face bias from state and local governments and the private sector. … state governments and private entities have implemented numerous policies that harm people of faith. … the Task Force repeatedly heard examples of anti-Christian bias and areas where the First Amendment and statutory promises of religious liberty have not been realized in American communities. … [Including] religious discrimination or unequal treatment impacting Christians … efforts to force out Christian charities via zoning enforcement, limitations on Christians' parental rights, coercion of particular viewpoints in public education. … The Task Force concludes its findings by assessing the harms of anti-Christian bias, which extend far beyond individual Christians and touch broader American communities of all kinds. *TASK FORCE REPORT*, p. vi.

40.     A small, but very vocal and determined, group of activists opposed Youth for Christ's ministry in Leelanau County.  These activists organized and demanded Leland Public School exclude Youth for Christ and Youth for Christ's Campus Life Directors from participating in volunteer activities at the public schools of Leelanau County.  The principal at Suttons Bay public school told Micah Cramer, Youth for Christ Campus Life Director, that Micah was not allowed to participate in a volunteer role at Suttons Bay Public School.

41.     The VanSteenhouse family wanted to provide Leelanau County students a convenient and accessible location for Christian youth ministry where students could gather for prayer and Bible study.  The North Lake Street property provided an ideal location for students to meet for prayer, Bible study, and other youth ministry activities.

42.     The VanSteenhouse family bought the North Lake Street property in early 2025 with the intention that Youth for Christ Club could use a portion of the building at North Lake Street as a venue where Leelanau County students could assemble.  The North Lake Street property where Youth for Christ met, and desires to still meet, is not a public forum. The North Lake Street

14

building is private property owned by an entity the VanSteenhouse family established to acquire the property for the purpose of allowing Youth for Christ Club and its members to assemble.

43.    After the VanSteenhouse family bought the North Lake Street property, high school students in Leelanau County, Michigan assembled at the North Lake Street property. Campus Life High School Directors, Micah and Kya Cramer, met with Leelanau County students at the North Lake Street property for prayer, fellowship, and Bible study and other Christian youth ministry activities.

44.    Individuals opposing Youth for Christ Club's ministry in Leelanau County then organized a campaign to prevent Youth for Christ Club from meeting at the privately owned North Lake Street property. The opponents of Youth for Christ Club enlisted Leland Township and Leland Township officials in their opposition to Youth for Christ. The opponents of Youth for Christ demanded Leland Township deny Youth for Christ Club the right to assemble at the North Lake Street property.

45.    Leland Township's Planning Commission acceded to the demands of the activists and the Township ordered Youth for Christ Club, its members, students, parents, and others to not assemble at the North Lake Street property unless Youth for Christ Club first applied for, and the Township granted, Youth for Christ Club a Special Use Permit allowing Youth for Christ Club and its members to assemble at the North Lake Street property.

46.    In October 2025, Youth for Christ Club and Apollos submitted an application for a Special Use Permit. Leland Township's Planning Commission then denied Youth for Chris Club's application for a Special Use Permit to meet at the North Lake Street property – twice.

47.    Leland Township, the Leland Township Trustees, and members of the Planning Commission were repeatedly told that denying Youth for Christ Club the right to assemble, speak,

15

study the Bible, and worship at the private property on North Lake Street violates the United States Constitution, the Michigan constitution, and various Michigan and federal civil rights laws. Leland Township was also told Leland Township's prohibition against and regulation of "Churches and Religious Institutions" was beyond Leland Township's lawful authority and was unconstitutional.

48.     Leland Township's own attorney told the members of the Planning Commission that the Township should permit Youth for Christ to meet at the North Lake Street property.  The Township's attorney told the Planning Commission members that Youth for Christ Club assembling for prayer and Bible study was a use of the North Lake Street property that is allowed by, and is consistent with, the Zoning Ordinance.

49.     The Township's attorney told the Planning Commission members that denying Youth for Christ and its members the right to meet at the private property on North Lake Street potentially violated the United States Constitution and civil rights laws including the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C 2000cc-2000cc-5 (RLUIPA).

50.     Leland Township officials, the Township's legal counsel, and the members of the Planning Commission were also provided the United States Department of Justice's guidance and direction that RLUIPA required townships and local government zoning authorities to comply with RLUIPA and that denying religious assembly at private property such as the North Lake Street property violated RLUIPA.

51.     When the Planning Commission met and voted to deny Apollos' and Youth for Christ's application for a Special Use Permit to meet at the North Lake Street property, Leland Township officials knew that local government using zoning and land use laws to deny churches and persons the right to assemble, worship, speak, and associate for religious purposes violated

RLUIPA, violated the United States Constitution, violated the Michigan constitution, and violated federal and Michigan civil rights laws.

52.    Under Leland Township's ordinances persons participating in speech, prayer, Bible study, and worship at the North Lake Street property are subject to criminal penalties of $500 and 93-days in jail for *each time* they met at the privately-owned property.

53.    Leland Township's violations of the United States Constitution, federal civil rights laws and those rights and freedoms guaranteed by the Michigan constitution and Michigan state law are especially egregious because Leland Township did not unwittingly stumble into these constitutional and civil right violations.  Rather, Leland Township and the members of the Leland Township Planning Commission had been repeatedly advised *by its own legal counsel* and by other prominent attorneys that denying Youth for Christ Club the right to assemble at private property for prayer and Bible study is beyond the Township's authority and violates the constitutional and civil rights of Youth for Christ Club and the students and staff participating in Youth for Christ Club activities.

54.    Yet, despite this knowledge, and contrary to the advice of its own legal counsel, Leland Township denied Youth for Christ Club, and those persons participating in Youth for Christ Club activities, their civil and constitutional right to assemble, speak, associate and worship. Leland Township's denial of the Plaintiffs' and other persons' constitutional and civil rights was made knowingly, intentionally and with the understanding that, by doing so, the Township was engaged in unconstitutional and illegal conduct.

55.    Even though possessing this knowledge, a majority of the Planning Commission (Chairwoman, Lee Cory, Skip Telgard, Sam Simpson, and Brian Fenlon) nonetheless, voted *twice* to deny Youth for Christ Club the right to meet at the North Lake Street property.  Planning

17

Commission member Steve Scales voted to grant the Special Use Permit and allow Youth for Christ Club to assemble at the North Lake Street property.

56.    As detailed in this complaint, Leland Township knowingly and intentionally violated the First, Fifth, Fourteenth Amendments and the Equal Protection Clause of the United States Constitution and numerous federal civil rights laws including RLUIPA, the federal Civil Rights Act of 1871 (the Ku Klux Klan Act) (42 U.S.C §1983), and Michigan's Constitution and Michigan civil rights statutes including Michigan's Elliott-Larsen Act (MCL 37.2101 *et seq.*).

57.    The Plaintiffs ask this Court to declare Leland Township's Zoning Ordinance to be:

(a)  Facially unconstitutional under the First Amendment's Free Exercise Clause (**Count I**);

(b)  Facially unconstitutional under the First Amendments' guarantee of Free Speech (**Count II**);

(c)  Facially unconstitutional as a prior restraint upon the freedoms guaranteed by the First Amendment (**Count III**);

(d)  Facially unconstitutional as a prohibition of the Right of Assembly guaranteed by the First Amendment (**Count IV**);

(e)  A facial violation of the United States Constitution's Equal Protection Clause (**Count V**);

(f)  Unconstitutional as applied to, and enforced against, Youth for Christ Club, a faith-based assembly of persons seeking to worship, pray, and study the Bible at private property (**Count VI**);

(g)  A violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C 2000cc-2000cc-5 (RLUIPA) (**Count VII**);

(h)  A violation of the federal Civil Rights Act of 1871, as codified at 42 U.S.C. §1983 (**Count VII**);

(i)  A violation of Michigan's Constitution Article I, Sections 3, 4, and 5 (**Count IX**);

(j)    A violation of Michigan's Elliott-Larsen Civil Rights Act (MCL 37.2101 *et seq.*) that protects an individual's right to exercise those rights, including religion and speech, guaranteed by the Michigan State Constitution and the United States Constitution (**Count X**);

(k)    Contrary to, and in excess of, any authority Leland Township has been granted under Michigan's Zoning Enabling Act, PA 110 of 2006, MCL 125.3101 (*et seq.*) (**Count XI**);

(l)    This Court should further find the Township's denial of Youth for Christ Club's right to assemble at the North Lake Street property to be contrary to Leland Township's Zoning Ordinance that explicitly permits "clubs" in this zoning district (**Count XII**); and,

(m)    A violation of Apollos right to own, use and enjoy private property guaranteed by the Fifth Amendment to the United States Constitution (**Count XIII**).

58.    Plaintiffs also ask this Court to issue a preliminary injunction prohibiting Leland Township from enforcing its Zoning Ordinance and from prohibiting Youth for Christ Club, Apollos, or any person from, assembling for prayer, Bible study and fellowship at the North Lake Street property.  Plaintiffs will file this request for a preliminary injunction in a separate motion with a memorandum of law in support.

59.    Finally, the Plaintiffs ask this Court to order Leland Township to refund the fees Leland Township required the Plaintiffs to pay, and pay the Plaintiffs' attorney fees, litigation costs and other damages as may be established at trial or agreed to by the Parties.

## FACTUAL BACKGROUND

### A.        Youth for Christ's Ministry in Leelanau County, Michigan.

i)        **Youth for Christ is an evangelical Christian ministry established by Torrey Johnson, Billy Graham, and others in the 1940s.**

60.        Youth for Christ International "is a worldwide Christian movement working with young people around the globe. Motivated by our own faith, we give young people everywhere the opportunity to be followers of Jesus Christ."  See, https://yfci.org.

61.        Youth for Christ has been recognized by the Internal Revenue Service to be a Section 501(c)(3) tax exempt public charity.  See **Exhibit 1**, *supra*.

62.        Youth for Christ's website explains, "[f]or over seventy years, Youth for Christ has been communicating the life-changing message of Jesus Christ to young people. Youth for Christ was born in the mid-1940s through an impulse from the heart of God that simultaneously touched dozens of leaders with a concern to reach young people that normal church channels were missing. …  In 1944 Chicago pastor Torrey Johnson was elected Youth for Christ's first president, with Billy Graham as its first full-time evangelist.", https://yfci.org/about/history/.  Youth for Christ makes, "prayer and the Word of God the foundation of our movement."  *Id*.

63.        Youth for Christ has declared its mission to be "a global movement committed to reaching young people everywhere. As part of the Body of Christ, our vision is to see every young person in every people group and nation have the opportunity to make an informed decision to follow Jesus Christ and become part of a local church. … We are passionate about responsible youth evangelism, discipleship, and raising lifelong followers of Jesus who live out their faith with godliness, devotion to Scripture and prayer, and a commitment to social involvement sharing Christ's love."  *Id*.

64.     During the November 5, 2025 Planning Commission hearing, Todd Cramer described Youth for Christ's ministry in Leelanau County.  The transcript of the November 5, 2025 meeting of the Planning Commission is attached as **Exhibit 2**.

65.     Todd Cramer explained, "Youth for Christ started 80 years ago. There were two guys in Florida fishing. Billy Graham and Torrey Johnson. And they're worried about, what are we going to do with all these young men coming back from World War II and how are we going to evangelize for them? How are we going to help them? And they came up with this idea of let's start an organization to reach these folks called Youth for Christ. That's 81 years ago. Billy Graham was the first paid full-time employee, and you know his history … There are 120-plus chapters in the United States. A chapter is assigned a certain geographic area." **Exhibit 2**, p. 6.

> ### ii)    Youth for Christ Club's ministry to Leelanau County high school students.

66.     Bluewater Thumb Youth for Christ, Inc., is a chartered affiliate of Youth for Christ International.  See Paragraph 59, *supra*. and **Exhibit 1**.

67.     Todd Cramer told the Planning Commission that the Youth for Christ Club chapter in Leelanau County is a new potential chapter in Michigan, "they have weekly prayer groups…" "ready to become hopefully the eleventh chapter [of Youth for Christ] in the state of Michigan." Todd Cramer told the Planning Commission,

> Campus Life is the model that we use mostly in Michigan, but we're smaller, rural, as in Leelanau County. And so Campus Life is outreach to middle school and high school students, and we're starting here by focusing on high school students. And so Campus Life has programs and they have a Campus Life club, and a Campus Life club is an open club. What that means is you have to be a high school student in this area. You're invited, maybe you're invited by Micah, maybe you're invited by one of these guys *(points to two Leland minor-students in the front row)*. And you come to the Club and you check it out and it could be something that you want to join so to speak.  **Exhibit 2** at 7.

21

68.    Todd Cramer told the Planning Commission members that the Campus Life programs "love to have spaces like this storefront [on North Lake Street] that we are discussing. It is a wonderful, high visibility area that parents are familiar with, that students are familiar with. The area provides also some excellent draws for the students."

69.    Todd Cramer further explained,

So we know the kids can come and gather. It's located in a place that is easily accessed. We think about doing the program all year long with all the hundreds of inches of snow you get, there isn't, that won't be an issue. I assume that the city will be plowed first before roads outside of town will be plowed. So it's a great opportunity to have continuity of the program instead if we were out on a side road someplace… [T]he storefront is convenient for students. It's convenient for parents. It's close to the school. Students gather in town anyway, and these are the places that Youth for Christ loves to do ministry in communities. And so we look at this storefront as a tremendous opportunity. *Id.* at 8.

70.    Micah Cramer, Campus Life Director with Youth for Christ, told the Planning Commission,

[W]e have summer uses that are a little bit different than the school year uses because in the summertime there's more time to hang out in the afternoons. There's students who are in the community working. They have lunch breaks, they have short breaks or on their day off they're Jetskiing and I know quite a few students. They Jetski right up to the [Mercantile] and they get a burger, and then they just walk around town. So a plan is to have some programming available in the afternoons in the summer. This provides space in the afternoon clubs for local high schoolers, as well as summer students who would also be members of the club and that would be extremely beneficial and fun and it also includes Sunday night gatherings, where we would be in the building, get ice cream from local stores, almost all of the … food and snacks and beverages we get is from The Mercantile, usually when we order foods, it's either made by somebody in the community or from a local restaurant… the Sunday night programs are open to all high schools, and it's been a ton of fun to be doing that for our home and using a building a little bit this summer. We could see the benefits. As Todd said, it's visible, has giant windows, right in the central location. I believe it's attractive … food. *Id.* at 8.

71.    Micah Cramer explained why the North Lake Street property was an ideal location where Youth for Christ Club and students participating in youth ministry activities could assemble.

[The North Lake Street property] provides safety for year round students during our gatherings. The streets will be paved, the parents can see what's going on,

22

transparency, clarity, and safety, and providing, I believe, a much needed safe place during these old winter months for the students. And a much needed refuge for a lot of the summer students as well who are here and trying to find a place to fit in in the summer. So we have our high school program, which is mainly what we do… *Id*. at 9.

72. Micah Cramer continued and explained,

[A]nd then we also have a local prayer team that would love to gather in this building. This is made up of people in the community who are interested, who are investing in what God is doing in this County, and who are invested in the youth. We have some of our students, their grandparents come, their parents come, we have school staff members who come in the summer, we have people who have been on this Administration, who come on a weekly basis, and it's really just enriching the fabric of this community through the prayer group… to get kids coming in before school, good, healthy community, and that's just been a ton of fun so far as well. So we have our high school program, our coffee programming and our prayer programming and that's mainly what we've been focused on in the last year and a half. *Id*. at 9.

### iii) Opposition to Youth for Christ's ministry to Leland Public School students.

73. The Leland Public School has a volunteer program where adults from the community can be background checked and participate as volunteers.

74. In the first semester of 2025, Leland Public School administration told Micah he should not participate in the volunteer program. The Leland Public School administration told Micah that he and Kya should take a break from volunteering because, "it's gotten to the point where it's not beneficial to the ministry or to the school, due to the upset parents." Micah and Kya offered to take a couple weeks off, and the school accepted.

75. After a few weeks Micah and Kya sought to resume their participation in the Leland Public School program. Leland Public School officials told Micah and Kya that Leland Public School no longer "needed" volunteers.

76. Micah explained, "it was very well known by the student body (and the school staff) that I worked for Youth for Christ. There was conversation on a regular basis about who we are

and what we do.  I did my best not to push, proselytize or pressure anyone to join in our group [Youth for Christ Club].  The focus was on being a good community member and showing the students what a healthy role model looks like."

77.    The Michigan Department of Education reminded Michigan public schools that "it is unlawful to discriminate against individuals on the basis of sexual orientation or gender identity or expression.  The Elliott-Larsen Civil Rights Act (ELCRA), Public Act 453 f 1976, which took effect in 1977, originally prohibited discrimination on the basis of '*religion*, race, color, national origin, age, sex height, weight, familial status, or marital status' in public accommodations, including education."  See **Exhibit 3** at 1 (February 13, 2025 memorandum from Michigan State Superintendent of Education, Michael Rice.) (emphasis supplied).

78.    Micah and Kya and the Youth for Christ Club participated in Leland High School's student-led interest group program with those students interested in Christianity.  The students that participated in this interest group were under no compulsion to participate and a student's participation in Youth for Christ Club activities or meetings was entirely voluntary.  Micah and Kya's involvement was directly approved by school administration. Only after parents began complaining to the school about Micah's involvement, the school then "reviewed" their rules on clubs and volunteers and informed Micah that "adult volunteers can only come in semi regularly, maybe once or twice a semester. And cannot provide supplies or snacks to students on a regular basis."

79.    On April 30, 20026, The *Task Force to Eradicate Anti-Christian Bias* issued a report pursuant to President Trump's Executive Order 14202.  The *Task Force Report* states,

> Evidence of anti-Christian bias is particularly troubling in the context of public education. In some States and localities, decisionmakers (from governors to school principals) are attempting to enforce their views of the prevailing cultural orthodoxy. School districts around the country are striving to ensure teachers and students affirm a progressive view

24

of sexual orientation and gender identity, without offering any religious accommodations to students, families, or teachers. These localities have gone far beyond promoting fairness and equality—which are laudable, lawful, and constitutionally required. Rather, localities are codifying and inculcating how students, families, and teachers should think, speak, and act on these controversial issues.

To advance those ends, States and school boards have silenced dissent at school board meetings, attached conditions to public funds, changed curricula, regulated the use of preferred pronouns, allowed boys in girls' spaces, and, when those policy efforts have fallen short, school leaders have even attempted to enforce compliance through social pressure campaigns. At the same time, public schools in many States have tried to eliminate Christian influence or presence from the classroom, curriculum, and extracurriculars. *TASK FORCE REPORT,* p. 149.

80.    A group of individuals opposing Youth for Christ Club's ministry organized protests and letter-writing campaigns demanding that Leland Public Schools prohibit Micah and Kya from meeting with students at school events including sports events open to the public.

81.    The *TASK FORCE REPORT* describes the kind of bias that Leland Public School officials demonstrated toward Youth for Christ's ministry and those students seeking to participate in Youth for Christ Club faith-based activities.  Leland Public School's exclusion of Youth for Christ Club and Micah and Kya Cramer from Leland Public School programs is why Youth for Christ Club needed to find a location for students to assemble.

82.    In response to the activists opposing Youth for Christ Club's ministry, Leland Public School Superintendent, Ryan Huppert, told Todd Cramer in October 2025 that, after reviewing Leland Public School's volunteer policies and needs, there was no longer a need for Micah or Kya to volunteer.

83.    Micah and Kya were told that they could no longer participate in the volunteer lunch program at Leland Public School due to the public opposition the school was received via phone calls and emails.  Other volunteers were allowed to continue participating in Leland High School's lunch program.  Officials with Leland Public School told Elizabeth VanSteenhouse not to speak about religion during her service as an elementary Bridge Mentor.

25

84. Leland Public School's exclusion of Micah and Kya Cramer and students wishing to participate in Youth for Christ Club student-led Bible studies and prayer meetings at the Leland Public School is akin to the situation the *TASK FORCE REPORT* described. "Under overly restrictive rules, Christian students have been punished for praying at school. For example, Hannah Allen, a middle-school student from Honeygrove, Texas, was punished by her school for organizing a prayer time with her classmates to pray for a fellow student. The principal at Hannah's school prohibited her and her classmates from praying in view of other students." *Id*. at 151.

### iv) Leland Public School's Superintendent was hostile to Christianity and promoted a Progressive-Left political agenda.

85. In July 2020, before the new school year began, newly employed Leland Public School Superintendent Stephanie Long wrote a letter to Leland Public School students and their parents. Superintendent Long's letter was also published in the *LEELANAU ENTERPRISE.* Superintendent Long encouraged students to engage in Progressive-Left activism, and to "join Black Lives Matter chapters, attend protests… Donate to and /or get involved with the NAACP or the ACLU Task Force.'"

86. A copy of Superintendent Long's letter to Leland Public High School students is attached as **Exhibit 4**. **Exhibit 4** also includes a copy of the *LEELANAU ENTERPRISE* article concerning Superintendent Long's letter.

87. On September 6, 2022, *NEW YORK TIMES MAGAZINE* ran a cover story featuring Superintendent Long and Leland Public School's promotion of the Progressive-Left's Critical Race Theory. The *NEW YORK TIMES MAGAZINE* article told how Leland Public High School encouraged students to engage in "social reform movement[s]" such as those Superintendent Long promoted in her July letter. See "*Daring to Speak Up About Race in a Divided School District:*

26

*What happens when a superintendent in northern Michigan raised the issue of systemic racism."* **Exhibit 5**.

88.    Superintendent Long told NEW YORK TIMES MAGAZINE that she "envisioned profound pedagogical changes in her school; she imagined sparking illuminating discussions within classrooms and searching transformative conversation in the community beyond." *Id*.

89.    Superintendent Long, a politically progressive white woman, said "To our black students, teachers and families, you matter.  We see you, we hear you, we mourn with you, and we will stand with you to confront the racism and injustices you live with as part of your American experience."

90.    Leland Public School currently has only one black student and, according to the Leland Public Schools' website, has only one black teacher who teaches in the pre-Kindergarten program.

91.    According to MySchoolScout, Leland Public School has an enrollment of less than 450 students in pre-Kindergarten through the senior year of high school.  The population of students in this Northern Michigan Village is overwhelmingly white (about 95%), with less than 1% black, asian, or native american combined. *Id*.

92.    When Superintendent Long wrote her letter encouraging Leland Public High School students to engage in Progressive-Left activism, Chris and Angie Butz's four adopted black children were attending Leland Public School.

93.    After Superintendent Long published her letter promoting Critical Race Theory and Progressive-Left political activism, the Butz family withdrew their children from Leland Public School and enrolled them in a private Christian school.  See NEW YORK TIMES MAGAZINE, **Exhibit 5**.

27

94.     Leland Public School's promotion of Progressive-Left activism is an example of what the TASK FORCE REPORT described as public school officials, "attempting to enforce their views of the prevailing cultural orthodoxy. School districts around the country are striving to ensure teachers and students affirm a progressive view of sexual orientation and gender identity, without offering any religious accommodations … school leaders have even attempted to enforce compliance through social pressure campaigns. At the same time, public schools in many States have tried to eliminate Christian influence or presence from the classroom, curriculum, and extracurriculars." TASK FORCE REPORT, p. 149.

95.     In June 2025 Superintendent Long resigned her position. The Leland Public School Board replaced Stephanie Long with Ryan Huppert, who is now Superintendent of the Leland Public School.

96.     The members of the Leland Public School Board at that time, June 2025, were John Elwell, Tom Trumbull, Logan Stuttmann, Bill Duperon, Kate Vilter Stassen, Mary Fleishman, and Chris Alpers.

97.     In Fall 2025, individuals opposing Youth for Christ's ministry in Leelanau County asked the Leland Public School Superintendent, Ryan Huppert, to prevent Youth for Christ Club, and Micah and Kya Cramer from participating in volunteer or interest group activities at Leland Public High School and to prevent Micah and Kya from meeting with students.

98.     Larry Acker, a Traverse City lawyer, is one of the leading activists organizing a campaign against Youth for Christ.  Larry Acker is not a parent of any student attending any Leelanau County public school.  Nonetheless, Larry Acker contacted parents of students in Leelanau County public schools stating that Micah and Kya were "grooming" high school students and intimated that Micah and Kya were stalking high school students.

28

99.     Larry Acker then drafted a form letter and, with the collaboration and coordination of other opponents of Youth for Christ, circulated this form letter to parents of Leelanau County students soliciting parents to sign the form letter.  Larry Acker's form letter purported to deny Micah and Kya the right to meet or talk with any signatory's child.

100.     THE *GLEN ARBOR SUN* ran a front-page story about Youth for Christ and Youth for Christ's ministry to youth in Leelanau County.  See **Exhibit 6**, the *GLEN ARBOR SUN* November 21, 2025 article.

101.     Those opposing Youth for Christ's ministry to students in Leelanau County organized a media and on-line internet campaign against Youth for Christ and Youth for Christ's ministry to Leelanau County students.

102.     The *GLEN ARBOR SUN* website included the following comments from those opposing Youth for Christ's ministry.

(a)    Jeff Hemingway said, "I just don't feel a public school is the forum for religion. [Youth for Christ] should maybe concentrate its teachings, works, and beliefs outside of the public arena." *Id.*

(b)    Justina Hlavka commented, "Neither [Campus Life Directors, Micah or Kya Cramer] have any religion based or childhood education college degrees.  Albeit [sic] they may have a personal mission to spread their religious beliefs Youth for Christ's goal is to use not only their marketing degrees but also their personal [convictions] to gaslight and manipulate ages 11-19 while using those children online as promotion of Youth for Christ to social media targeted audiences… The kids are the product being sold wrapped up in purity, evangelical culture.  Micah and Kya get paid by Youth for Christ and the tools to manipulate such as boats, drones, parties, recreational activities geared to the age targeted. …their religious affiliation and beliefs are misogyny based propaganda…  Also I would be [willing] to bet that if this was a couple of different faith people would be out with torches and pitchforks…I do not support attempts to bribe or pressure people into a religion, especially children." *Id*.

(c)    Justina Hlavka said Youth for Christ was "evangelical nationalism" that was "gaslight[ing] Leland residents" and opposed "the end goal [of] Youth for Christ to grow future religious leaders." *Id.*  Justina Hlavka subsequently said, "What I DO NOT support is any group pushing their beliefs onto others or using incentives to draw people in, especially when it involves kids…" Justina Hlavka claimed that,

"Christianity has actually been associated with the highest number of killings done 'in the name of religion', largely because Christian empires dominated global politics for so long. That doesn't reflect Christian teaching- it reflects human power, corruption, and political motives." (emphasis in original.). *Id.*

(d)     Bill Watson, who opposed Youth for Christ, responded that, someone in Leland should… "build little libraries with leftist and anarchist and atheist literature for people to pick out books from, take some hikes, maybe some leftist and anarchist poetry, maybe some really good left-wing Islamic and Buddhist speakers?  There are really great leftist Christian clergy, and Christian speakers as well…  we could bring Planned Parenthood in to talk to kids as well as the ACLU…the Church of Satan has great school programs available." *Id.*

(e)     P. Smith Bell wrote, "I'll create a Marxist fellowship." *Id.*

(f)     Ann Ofthesea said, "I find it confusing that folks want the public school to also be a place of worship … [Youth for Christ] are teaching kids a specific flavor of morality and spirituality that pressures them into being emotionally and socially vulnerable and pressures them to recruit other kids."  *Id.*

(g)     Bill Watson commented again and called for Youth for Christ to be excluded from Leelanau County because he opposed the religious content and viewpoint Youth for Christ proclaimed. Bill Watson wrote, "It would be great to be able to offer, or to have a space where young people could read books and papers for people like Christopher Hitchins, a Malcolm, X, Howard Zinn, Angela Davis, Maya, Angelou, … these types of books around leftist history. …wow the opportunity to be able to talk the real history of Israel and it's a part [in] state and genocide… we would be able to give them an opportunity to look at social Democratic principles and give them a chance to listen to the words of Bernie Sanders and Mamdani, and AOC… quite honestly what I feel is the grooming that is taken place by this group. I believe this group [Youth for Christ] and Leland is a cult. I think we can do better. Their families can do better. What these people are doing [are] classic called tactics. I believe the community needs to resist this, and [resist it] in an active way." *Id.*

(h)     M'Lynn Hartwell wrote, "John Fugelsang's new book is titled from *Separation of Church and Hate: A Sane Person's Guide to Taking Back the Bible from Fundamentalists, Fascists, and Flock-Fleecing Frauds*. It focuses on challenging Christian nationalism and the far right's use of scripture, with a mix of theology, politics, and comedy." *Id.*

(i)     Mark Smith wrote, "These are not nice people. These are people who intend to get their way, one way or another, regardless of our community's wishes. So now they get nasty with us." *Id.*

(j)     Jessy Reyes Alcantar said that Youth for Christ Club was like, "a mosque being set up? Or when … satanists trying to expose [our] children to their religion?" *Id.*

30

(k)   Peter Jay Hurlin said Youth for Christ's proclamation of the Gospel, Bible study, and the teaching of Jesus Christ was, "Brainwashing kids with the make believe [that] doesn't belong in any credible educational setting." *Id.*

(l)   Ellen Stowe Montoya wrote, "These folks feel like a Dollar Store Cult of religion. Not good in any way." *Id.*

(m)   Wren Fren said, "…these shifty people [are] forcing and sneakily attracting children with gifts and other enticements to join. That is textbook grooming and predator behavior. Period." *Id.*

(n)   Bob DeKorne opposed Youth for Christ ministering to Leland Public School youth and said Youth for Christ should be prohibited from meeting students at school events.  Bob DeKorne said Youth for Christ should, "Buy a building somewhere else and start your "ministry" - public schools should not choose which religion they offer." *Id.*

(o)   Matt Dykema agreed and said, "Get rid of one cult (flaming whatever). Just to add another one. Religion is the root of all evil." *Id.*

(p)   Stacy Brugeman from ilovethepistons32@yahoo.com sent a message to Youth for Christ Club stating, "You can't claim to be for Christ and also have a Trump loving attorney.  You cannot serve God and money.  NOBODY WANTS YOU IN LELAND. If you were actually Christian, you'd operate anywhere and stop terrorizing a small town.  You're trying to indoctrinate children, you creeps. Leave our towns alone." (Emphasis in original.) Stacy Brugeman apparently loves the Pistons but hates Christians.

103.   The statements of those opposing Youth for Christ Club demonstrate that they oppose Youth for Christ Club because the opponents object to Youth for Christ Club's Gospel message and the religious speech of those students participating in Youth for Christ Club activities. The activists opposing Youth for Christ Club and opposing Micah and Kya Cramer's ministry to Leelanau County youth object to the religious speech and beliefs of those individuals participating in Youth for Christ Club activities.  The organized opposition to Youth for Christ is anti-Christian bigotry.

104.   One person, Elizabeth Vanderveen Heinrich, told those opposing Youth for Christ Club, "Let them [Youth for Christ Club] offer the option for students to gather and pray if they choose. If you don't like it, sign up to volunteer and sponsor a club you prefer at the school. Bravo

for a faith-based group to have the courage to step up and offer this option for students. No one is forcing it upon students. As a public educator, I applaud the volunteers willing to invest their time and energy to offer options to the next generation." *Id.*

105.    In Fall 2025, Leland Public School Superintendent Ryan Huppert told Micah and Kya Cramer and Youth for Christ Club supporters that they could no longer participate in the Leland Public School volunteer lunch program.

106.    Superintendent Huppert said Leland High School's decision to prohibit Micah and Kya from meeting with students at the Leland Public High School volunteer lunch program and from participating in the student interest group meetings was in response to the objection of some individuals that opposed Youth for Christ Club because Youth for Christ is a Christian faith-based organization and should not be allowed to participate in activities with public school students.

107.     Chris Reeves, Principal of the Suttons Bay Public High School, as instructed by the superintendent, called Micah Cramer in October 2025 and told Micah he could no longer volunteer at the school or attend high school sporting events otherwise open to the public.  Chris Reeves told Micah the Suttons Bay Public Schools prohibition against Micah volunteering at the school was because the Leland Public School had prohibited Micah and Youth for Christ from meeting with students.  This prohibition against Micah and Kya attending public high school sporting events open to the public was later rescinded by the Suttons Bay public school superintendent.

> **B.    Apollos Properties, LLC purchased the North Lake Street property to provide a location where Leelanau County students could assemble for prayer, Bible study, and fellowship.**

108.    In response to the social pressure campaign that activists waged against Micah and Kya Cramer meeting with students at Leelanau County public school events, Youth for Christ Club

32

sought a convenient location on private property where high school students could assemble for fellowship, Bible study, prayer and other faith-based activities.

109.    James and Elizabeth VanSteenhouse responded to Youth for Christ Club's need by buying a building at 110 North Lake Street in Leland, Michigan.  The VanSteenhouse family paid almost $1.5 million for this property.  The VanSteenhouse family held title to the Property through a limited liability company, Apollos Properties, LLC (Apollos).

110.    The VanSteenhouse family purchased the North Lake Street property with the specific intent of leasing a portion of the building to Youth for Christ as a location where Youth for Christ Club, its members, and Leelanau County students and their parents could assemble to study the Bible, pray, and fellowship.  Other portions of the building are still used for the existing retail businesses.

111.    Two structures are located on the Property. The north structure consists of an approximately 2,400 square-foot single story commercial building with a similarly sized lower level.  The building overlooks Leland Harbor, Lake Michigan, and the Manitou Islands.

112.    Prior to Youth for Christ's use of the property a portion of the northern building was leased to Grand Traverse Distillery, LLC, for use as a whiskey tasting room and related retail activities.  Other parts of the building have since been leased to a tenant operating a specialty photography gallery and retail shop.  The southern building is occupied by commercial retail tenants, including Grand Traverse Distillery which expanded into additional space and a retail shop offering a variety of goods and merchandise geared toward visitors to Leland.

113.    The North Lake Street property is located in a C-1 mixed-use zoning district as designated by the Leland Township Master Plan adopted September 4, 2024.  See *infra.* Paragraph 25(p), and n. 4.

33

114.    The property immediately north of the North Lake Street property is a residential property used for short-term vacation rentals.  The other structures in the same block of this C-1 zoning district are used for a bank, bookstore, retail businesses an art studio, and professional offices.  Across Pearl Street to the north is a single-family residence and next to that is a commercial building used for retail business on the first floor and law offices on the second floor. Other properties in this C-1 multi-use zoning district are used for restaurants, bars, a grocery store, single-family residences, a bookstore, art studios, the United States Post Office, and administrative offices for tax-exempt organizations including the Leelanau Conservancy and Fishtown Preservation Society.

115.    The surrounding landowners and the other tenants in the North Lake Street property support Youth for Christ Club's use of the Property for prayer and Bible study.  See **Exhibit 7** (Letters of support from Mead Treadwell, Greta Stimson, and Kent Rabish.) Mead Treadwell and his family are from Leland.  Mead Treadwell is the former Lieutenant Governor of Alaska. Mead Treadwell and his family own the cottage immediately north of the North Lake Street property.

116.    Prior to closing on the purchase of the North Lake Street property, the VanSteenhouse family had their legal counsel, Robert Parker, discuss use of the Property with Leland Township's Zoning Administrator, Tim Cypher.  The VanSteenhouse family's counsel told Zoning Administrator Cypher that Apollos intended to lease a portion of the building to Youth for Christ Club as a location where high school students could assemble for prayer, Bible study, and engage in other faith-based activities.

117.    On the basis of these discussions with Leland Township's Zoning Administrator, Apollos understood that Youth for Christ Club and those high school students participating in Youth for Christ Club activities could meet at the North Lake Street property for prayer, Bible

study and fellowship.  Youth for Christ and Apollos understood that faith-based assembly and activities were permitted under Leland Township's Zoning Ordinance because Youth for Christ Club was a "club" allowed as a special use in the C-1 mixed-use zoning district.

118.    On February 28, 2025, Apollos closed on its purchase of the Property.

119.    After Apollos acquired title to the Property, Youth for Christ Club and its members began meeting at the Property to study the Bible, pray, fellowship and engage in other youth ministry activities.  Parents and supporters of Youth for Christ also assembled at the Property for a special gathering of prayer and fellowship.

120.    Youth for Christ Club's use of the Property did not (and does not) involve any changes or modifications to the exterior of the building, surrounding land, parking, or landscaping. Youth for Christ Club's use of the Property does not impose any burden upon the public and private parking in the C-1 zoning district that is greater or different than the existing, and previous, uses of the Property.  Youth for Christ Club's use of the North Lake Street building does not impose any additional burden upon any public infrastructure such as the sanitary sewer system.  See discussion below and Leland Planning Commission's Findings and Conclusions of April 15 and May 4 letter of amendment and exhibits from Tom Grier.  **Exhibit 8-A** (Leland Planning Commission's Findings and Conclusions of Approval Draft) and **Exhibit 8-B** (Leland Planning Commissions Findings and Conclusions of Denial Draft).  See also, **Exhibit 9-A** (May 4, 2026 Letter from Tom Grier) and **Exhibit 9-B** (Exhibits to May 4, 2026 Letter).

121.    Youth for Christ Club members, students and leaders assembling at the Property is in full compliance with all provisions of any applicable building code, fire code and all other relevant health and safety regulation.  The Leland Township Zoning Administrator, Tim Cypher,

and the Planning Commission confirmed this to be so in their Findings and Conclusions.  See **Exhibit 13**.

122.    On October 10, 2025, during a Youth for Christ Club meeting of high school students at the North Lake Street property, Lindsey Acker (Larry Acker's daughter-in-law) entered the building and asked Micah to tell her about Youth for Christ Club's ministry.  Lindsey Acker was invited to stay and join the students for the meeting, which was a Christian devotional with high school students. Lindsey Acker was offered a hot chocolate.

123.    Shortly thereafter, Nicholas Dow with the Leelanau County Health Department told Micah that Youth for Christ Club wasn't following the rules but stated that he wanted to work with Youth for Christ Club to ensure Youth for Christ Club could continue the programs.  Nicholas Dow said Youth for Christ Club needed a license to serve snacks such as hot chocolate and coffee at their meetings and said Youth for Christ Club and Apollos must pay a fee to be granted a license to serve coffee and hot chocolate.

124.    Nick Dow said he called Micah in response to a complaint from "a lovely couple from your area that does a lot of good work feeding the poor."  This was a reference to Bill and Michelle White who were some of the activists opposing Youth for Christ's ministry to Leelanau County youth.  Later, Micah was told that Bill and Michelle White were looking through the widows during Youth for Christ Club's meeting that morning.

125.    Following Lindsey Acker's visit to the North Lake Street property, Leland Township told Youth for Christ Club that the club and those students participating in Youth for Christ Club activities could no longer assemble at the North Lake Street property and that Apollos and Youth for Christ must apply for a Special Use Permit asking Leland Township to allow Youth for Christ Club to assemble at the North Lake Street property.

36

126.    Based upon discussions with Leland Township Zoning Administrator, Tim Cypher, Youth for Christ Club, Apollos and their legal counsel understood that the Township's requirement that Youth for Christ Club apply for a Special Use Permit was a ministerial formality. Zoning Administrator Tim Cypher said he anticipated the Leland Township Planning Commission would summarily grant Apollos and Youth for Christ Club's application for a Special Use Permit and allow the club to assemble at the Property.

127.    Zoning Administrator Tim Cyper told the Planning Commission members that Apollos and Youth for Christ's Special Use Permit application complied with the Township's Zoning Ordinance because Youth for Christ was a "club" allowed under Leland Township's Zoning Ordinance.  See Section C below and the exhibits referenced therein.

C.    **Leland Township's Zoning Ordinance and Master Plan.**

128.    Under Michigan law, townships have no inherent authority to regulate an owner's use of private property.[6]

---

[6] "The power of the city to enact ordinances is not absolute. It has been given power by the State of Michigan to zone and regulate land use within its boundaries so that the inherent police powers of the State may be more effectively implemented on the local level. But the State cannot confer upon the local unit of government that which it does not have. For the State itself to legislate in a manner that affects the individual right of its citizens, the State must show that it has a sufficient interest in protecting or implementing the common good, via its police powers, that such private interests must give way to this higher interest." *Kropf v. City of Sterling Heights,* 215 N.W.2d 179, 186 (1974), See also, *Gust v. Canton Twp.,* 70 N.W.2d 772, 774–75 (1955) (The extent of the owner's right to the free use of his property in the manner deemed best by him is not to be determined by such speculative standards. The test of validity is not whether the prohibition may at some time in the future bear a real and substantial relationship to the public health, safety, morals or general welfare, but whether it does so now.) And see, *Robinson Twp. v. Knoll*, 302 N.W.2d 146, 150 (1981).  "[A] zoning ordinance, which has, in the final analysis, no reasonable basis for its very existence," is not constitutional and "[a] 'reasonable basis' must be grounded in the police power, which this Court has defined as including "protection of the safety, health, morals, prosperity, comfort, convenience and welfare of the public, or any substantial part of the public."

37

129.    The Michigan Constitution establishes several levels of subordinate local government, including counties, townships, and various commissions and entities established for specific purposes, such as operating a public school and drain commissions that oversee the inland lakes and dams.

130.    Michigan's Zoning Enabling Act (MCL 125.3101-125.3702) defines the authority the Michigan legislature granted townships to regulate an owner's use of land.  Michigan has two types of townships, a General Law Township and a Charter Township.

131.    Pursuant to the Zoning Enabling Act, Leland Township adopted a Zoning Ordinance (the "Zoning Ordinance") and a Master Plan (the "Master Plan") to regulate property in Leland Township.  The Leland Township Zoning Ordinance and Leland Township Master Plan are available at the websites referenced above in Paragraph 25(p), and n. 4.

132.    Leland Township's authority to regulate an owner's use of private property is established and limited by the Michigan Zoning Enabling Act (MCL 125.3101 – 125.3702). Leland Township's authority to regulate or limit an owner's use of private property is also subordinate to the United States Constitution, the Michigan state constitution, and Michigan and federal civil rights laws.  See *Knick v. Scott Township*, 588 U.S. 180 (2019).  Chief Justice Roberts wrote the decision for the Court declaring that, "a property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it."

133.    Thus, a property owner may file a Section 1983 action in federal court immediately and need not await or endure the owner continuing to pursue additional administrative remedies by the local government nor seek discretionary exceptions before vindicating the owner's rights in federal court.  See also, *Pakdel v. City and County of San Francisco, California*, 594 U.S. 474

38

(2021).  *Knick* overruled *Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985).

134.   A property owner does not have to exhaust state court remedies before pursuing a remedy in federal court. A property owner does not have to endure endless local administrative processes once the government has made a decision denying an individual's constitutional rights. The owner may bring a federal claim under 42 U.S.C. § 1983 as soon as there is a final governmental decision.  As a general rule, a person may file a federal lawsuit as soon as there is an actual or imminent infringement of First Amendment rights, without first exhausting state administrative or judicial remedies.   The Supreme Court has long recognized that First Amendment freedoms occupy a "preferred position," and delays in obtaining judicial review can themselves chill protected speech and assembly.

135.   An individual does not have to exhaust state administrative remedies before bringing a First Amendment claim in federal court. *Patsy v. Board of Regents*, 457 U.S. 496 (1982), *Monroe v. Pape*, 365 U.S. 167 (1961), and *Mitchum v. Foster*, 407 U.S. 225 (1972). Furthermore, a person need not wait to be prosecuted or punished before challenging a law that threatens First Amendment rights.  See also, *Knick*.

136.   An individual or association may bring a pre-enforcement challenge to an ordinance or order denying free speech or assembly. The Supreme Court has repeatedly held that speakers need not "test the law by violating it." *Steffel v. Thompson*, 415 U.S. 452 (1974) (credible threat of prosecution permits federal declaratory relief), *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988) (booksellers could challenge statute before enforcement), and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (credible threat of enforcement created standing for a pre-enforcement First Amendment challenge).

137.    Prior restraints against free speech, assembly, and First Amendment rights are subject to immediate federal review. If the government requires a permit or license before speech, assembly, or religious exercise may occur, federal courts possess the jurisdiction to immediately review and enjoin such prior restraints because such denials of these rights are a particularly serious threat to First Amendment freedoms. See, *Freedman v. Maryland*, 380 U.S. 51 (1965), *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969), and *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150 (2002).

138.    The Supreme Court has repeatedly recognized that: "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  This principle is one reason preliminary injunctions are frequently granted in First Amendment cases.

139.    If a township tells a religious group that it may not gather for prayer or Bible study without first obtaining a permit and the Township threatens civil or criminal penalties for assembling at the private property, the individuals seeking to meet have an immediate right to recourse in a federal court.  See *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993).

140.    Leland Township's land use scheme and the Master Plan and Zoning Ordinance divided land in Leland Township into thirteen different zoning districts.  The zoning districts are the Agricultural Conservation District, Low Density Agricultural – Residential District, Medium Density Lakeshore Residential District, Medium Density Inland Residential District, Medium Density Village Residential District, High Density Residential District, Village Commercial (Village Commercial C-1), General Commercial District (Village Commercial C-2), Waterfront

Commercial District, Light Manufacturing District, Fishtown Historic District, Leland Harbor Overlay District and Cultural Overlay District.

141.    For each zoning district, the Zoning Ordinance identifies uses allowed "*as of right*" and uses allowed with a Special Use Permit.  A use allowed "*as of right*" means the owner may use the land for the stated purposes without having to first seek the Township's permission or approval.  The Zoning Ordinance also specifies uses for which an owner may use property but only if the owner first applies for, and is granted, a "Special Use Permit" by the Township.  See Zoning Ordinance Articles 7 and 14.

142.    If a use is not one of those uses listed in the Zoning Ordinance as an allowed use by right (an "*allowed use*") or a use allowed if the owner applies for a permit and the Township grants a Special Use Permit (a "*permitted use*"), the owner of the property may not use the owner's private property for such a purpose.  Should an owner use his private property for a purpose not allowed or permitted under the Zoning Ordinance and Master Plan, the owner is subject to a $500 fine and 93-days in jail for each day the owner's property is used for a prohibited purpose.

143.    The North Lake Street property where Youth for Christ Club met and desires to continue meeting is in the C-1 mixed-use zoning district.  The Zoning Ordinance allows property in the C-1 mixed-use zoning district to be used *as of right* for: "any generally recognized retail business …which supplies commodities on the premises…including but not limited to foods, drugs, liquor, furniture, dry goods, notions, books, flowers, jewelry, or hardware."

144.    The uses of property allowed *by right* in the C-1 mixed-use zoning district also includes, "personal service establishments such as, but not limited to, repair shops, barber and beauty shops, photographic studios, and dry cleaners."  Other uses permitted by right in the C-1 zoning district include, "financial institutions, insurance offices, real estate offices, artist offices

41

and galleries, professional offices for accountants, doctors, lawyers, engineers, architects, and similar uses."

145. The uses permitted by right in the C-1 zoning district also include, "residential uses when occupying the second or third floors" and "single family dwelling[s], and standard restaurants."

146. The Leland Township Zoning Ordinance allows property in the C-1 zoning district to be used for "public facilities, including parking lots, cemeteries, parks, schools, libraries, and similar uses and activities not including administrative buildings… Automobile and Service Repair Stations, clubs and other establishments which provide food or drink…bed and breakfast businesses," and "planned unit development." These uses are *permitted uses* if the property owner pays a fee, submits an application for Special Use Permit, and the Township grants the permit. The permitted uses of property in the C-1 mixed-use zoning district include "adult related businesses."

147. The Zoning Ordinance defines a "church" as "a building wherein persons regularly assemble for religious worship and which is maintained and controlled by a religious body organized to sustain public worship, together with all accessory buildings and uses customarily associated with such primary purpose." See Zoning Ordinance, Art. 2.

148. The Zoning Ordinance prohibits "Churches and "Religious Institutions" in *every* zoning district in Leland Township as a matter of right. Churches and Religious Institutions are only permitted in certain agricultural and residential zoning districts if the owner applies for a Special Use Permit and the Township grants a "Special Land Use Permitted by Special Approval." See Article 11 of Leland Township Zoning Ordinance.

149. Leland Township's Zoning Ordinance categorically prohibits and forbids "Churches and Religious Institutions" in the C-1 and C-2 mixed-use districts, the Waterfront

42

Commercial District, Harbor Overlay District, the Cultural Overlay District, and the Fishtown

Historic District.  See, Article 12 of the Leland Township Zoning Ordinance.

150.    Leland Township's Zoning Ordinance and Master Plan, forbid "Churches and Religious Institutions" *anywhere* in Leland Township unless the Church or Religious Institution first pays a Special Use Permit fee, applies for, and the Township grants, a Special Use Permit and the "Church or Religious Institution" satisfies a number of "Special Performance Standards" specific to Churches and Religious Institutions.

151.    The following chart summarizes those zoning districts in which religious assembly, speech, and prayer are forbidden and those zoning districts in which religious assembly is allowed only after Leland Township is paid a fee and the township grants a permit allowing such assembly.

| | Zoning Districts | Churches and Religious Institutions |
|---|---|---|
| AC | Agricultural Conservation District | Permit required |
| AR | Low Density Agricultural – Residential District | Permit required |
| R-1A | Medium Density Lakeshore Residential District | Permit required |
| R-1B | Medium Density Inland Residential District | Permit required |
| R-2 | Medium Density Village Residential District | Permit required |
| R-3 | High Density Residential District | Permit required |
| C-1 | Village Commercial District | Absolutely prohibited |
| C-2 | General Commercial District | Absolutely prohibited |
| C-3 | Waterfront Commercial District | Absolutely prohibited |
| M-1 | Light Manufacturing District | Absolutely prohibited |
| C-4 | Fishtown Historic District | Absolutely prohibited |
| | Leland Harbor Overlay District | Absolutely prohibited |
| | Cultural Overlay District | Absolutely prohibited |

152.    In addition to paying a fee, applying for and being granted a Special Use Permit, a "Church or Religious Institution" must also satisfy a number of other requirements and "Special Performance Standards" unique to "Churches and Religious Institutions."

153.    Leland Township's "Special Performance Standards" are specific requirements imposed upon "Churches and Religious Institutions" that do not apply to other entities, individuals, or secular non-religious businesses.

154.    Articles 7 and 16 of the Leland Township Zoning Ordinance specify the requirements an applicant must satisfy to be granted a Special Use Permit.  The applicant for a Special Use Permit must also pay a fee of $300 to submit an application for a Special Use Permit.

155.    Three definitions in Leland Township's Zoning Ordinance are relevant to this litigation.

    a.  A "*church*" is defined as "A building wherein persons regularly assemble for religious worship an which is maintained and controlled by a religious body organized to sustain public worship, together with all accessory buildings and uses customarily associated with such primary purpose."

    b.  A "*club*" is defined as "An organization of persons for special purposes or for the promulgation of sports, arts, science, literature, politics, agriculture or similar activities, but not operated for profit and open only to members and not the general public."

    c.  A "*standard restaurant*" is defined as "An establishment whose principal business is the sale of food and/or beverages to customers in a ready to consume state, and whose principal method of operation includes one or both of the following characteristics: (a) customers normally provided with an individual menu, are served their food and beverage by a restaurant employee, at the same table or counter at which food and beverages or are consumed; (b) a cafeteria-type operation where food and beverage generally are consumed within the restaurant building.

156.    Section 16.11 of the Leland Township Zoning Code imposes specific and unique requirements upon *"Churches and Religious Institutions."* A "church" is defined in the Zoning Ordinance, but "Religious Institutions" is not defined.

    **a.  The following site and development requirements shall apply:**

    1.  All ingress and egress for the site shall be from a paved major or minor thoroughfare.

    2.  The site shall be at least two (2) acres in size.

44

3.   No more than twenty-five (25) percent of the site area shall be covered by buildings.  No more than sixty percent (60%) of the site shall be covered by impervious surface.

4.   No building shall be closer than fifty (50) feet from any lot line or right-of-way.

5.   No building shall be erected to a height greater than that permitted in the district in which it is located unless the building is set back an additional one (1) foot for each one (1) foot of additional height above the district height limitation. A spire is excluded.

**b.  Special Performance Standards:**

1.   Use of the structure shall not result in accrual of distributable profits, realization of private gain resulting from payment or compensation in excess of a reasonable and customary allowance for salary or other compensation for services rendered, or any other form of private gain.

2.   No day care center, private school, or other use requiring a Special Approval shall be allowed without a separately approved Land Use Permit for each use.

3.   Signs shall be limited to one (1) identification sign and one changeable message board.  The identification sign shall have a maximum area of twenty-four (24) square feet.  Both signs may be lighted, but not internally.

157.    Leland Township requires a "Church or Religious Institution" to submit an application for a Special Use Permit with supporting documents and pay a fee of $300.00.  See, for example, **Exhibit 10** (Apollos Special Use Permit application).

158.    The Zoning Ordinance regulations and requirements in Section 16.11 apply *only* to "Church[es] and Religious Institutions."  These land use restrictions, acreage requirements, set-back regulations, and the "Special Performance Standards" do not apply to other uses of property or to non-religious uses of property such as property used for libraries, art studios, and administrative offices by not-for-profit and organizations such as the Leelanau Conservancy and Fishtown Preservation Society that are 501(c)(3) public charities.

159.    As interpreted, enforced, and applied by Leland Township, persons wishing to gather and assemble for religious fellowship, speech, worship, prayer and association anywhere in

45

Leland Township (whether the assembly is called a "church" or a "club") are prohibited from doing so (whether on private property or public property) without first paying the Township $300, applying for a special use permit and the Township granting the permit.  Should the Township not grant the permit, those who gather for prayer and Bible study at the property are subject to civil and criminal sanctions of $500 and 93-days in jail for *each time* they meet.  See, Leland Township General Code Penalty Ordinance cited above in Paragraph 25(p), and n. 4.

160.    In the Findings and Conclusions the Planning Commission adopted at the April 15 and May 6 meetings, the Planning Commission concluded high school students assembling for prayer, Bible study and fellowship are not a "club" allowed or permitted in the C-1 zoning district, but are a "Church or Religious Institution" that is forbidden to assemble in the C-1 zoning district. On the basis of this premise (that Youth for Christ Club was a forbidden "church" and not a permitted "club") a majority of the Planning Commission members voted to deny students the right to assemble for prayer and Bible study at the North Lake Street property.

**D.     Leland Township's enforcement of the Township's Zoning Ordinance against Youth for Christ Club and Apollos.**

*1.      The Special Use Permit application.*

161.    Prior to October 2025, Youth for Christ Club, its members, and students assembled at the North Lake Street property for prayer, Bible study and faith-based activities.

162.    In October 2025, following Lindsey Acker's visit to the Property, Youth for Christ and those participating in these faith-based activities at the Property were told by the Township that they could no longer assemble at the Property unless they first applied for, and were granted, a Special Use Permit by the Township.

46

163.   On October 17, 2025, the owner of the Property, Apollos, and Youth for Christ Club submitted a "Land Use Application for a Special Use" to the Township.  See **Exhibit 10** above.

164.   The Special Use Permit application included a supporting memorandum from Youth for Christ Club's and Apollos's legal counsel, Robert Parker.  See **Exhibit 11.**

### 2.    *The November 5, 2025 Planning Commission hearing.*

165.   On November 5, 2025, the Planning Commission held a hearing to consider Youth for Christ Club's and Apollos' application for a permit to meet at the North Lake Street property. See **Exhibit 12** (November 5, 2025 Agenda).  A Transcript of the November 5, 2025 hearing is attached as **Exhibit 2.**

166.   During the November 5 public hearing Todd Cramer, the Executive Director of Bluewater Thumb Youth for Christ, explained the history of Youth for Christ.  "Youth for Christ started 80 years ago. There were two guys in Florida fishing. Billy Graham and Torrey Johnson. And they're worried about, what are we going to do with all these young men coming back from World War II and how are we going to evangelize for them? … And they came up with this idea of let's start an organization to reach these folks called Youth for Christ. That's 81 years ago. Billy Graham was the first paid full-time employee, and you know his history… Youth for Christ [is] a 501(c)(3) … international organization … There are 120-plus chapters in the United States. A chapter is assigned a certain geographic area … there are 10 in Michigan. And what we'd like to do is start number 11 in Leelanau County." **Exhibit 2,** p. 6.

167.   Todd Cramer continued and explained Youth for Christ's Campus Life is the ministry "model that we use mostly in Michigan, but we're smaller, rural, as in Leelanau County. And so Campus Life is outreach to middle school and high school students, and we're starting here by focusing on high school students ... And so Campus Life has programs and they have a Campus

47

Life club, and a Campus Life club is an open club. What that means is you have to be a high school student in this area. You're invited, maybe you're invited by Micah, maybe you're invited by one of these guys *(points to two Leland minor-students in the front row)*. And you come to the Club and you check it out and it could be something that you want to join so to speak, the[n] you're welcome to do that?   *Id.* at 7.

168.    Todd Cramer explained that the North Lake Street property was ideally suited as a location for Youth for Christ Club to meet. "The Campus Life programs love to have spaces like this storefront that we're discussing. It is a wonderful, high visibility area that parents are familiar with that students are familiar with. The area provides also some excellent draws for students … So we know the kids can come and gather. It's located in a place that is easily accessed. We think about doing the program all year long with all the hundreds of inches of snow you get, there isn't, that won't be an issue. I assume that the city [streets] will be plowed first before roads outside of town will be plowed. So it's a great opportunity to have continuity of the program instead [of] if we were out on a side road someplace … the storefront is convenient for students. It's convenient for parents. It's close to the school. Students gather in town anyway, and these are the places that Youth for Christ loves to do ministry … so we look at this storefront as a tremendous opportunity." *Id.* p. 7-8.

169.    Micah Cramer (who is Todd Cramer's son and serves with Youth for Christ) addressed the Planning Commission and introduced himself, "I'm … Micah Cramer here with my wife Kya Cramer. We are full time staff of Youth for Christ here in Leelanau County. We officially live in Leland…" *Id*. at 8.

170.    Micah Cramer continued to tell the Planning Commission and those attending the public meeting, "So a plan is to have some programming available in the afternoons in the summer.

48

This provides space in the afternoon clubs for local high schoolers, as well as summer students who would also be members of the club and that would be extremely beneficial and fun and it also includes Sunday night gatherings, where we would be in the building, get ice cream from local stores, almost all of the … food and snacks and beverages we get is from The Mercantile, usually when we order foods, it's either made by somebody in the community or from a local restaurant, … the Sunday night programs are open to all high schools, and it's been a ton of fun to be doing that for our home and using [the North Lake Street] building a little bit this summer." *Id*. at 8.

171.    Micah Cramer explained, "[the North Lake Street building is] visible, has giant windows, right in the central location. I believe it's attractive … I couldn't tell ya how many times when we put the Youth for Christ sticker up that families would stop me on their way by and say 'Youth for Christ I didn't know that was here, that impacted me so much as youth.' That happened countless times this summer. And then as we said it provides safety for year round students during our gatherings. The streets will be paved, the parents can see what's going on, transparency, clarity, and safety, and providing, I believe, a much needed safe place during these cold winter months for the students. And a much needed refuge for a lot of the summer students as well who are here and trying to find a place to fit in in the summer." *Id*. at 8-9.

172.    Micah then explained the summer and school year programs Youth for Christ Club provided to Leelanau County youth.  "So we have our high school program, which is mainly what we do, and then we also have a local prayer team that would love to gather in this building. This is made up of people in the community who are interested, who are investing in what God is doing in this County, and who are invested in the youth. We have some of our students, their grandparents come, their parents come, we have school staff members who come in the summer, we have people who have been on this Administration, who come on a weekly basis, and it's really just enriching

49

the fabric of this community through the prayer group. And so that's been a ton of fun … And … a Friday morning coffee program. Coffee provided by local businesses … to get kids coming in before school, [it is a] good, healthy community, and that's just been a ton of fun so far as well. So we have our high school program, our coffee programming and our prayer programming … that's mainly what we've been focused on in the last year and a half." *Id.* at 9.

173.    Robert Parker, the legal counsel for Apollos and Youth for Christ, addressed the Planning Commission and explained that Youth for Christ Club meeting at the Property is entirely consistent with, and is expressly allowed by, the Zoning Ordinance as a "club."  Robert Parker referenced the Zoning Ordinance that explicitly permits "clubs" in the C-1 mixed-use district. *Id.* at 9-10.   See also, **Exhibit 11** (Robert Parker's memorandum in support of Special Use Permit application).

174.    During the November 5 hearing, the coalition of activists that opposed Youth for Christ Club's ministry to students in Leelanau County, told the Planning Commission that Leland Township should deny Youth for Christ Club the right to assemble at the private property on North Lake Street.  The opponents of Youth for Christ argued Youth for Christ is not a "*club*" as defined by the Zoning Ordinance because Youth for Christ assembles for religious speech and faith-based activity such as prayer, Bible study, and worship.

175.    The activists opposing Youth for Christ argued that Youth for Christ Club is a "*church*" and said that Leland Township's Zoning Ordinance absolutely prohibits churches from meeting in the C-1 mixed-use zoning district.  The opponents also (wrongly) argued that the Zoning Ordinance only allows for-profit retail businesses in the C-1 zoning district and Youth for Christ Club and its members should be prohibited from meeting because Youth for Christ Club is not a for-profit business.

176.    Larry Acker, one of the activists organizing and leading the opposition to Youth for Christ's ministry in Leelanau County, told the Planning Commission, "I do not think this [Youth for Christ] is a club. I think it's exactly what the previous speaker said. It is similar to a church, in disguise on the application as a club." *Id.* at 3.

177.    The "previous speaker" Larry Acker referenced was Anna Hogan who said, "Does a religious youth assembly, which is focused on worship and ministry, truly fit the intent of this definition of a club?" *Id. at* 2.  Anna Hogan also said, "Allowing a non-retail, non-service, non-tourism focused assembly use in this premium retail location sets a precedent that I believe alters the intended function of our core commercial area, and a youth assembly group is clearly distinguishable from essential lower-impact services … I believe the proposed use is an intrusion into this high value, extremely visible, commercial area, and doesn't contribute to, and I actually believe dilutes, the essential blend of retail, art, historical experiences, and other natural beauty." *Id.*

178.    The opponents did not address the fact that the Zoning Ordinance explicitly allows "clubs" in the C-1 mixed-use district.  Nor did the opponents address the fact that the Zoning Ordinance permits, as of right and by special use permit, property in the C-1 mixed-use zoning district to be used for purposes other than retail businesses including not-for-profit uses.  See the legal opinion of the Township's legal counsel Brad Wierda, **Exhibit 13** *infra.*

179.    Keith Ashley, another opponent of Youth for Christ Club, asked the Planning Commission to deny Youth for Christ Club and those students desiring to assemble for prayer and Bible study the right to do so because he and his fellow activists objected to Youth for Christ Club's Christian beliefs and ministry.  Keith Ashley said, "to have an organization that is specially set up, to teach children about their vision of what God, Christ, and those things are is a little bit

51

concerning to me, and frankly a bit frightening… I think you ought to … find out how all of this stuff can be overseen and enforced by somebody who is *not* part of this youth movement." **Exhibit 2** at p. 23 (emphasis in original).

180.    Larry Acker and Anna Hogan spoke again in opposition to Youth for Christ.  Larry Acker explained how he had organized a letter writing campaign against Youth for Christ's student ministry because Youth for Christ was "chasing children."  Larry Acker said, "I think the parents in this community have a right to know who is chasing their children, where they're chasing their children, how they're chasing their children, and say, 'no, you do not have permission.' And that is a legally enforceable right."  *Id.* at 22.

181.    Justin Acker, the son of Larry Acker, also opposed Youth for Christ Club assembling at the privately owned North Lake Street property because those participating in Youth for Christ Club activities would engage in religious speech and activity.

182.    Justin Acker told the Planning Commission that, "Youth for Christ is defined as a "parachurch." There's no club in "parachurch." "A parachurch organization is a Christian faith-based group that works alongside local churches and across denominational lines. This typically specializes in areas like evangelism, discipleship, or social welfare, often focusing on specific demographics." In this case, young people that individual churches may not be able to specialize in alone. The Youth for Christ mission and structure is a mission to reach young people everywhere and partner with local churches and raise fellow followers of Jesus. They operate independently of any single church or denomination, but exist *to support and supplement the work of the church.*" *Id.* at 25-26.  (emphasis in original.)

183.    Some of those opposing Youth for Christ Club, such as Larry Acker and Keith Ashley, engaged in a false and slanderous campaign of rumors and personal slurs suggesting that Micah and Kya Cramer were pedophiles seeking to "groom" Leelanau County youth.

184.    Many members of the Leland community stood in opposition to the Ackers and others opposing Youth for Christ Club.  The supporters speaking in favor of Youth for Christ include Pete Miller, a prominent local attorney with expertise in real estate and land use law.  Pete Miller told the Planning Commission, "my office is maybe half a block from the proposed location, 201 North Main. We [Pete Miller and his wife, Lisa, who is also a prominent attorney] are here to express enthusiastic support for this proposal, with no qualifications whatsoever about either the Youth for Christ organization or this proposed location. Leland, simply put, needs a place like this for young people to gather. … I believe that the proposal is remarkably consistent with the ordinance and the neighborhood. … most important to me and I think also to Lisa, is we've come to know pastor Micah and Kya Cramer. We consider them good friends. They are loving, caring, … individuals, dedicated in their faith, and dedicated to this community. It's a beautiful thing. We're glad they're here, and we wish we had more people like that… they're the sort of people that can really help to build community into something important and good." *Id.* at 4.

185.    Elise Vann, one of the students participating in the Youth for Christ Club activities explained why she supported Youth for Christ Club meeting at the North Lake Street property. Elise Vann said, "The Lighthouse [Youth for Christ calls its high school youth ministry "the Lighthouse"] has been an outlet for those who strive to grow in their faith. Micah and Kya have guided us in a way that allows us to process our faith in God's timing. They encourage us in everything by teaching us how to create a way for our faith to be in all that we do, and all for the glory of God. They show up for us, they want us to be there for us. I have enjoyed every Sunday

53

that I've attended at the Lighthouse. I've met people that I would have never interacted with at school. …

186.    Elise Vann continued and told the Planning Commission that, "they [Micah, Kya, and other students participating in Youth for Christ activities] don't judge or make you feel uncomfortable. We support each other through our sister- and brother- hood. I was desperately praying for a group to encourage me in my walk to the Lord, and by answering my prayers God has given me the Lighthouse, a place that shows me the true meaning of the life of Jesus in the biblical community." *Id.* at 24.

187.    Chris Butz, the father of the four adopted Black children mentioned in the *New York Times Magazine* article and quoted above (see **Exhibit 2** and **Exhibit 5**), explained how Youth for Christ is a ministry that greatly enriched his life.  Chris Butz told the Planning Commission members that, "if it were not for a group like Youth for Christ, I wouldn't be standing here to this day… when I was 15-year-old/16-year-old Chris, and a group of us decided, hey, there's this open, Friday morning coffee that we could go to and listen to music and hear a guy talk and go on cool ski trips and all this stuff we thought, 'let's go.' Some of us gave our life to Christ and others didn't. … when I was 24 years old, newly married, depressed, and suicidal, I had that faith to go back to. And that faith saved my life. So I'm just telling you, please don't be afraid of these people. I've known Micah and Kya, I'm in deep community with Micah. I've known him for over a year. And I'm in Bible study with Micah, a Bible study that I lead here every Thursday morning in the community." *Id.* at 26.

### *3.       The December 3, 2025 Meeting of the Planning Commission.*

188.    The Youth for Christ Special Use Permit application came before the Planning Commission again at the Commission's December 3, 2025 meeting.  See **Exhibit 14** (December 3, 2025 notification on the Planning Commission's website.).

189.    Several hundred people appeared and wanted to comment at the public meeting. Because so many people attended, the December 3 public hearing was cancelled and "moved to the Northport Public School auditorium to accommodate a crowd that numbered in the hundreds." **Exhibit 15** (*Glen Arbor Sun* February 18, 2026, update article, *Allegations of youth grooming, a Bear Man's tracks, and divisive debate over the role of religion in a small town*.)

190.    Following this Planning Commission meeting, Ross Satterwhite, who was then, chairman of the Planning Commission, tendered his resignation effective December 30.

### 4.    *Thor Hearne's December 30 memorandum.*

191.    Thor Hearne is a Leland summer resident.  Thor Hearne grew up in Leland in the summers and Thor Hearne and his family own property in Leland.  Thor Hearne's family has been part of the Leland community for more than 120 years.  Thor Hearne is an experienced constitutional and civil rights attorney.  Thor Hearne is a member of the Michigan, Missouri and Washington, DC bar and has more than thirty-years' experience litigating constitutional and civil rights matters before federal and state courts.  Thor Hearne has argued constitution and civil rights cases before the United States Supreme Court, the Michigan Supreme Court, the Missouri, Florida, and Kansas Supreme Courts, other state courts and numerous federal Circuit Courts of Appeal, including the Sixth Circuit, Eighth Circuit, and Eleventh Circuit Courts of Appeal.[7]

192.    James VanSteenhouse and Robert Parker asked Thor Hearne to provide his opinion concerning the constitutional and civil rights issues related to Youth for Christ Club meeting at the North Lake Street property.  Thor Hearne wrote a December 30, 2025 memorandum. **Exhibit 16** (Thor Hearne Memorandum I - December 30, 2026).

---

[7] See **Exhibit 17** (a summary of Thor Hearne's experience).

193.    In the December 30 memorandum, Thor Hearne explained that Leland Township's Zoning Ordinance was facially unconstitutional because Leland Township's Zoning Ordinance violated Youth for Christ Club's and its members' First Amendment right to assemble, speak, and associate.    Thor Hearne's memorandum further explained that Leland Township's land use scheme, as written and as applied and enforced against Youth for Christ Club (among other constitutional and civil rights infirmities) violates the First Amendment right to Free Speech, Assembly, and the Free Exercise of Religion.

194.    The December 30 memorandum also noted the Township's denial of Youth for Christ Club's right to speak, assemble, worship and associate was unconstitutional as enforced and as applied against Youth for Christ Club.

195.    Thor Hearne's December 30 memorandum further explained that the Township denying Youth for Christ the right to meet at the private property violated various federal civil rights laws including RLUIPA.

196.    The memorandum from Thor Hearne included a copy of the Department of Justice's letter to State, County, and Municipal officials concerning RLUIPA's requirement that land use ordinances and enforcement comply with RLUIPA.

197.    The December 30 memorandum stated,

> Leland Township's denial of Youth for Christ Club's right to assemble and speak at private property in the C-1 District would be a federal civil rights violation subject to (among other provisions of the Constitution and federal statutes) the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5. Should Leland Township deny Youth for Christ Club's right to assemble at the North Lake Street property Leland Township would be exposed to significant financial liability for a federal civil rights violation.

198.    The Planning Commission was provided a copy of Thor Hearne's December 30 memorandum.

**5.      *The January 7, 2026 Meeting of the Planning Commission.***

199.    Youth for Christ Club's application for a permit to meet at the North Lake Street property was, again, on the Planning Commission's agenda for January 7, 2026.  Due to the significant public interest in this matter, the Planning Commission moved the January 7, 2026 meeting from Leland to Northport, Michigan.  Northport School provided a larger venue accommodating more people than the Leland Public Library where the Planning Commission customarily met. Those wishing to comment were limited to three minutes.  So many people appeared to comment that the hearing lasted three hours.  The transcript of the January 7, 2026 (incorrectly titled as "January 8, 2025") meeting is attached as **Exhibit 18**.

200.    Those speaking in favor of Youth for Christ Club included AJ Garcia, pastor of Westside Community Church.  Pastor Garcia told the Planning Commission members, "I care deeply about the people who call this place home. ... We have heard that they do not meet the requirements, but that is simply untrue. Under the zoning ordinance, private clubs are explicitly permitted. There has been some confusion over what [Youth for Christ] is, but they are not a church and certainly not a cult. While some will try to define them as such, any historical, theological, or superficial study will prove that to be false. It [Youth for Christ Club] is a club that voluntarily meets for mentoring and community, consistent with similar organizations across the state. That should be the basis of your decision. Much of the broader ... controversy, however, has not been about zoning, but about discomfort with Christianity. The Bible warns against partiality, holding one group to a different standard than another. Or that governing authorities must reward what is good and restrain what is harmful. These truths should weigh on our hearts and minds and call us to honesty, fairness, and integrity, especially in public decision-making." *Id.* at 13-14.

201.    Pastor Garcia continued and told the Planning Commission members of the RLUIPA requirements, "State and federal law requires religious groups to be treated on equal

terms with comparable secular clubs. Under [RLUIPA] a permit cannot be denied because the group's beliefs are unpopular. Once permitted, any religious activity is protected under the First Amendment." *Id.* at 14.

202. Chris Butz, spoke in support of Youth for Christ.  Chris Butz told the Planning Commission, "What we really have here, in my opinion, is an attack on religious freedom, dressed up like a zoning and compatibility issue, and I ask you to make the right decision please." *Id. at* 20. Chris Butz also spoke in support of Youth for Christ Club at the November 5, 2025 hearing. See Paragraph 54, *infra.*

203. Kevin Vann, the father of Elise Vann who told the Planning Commission during the November meeting of her positive experience as a student participating in Youth for Christ Club, told the Planning Commission, "Our family has seen first hand positive impact organizations like Youth in Christ have, not only on the young people who participate, but on their families and communities as well. For these reasons, we strongly support this special land use application for the Youth [f]or Christ [C]lub. And while a faith-based youth group not affiliated with the church may seem unfamiliar to some, it is a well-established concept throughout the country, not to mention the world, and I am excited to see it coming to Leland." *Id.* at 21.

204. Sarah Spinniken Swinger similarly said, "…it has been on our heart for a long time to have a local Christian outlet for our kids to be a part of. There is nothing like YFC in this area, and most families I know travel to Traverse City for opportunities like this. I hope everyone can see the benefit of having something local for our young people that instills values like love your neighbor as yourself and in everything do to others what you would have them do to you. Micah and Kya are genuine, honest, trustworthy people who are doing an incredible job ministering here. They are creating a safe, local, and supportive ministry center for our future generations. And

58

personally, as a mom, I would rather have my children in a visible area than tucked away in some woods with a bunch of people that I don't know what's going on all the time." *Id.* at 21-22.

205.    Emily Pennings explained why it was important that the Youth for Christ Club meet at the North Lake Street property.  Emily Pennings said, Youth for Christ Club "would be in the main area here, where we should walk past and see what's going on at all times. To me, that is a huge benefit to an issue that seems very divisive in this community, but if you want to see transparency, why not put them in the center? And so for me, I'm just in full support of this ministry." *Id.* at 22.

206.    Another mother, Patty Lesche, spoke directly to those opposing Youth for Christ and told the opponents "It seems as though you don't care enough about our children to give them a safe haven of honor in a public square. The power rovers started out maligning Youth for Christ with a cult narrative that didn't stick. Instead, those who claim to have the best interest of our children have resorted to what the real issue is. It's not about the kids. It's all about the money. You should be ashamed! When kids experience community outside of the four brick walls of the school and 22 reside among a much broader community, how the adult-child relationships are formed. Young people who are losing when they are given the opportunity to rise up to a challenge. Those students who have been participating in [Youth for Christ] are experiencing a life-changing event and this opportunity will grow them into a viable community member in this County." *Id.* at 22-23.

207.    Greg Irwin and his wife spoke in support of Youth for Christ Club and told the Planning Commission, "I'm here on behalf of myself and my wife. We are retired pastors, most recently we served in the Salvation Army for 16 years. We served Leelanau County through the Grand Traverse chapter of the Salvation Army, which is in Traverse City, and we're here just to

voice our support wholeheartedly for the Youth for Christ initiative and ask that you at least consider what it can do even with the zoning, what you have as far as zoning restrictions. I'm not an attorney so I hear a lot of speaking on both sides of this. I don't know. That's a decision you have to make. But I can tell you this: as a recovering alcoholic with 22 years of sobriety and as one who came from a home [sic] and as one who [has ministered] to a lot of youth that turn into adults and many times broken adults, I know that Youth for Christ will help mend relationships, it helps mend families, it is the epitome of inclusivity, the epitome of reaching out and welcoming everyone in and I think it's just important that we keep that in mind because in this day and age we need that and we need initiative like that in our towns not just in Leland but in Traverse City and elsewhere." *Id.* at 23.

208.   A mother of young children, Erika Humphrey, told the Planning Commission, "I have two boys who attend school here, and dearly love Micah and Kya Cramer. I've known them since shortly after they moved here. I know them intimately. I can't say enough good things about their character. And I'm incredibly passionate about youth ministry because it saved my life in high school." *Id.* at 25.

209.   Erika Humphrey explained, "I went to Sutton's Bay from 1999 to 2003. I struggled with bulimia, cutting myself, I was sexually abused by Dr. Larry Nassar, I had cancer surgery, I had an incredibly tumultuous home life. I had anxiety and depression. I cut myself, and I nearly hung myself. I thank the Riley's...I'm sorry (crying)... and their Youth Ministry, because I felt very desperate, and I came to know Jesus. (crying) … I found hope, and I found peace, and I found love, and I found gentleness, and forgiveness. And that changed the trajectory of my life, and I'm passionate about them, them having a place in Leelanau County for our youth … *Id*. at 25.

210.    Erika Humphrey also told the Planning Commission, "I feel like we know that we've said that this is about zoning, but I can't help but feel like it's persecution of the faith, and I feel like Christians have done a really good job in our area in being tolerant of culture that we don't agree with, because we support freedom. And I pray that we be free to live out our faith, and I go to church, and I went to youth group and I can tell you that they're not the same things. Youth group is not a church. It's a club, and under these ordinances they should be allowed to be there and it would serve the entire county because it's centrally located for Northport and Suttons Bay and Leland. And only half of the kids can drive, most of them carpool and the ones in Leland can often walk. So I don't think that the driving issue, the parking issue, is as big a deal as they're making it out to be." *Id.* at 25.

211.    Doug Vandyke is a thirty-year resident of the Leland community and president of the Lake Leelanau Lake Association, a not-for-profit organization devoted to the conservation of Lake Leelanau. Doug Vandyke told the Planning Commission, "I'm in support of this ministry and where it's talked about being located. One of the reasons I'm in support of the subject project has to do with my familiarity with Youth for Christ for several decades, reaching back as far as my own involvement as a youth, living in Grand Rapids during the time of 1950 to 1970. So it's been a long time that I've known about this ministry. I've got the utmost confidence in the integrity, mission, and accountability of this organization based on personal exposure. I would welcome the opportunity for my own offspring to be involved with such an endeavor here in our community of Leelanau. Another reason I'm in support of this is that I've personally met Micah and Kya Cramer, spoke with them about their own backgrounds, their personal stories as a couple, asked enough questions concerning their intentions in our community to confidently encourage them with their

61

mission. I'm also well aware of many others whom I respect and who [have expressed] the same degree of support." *Id*. at 25-26.

212.    Doug Vandyke also explained why the community was in favor of Youth for Christ Club meeting at the North Lake Street property, "Additionally, I believe that the location they have proposed on Lake Street for the location of the YFC Lighthouse will have nothing but a positive impact on the community and is ideal for meeting their purposes. I see nothing that will create negative effects on other local businesses and in regard to the zoning and so forth I would say if there's a way that you can look beyond what some of those concerns are I think that the positives of what has been demonstrated by just what this young lady was talking about certainly supersedes any of what some of these concerns have been that are expressed." *Id.* at 26.

213.    Mackenzie Sluiter similarly told the Planning Commission that the Youth for Christ Club was filling a needed role in the community for youth ministry.  Mackenzie Sluiter told the Planning Commission, "I'm speaking in support of granting a special use permit for the establishment of a permanent Youth for Christ meeting location in the building owned by Apollos Properties, LLC in Leland. … Unlike the other cities I had lived in, Leland had limited church involvement and even fewer youth group opportunities. While I knew of programs in Traverse City, the lack of transportation and the demands of academics and athletics made it challenging to participate consistently. … I sincerely wish that a club like Youth for Christ, Leelanau Chapter, had existed during my high school years. I have witnessed firsthand the positive impact Youth for Christ has had on my two younger sisters who were able to be involved from the beginning. And I am now fortunate to volunteer with the program as I continue to grow in ministry. Removing [sic] a supervised space designated for students to socialize in town would be a significant loss for the community, as no other place like it exists. … I have witnessed many shops go in and out of

business in that location [where Youth for Christ's Club now meets] and would much rather have a safe space for adolescents to gather than another shop. It is with sincere respect and conviction that I urge the Planning Commission to recognize the critical need for a safe, consistent gathering space for adolescents … in Leland." *Id*. at 27-28

214.    Those opposing Youth for Christ Club said they opposed Youth for Christ Club primarily because Youth for Christ Club was a Christian ministry promoting the Gospel, prayer, Bible study, and encouraging youth to have a relationship with Jesus Christ.  The opponents called Youth for Christ Club a "cult."

215.    Keith Ashley, an outspoken opponent of the Youth for Christ's ministry in Leelanau County, told the Planning Commission, "The question before the [P]lanning [C]ommission is not just should a club of any type be allowed to operate in a commercially zoned district, but rather does the criteria of Youth for Christ, being a religious club, meet the zoning regulations put in place to create an orderly arrangement of compatible uses. A careful reading of the Zoning Ordinance Section 16.11 [the section prohibiting and regulating "Churches and Religious Institutions"] reveals that as a religious institution, as self described by Youth for Christ, they are not permitted in the C-1 zone unless, amongst other things, they have a two acre parcel of land." *Id.* at 23.

216.    Keith Ashley stood up, again, to say, "That term 'religious institution.' It happens when the purpose of the club identifies as a club to socialize, educate, and provide religious teachings. These are all things that they have talked about in the past … I think by their own self-identification, they are a religious institution, and that's covered in [Leland's Zoning Ordinance] 16.11, requires two acres of ground and ground coverage and so on, so forth." *Id.* at 40.

217.    The Township's obligation to comply with RLUIPA was squarely presented to the Planning Commission.  Greg Irwin, the retired pastor with Salvation Army told the Planning Commission, "[RLUIPA] Says that the local governments cannot prevent or put substantial burdens on those that are religious organizations and it goes on to say that there's an equal terms provision that prevents local governments from treating religious uses less favorably than comparable uses... Youth for Christ can't be treated with less respect than a secular organization. And again, this comes from the law. It prevents local governments from treating religious uses less favorably than comparable secular uses so the fact that it's a club or a church, I think that there needs to be serious consideration under this law [RLUIPA] Which I believe is something that needs to be reviewed when making a decision on this special use permit. *Id*. at 44-45.

218.    Two lawyers in the audience, Larry Acker and Jacob Danzinger, both of whom acknowledged they have no experience in this area of law, opposed Youth for Christ meeting at the North Lake Street property.

219.    Larry Acker, one of the leading organizers of the activists opposing Youth for Christ Club's ministry, and Jacob Danzinger opined that RLUIPA does not apply to Youth for Christ Club because Leland Township has not approved a secular chess club in the same zoning district so there is no discrimination against Youth for Christ. *Id*. at 45.

220.    Chris Bzdok and Sean Clark, the authors of two memoranda that were commissioned by the Fishtown Preservation Society, told the Planning Commission that RLUIPA does not apply to the Township's denials of Youth for Christ meeting at the North Lake Street property because RLUIPA only applies in Michigan if Leland Township said that an Islamic group could not meet anywhere in Leland Township.  *Id*. at 46.  See **Exhibit 20**, **Exhibit 29**, **Exhibit 30**, and **Exhibit 31**.

221.    As described in Count VII, *infra*, the Troposphere Memoranda by Bzdok and Clark, and Jacob Danzinger's unsolicited opinions about the applicability of RLUIPA, are entirely without merit and are contrary to all authority including the United States Department of Justice's interpretation and enforcement of RLUIPA, decisions of numerous federal district courts enforcing RLUIPA, the explicit text of RLUIPA and various Circuit Courts of Appeal's decisions enforcing RLUIPA against local governments and townships.  See Count VII below and the authority cited therein.

222.    The Planning Commission scheduled a subsequent hearing on February 11, 2026 to consider Youth for Christ's application for a Special Use Permit. See Planning Commission Agenda, **Exhibit 19**.

### 6.    *The Township counsel's February 3, 2026 Legal Opinion advised the Planning Commission that the Township should grant the Special Use Permit application and allow Youth for Christ Club to meet at the North Lake Street property.*

223.    Following the meeting on January 7, and prior to the next meeting of the Planning Commission, the members of the Planning Commission sought and were provided the legal opinion of Leland Township's counsel, Brad Wierda.  Brad Wierda is a respected attorney in Traverse City who has expertise in zoning, land use, and municipal law.  Brad Wierda's legal opinion is attached as **Exhibit 13** (Wierda Legal Opinion).

224.    In his Legal Opinion, Brad Wierda summarized the Special Use Permit application noting that, "Applicant states that '[n]o new construction, renovations, or updates are being done to the existing building or its systems.' … The use of the Property will be to provide programming for high school age students to help them: 'make good choices, build a solid foundation for life, and make a positive impact on their schools and communities.'… The Application also identifies serving '11-19-year -olds' as well as an 'Adult Prayer Club.'" *Id.* at 2.

65

225.    Brad Wierda stated that Youth for Christ Club assembling at the Property was allowed as a permitted use under the Zoning Ordinance and Brad Wierda cautioned the Planning Commission that denying Youth for Christ Club the right to meet at the Property could violate RLUIPA. *Id.* at 2.

226.    Brad Wierda's Legal Opinion noted, "The Zoning Administrator [Tim Cypher] states: 'Clubs are specifically permitted in C-1. By inclusion there has been a legislative determination that clubs are 'generally accepted as reasonably compatible' with primary uses and structures.'" *Id*.

227.    Brad Wierda's Legal Opinion notes the opponent's arguments against granting the special use permit were without merit.  Brad Wierda wrote, "[s]ome opponents of the application have argued that the Village Commercial District should be limited solely to retail and/or commercial uses and should not include further mixed-uses. I have not been provided with any support for that argument from the Comprehensive Development Plan. Rather, as noted by Applicant and the Zoning Administrator, the Comprehensive Development Plan appears to support the opposite." *Id*. at p 5.   Brad Wierda's Legal Opinion continued, "Accordingly, a general argument that the application should be denied because it is not a retail or commercial use appears inconsistent with the Zoning Ordinance." *Id.* at 6.

228.    Brad Wierda's Legal Opinion also noted "the use of the land is encouraged when it is consistent with the health, safety and welfare of the Township's residents.  Since changes are not being made to the exterior of the building or use of public services, many of the issues identified [in the Zoning Ordinance] are largely inapplicable." *Id*.

229.    Wierda's Legal Opinion contained a section discussing the "Constitutional and Federal Law Implications" of Youth for Christ Club's application for a permit to meet at the

66

Property.   In his Legal Opinion to the Planning Commission members, Brad Wierda as the Township's legal counsel noted, "[t]he decision [on] this Application also has constitutional and federal law implications … the decision of the Planning Commission] could potentially also be attacked through a direct action against the Township.  Accordingly, it is appropriate for you to be aware of constitutional and federal law considerations in making your decision." *Id*. at 9-10.

230.    Wierda's Legal Opinion then advised the Planning Commission members that the Township's zoning authority is subject to the First and Fourteenth Amendments to the United States Constitution, the Free Exercise Clause of the First Amendment, Freedom of Association and that the Township's "[z]oning power, while broad, 'must be exercised within constitutional limits.'" *Id*. at 10 (Citing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981)).

231.    Township attorney Wierda's Legal Opinion noted, "[r]egulation of the Applicant's proposed use of the property affects First Amendment rights to speech, assembly, and the free exercise of religion.  Accordingly, review of such a decision may trigger strict scrutiny which would require the Township to persuade the Court that its actions: (1) serve a compelling government interest, and (2) are narrowly tailored to achieve the compelling government interest by the least restrictive means available.  This is a very demanding standard which is very challenging to meet." *Id*.

232.    The Township's attorney then noted, "[n]umerous public comment received to date would clearly violate the First Amendment if relied upon."  Brad Wierda then listed six examples of public comment that asked the Planning Commission to deny the special use permit because of the religious character of the speech, assembly and worship that Youth for Christ members engaged in at the Property including, "they want to incorporate worship at the location" and "she doesn't believe a religious club belongs in the C1 district." *Id*. at 11.

67

233. Brad Wierda's reference to public comments that "would clearly violate the First Amendment if relied upon" are listed in **Exhibit 13** at 11.

234. Finally, Township attorney Wierda noted, "[i]n addition to the Constitutional issues, there are issues related to potential application of [RLUIPA]." *Id.*

235. Wierda's Legal Opinion explained to members of the Planning Commission that, "RLUIPA is a civil rights law that protects individuals and religious assemblies and institutions from discriminatory and unduly burdensome land use regulations. It also prohibits the implementation of any land use regulation that imposes a 'substantial burden' on the religious exercise of a person or religious assembly or institution except where justified by a 'compelling governmental interest' that the government pursues in the least restrictive way possible ... RLUIPA also provides that religious assemblies and institutions must be treated at least as well as non-religious assemblies and institutions ... A 'compelling government interest' is a very high standard which is has been interpreted by at least one court to mean an interest of the 'highest order.' An interest of the highest order typically involves 'some substantial threat to public safety, peace, or order." *Id.*

> **7.    *Chris Bzdok's and Sean Clark's memorandum on behalf of Fishtown Preservation Society asking Leland Township to deny Youth for Christ Club the right to assemble at the North Lake Street property.***

236. Fishtown Preservation Society is a 501(c)(3) public charity established for the purpose of preserving property in the Fishtown Historic District and commercial fishing businesses operating from Leland Harbor. Fishtown Preservation Society holds title to land in the Fishtown Historic District and two fishing vessels. Fishtown Preservation Society told the Internal Revenue Service that, "Fishtown Preservation Society exists to assure public access to Fishtown and maintain its historical integrity, working waterfront, artifacts and stories through preservation, education and stewardship."

68

237.    Fishtown Preservation Society leases the property it owns in the Fishtown Historic District to retail stores that pay Fishtown Preservation Society rent. The property titled to Fishtown Preservation Society is not subject to *ad valorem* property tax as are other retail business properties.  Fishtown Preservation Society also maintains their administrative offices at property in the Fishtown Historic District.

238.    The Fishtown Historic District does not include the North Lake Street property and there's no provision in Fishtown Preservation Society's corporate articles or tax documents stating that Fishtown Preservation Society was established for the purpose of opposing or even opining upon the use of property outside the Fishtown Historic District.

239.    Notwithstanding the specific and limited purpose for which Fishtown Preservation Society was established, the director of Fishtown Preservation Society, David Burkhardt, and Scot Zimmerman, the Treasurer of Fishtown Preservation Society, used funds donors contributed to Fishtown Preservation Society to hire Chris Bzdok and Sean Clark, lawyers with the Traverse City Troposphere Legal firm.  Fishtown Preservation Society hired Bzdok's and Clark's firm to argue the Planning Commission should deny Youth for Christ Club's application for a Special Use Permit and that Leland Township should deny Youth for Christ Club, and students the right to assemble at the North Lake Street property for prayer and Bible study.  See **Exhibit 20** (the Fishtown Preservation Society memorandum (Troposphere Memorandum I)).

240.    In Troposphere Memorandum I, Bzdok and Clark argue that the word "club" as used in Leland's Zoning Ordinance means "Standard Restaurants" with dancing that serve food and drink.  And, despite Fishtown Preservation Society's own use of property in the C-1 mixed-use district for not-for-profit administrative offices, the Troposphere Memorandum argues that

69

Youth for Christ Club's use of the property for a religious faith-based club is prohibited because such activity is a "church" forbidden by the Zoning Ordinance and not a commercial retail use.

241.    The Troposphere Memorandum incorrectly claims, "RLUIPA only applies in limited circumstances." **Exhibit 20**, p. 8.  Bzdok and Clark cite only one Michigan state court decision as authority for this proposition.  Furthermore, the Troposphere Memorandum makes statements directly contrary to the text of RLUIPA, contrary to numerous decisions of various federal Circuit Courts of Appeal, contrary to numerous federal district courts and contrary to the United States Department of Justice guidance concerning and enforcement of RLUIPA.  See Count VII below.

242.    On the basis of the inaccurate and false factual and legal statements contained in the Troposphere Memorandum written by Bzdok and Clark, Fishtown Preservation Society asked the Planning Commission to deny Youth for Christ Club the right to assemble at the North Lake Street property.

### 8.    *The February 11, 2026 Meeting of the Planning Commission.*

243.    The Planning Commission's agenda for the February 11 meeting included a motion to reduce the size of the Planning Commission from seven members to five members.  At the time, the Planning Commission had only five members. No one ever explained why the bylaws required seven members and the Planning Commission had met and acted for years with only five members.

244.    The February 11 meeting agenda also included election of a new chairperson of the Planning Commission, and consideration of Youth for Christ's Special Use Permit application. The February 11, 2026 meeting was cancelled due to snow.

245.    The Planning Commission rescheduled its meeting for February 18, 2026 by which time Leland Township Supervisor, Clint Mitchell, had appointed Brian Fenlon to fill the vacancy created by Ross Satterwhite's resignation.

70

### 9.    *The February 17, 2026 Memorandum to the Planning Commission.*

246.    Before the Planning Commission met on February 18, Thor Hearne provided the Planning Commission members and their counsel a memorandum responding to the errors in the Troposphere Memorandum.  This February 17 Memorandum is attached as **Exhibit 21** (Thor Hearne Memorandum II).

247.    Thor Hearne's February 17 Memorandum explained,

The Troposphere memorandum entirely overlooks or ignores a substantial body of federal, especially Supreme Court, jurisprudence on the First Amendment's guarantee of freedom of speech and religious liberty including, most notably, *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993), *City of Cleburne v. Cleburne Living Center, Inc.* 473 U.S. 432 (1985), *Widmar v. Vincent*, 454 U.S. 263 (1981), *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150 (2002) and *Cantwell v. Connecticut,* 310 U.S. 296 (1940). See the December memorandum p. 14, 25, and the authorities cited therein.

The Supreme Court's Establishment Clause decisions in *Good News Club v. Milford Central High School*, 533 U.S (2001) *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384 (1993) and *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995) also support Youth for Christ's right to assemble and engage in prayer and bible study at the North Lake Street property. The Township simply cannot use its zoning authority to permit commercial and retail use of private property but deny the owner of the property from using the private property for religious uses such as prayer and bible studies.

This authority holds that any regulation by Leland Township purporting to deny Youth for Christ or its members the right to assemble, speak and pray at the North Lake Street property will be evaluated by a federal court under the strict scrutiny standard of constitutional review. This is a standard of review the Township cannot survive…

The Troposphere memorandum provides no basis upon which the Township can deny Youth for Christ the right to assemble at the North Lake Street property. Denying Youth for Christ the right to meet at the North Lake Street property would be an extremely imprudent course for the Township to pursue…

I recommend the Commission heed the counsel of their attorney Brad Wierda, consider the analysis Robert Parker has provided and consider the significant constitutional and federal civil rights implications, including the United States Department of Justice's guidance in the June 2018 memorandum, and President Trump's subsequent Executive Orders.

71

On the basis of all this authority, I respectfully suggest the Commission grant Youth for Christ's special use permit and recognize Youth for Christ's right to assemble at the North Lake Street property.

248. The members of the Planning Commission and their counsel had Thor Hearne's memorandum before the Planning Commission members met on February 18.

### 10. The February 18, 2026 meeting of the Planning Commission.

249. On February 18, 2026, the Planning Commission met at the Northport Performing Arts Center Auditorium. Youth for Christ's Special Use Permit application was again on the agenda. Public interest in this matter was so great that the Planning Commission had relocated the meeting to an auditorium in Northport that provided a larger venue. See **Exhibit 22** (Agenda for the February 18 meeting).

250. At the February 18 meeting, the Planning Commission elected Lee Cory to be the new Chairwoman of the Planning Commission.

251. During the public comment period, opponents of Youth for Christ argued that, because Youth for Christ engaged in faith-based activity such as prayer and Bible study, Youth for Christ Club was not a "club" within the meaning of the Zoning Ordinance but was, rather, a "church" that is categorically prohibited under the Township's Zoning Ordinance. See, **Exhibit 23** (Minutes for the February 18 meeting), and **Exhibit 24** (Transcript from February 18 meeting).

252. During the February 18 meeting, opponents of Youth for Christ Club's ministry, including Larry Acker, Berkley Duck, Bill White, Jacob Danzinger, Anna Hogan and Keith Ashley demanded Leland Township deny Youth for Christ Club the right to assemble at the private property on North Lake Street.

253. The opponents argued Youth for Christ was a "church" not a "club" under the Zoning Ordinance. The opponents argued Youth for Christ Club was a "church" because those individuals participating in Youth for Christ Club activities were engaging in religious activity

72

such as prayer and Bible study.  And, the opponents argued, because "churches" were forbidden in this church-free zoning district, the Township must deny Youth for Christ Club the right to assemble at the North Lake Street property.

254.    The motivating animus of those opposing Youth for Christ Club assembling at the North Lake Street property was hostility to the Christian *message* Youth for Christ Club and its members proclaimed and the prayer and Bible study they engaged in when they met at the Property.  The opponents objected to the *religious content* of Youth for Christ Club members' speech when assembled at the North Lake Street property.  The opponents' objection to Youth for Christ Club had nothing to do with the character of the property or structure where Youth for Christ Club assembled on North Lake Street.  Rather, the opponents' objection was that when students assembled at the North Lake Street property, those assembled did so to pray, study the Bible, and proclaim the Gospel and teachings of Jesus.

255.    Dan Brugeman of Fishtown Preservation Society told the Planning Commission, "there is a documented history of regular religious worship and the pursuit of baptism inside the very space in question."  **Exhibit 24** (Transcript of February 18 hearing, p. 8).

256.    Bob Schlueter told the Planning Commission that, "[Youth for Christ] is a church doing church-like things and having church-like activities. The Youth for Christ group is a church; they are not a club. Clubs don't have baptisms on the shores of Lake Michigan. Clubs don't recruit young people for the sole purpose of introducing them to their religious deities." *Id.* at 3.

257.    Bill White is another outspoken opponent of Youth for Christ's ministry in Leelanau County.  Bill White provided the Planning Commission his resume that included, *inter alia*, "Certified in Meat Cutting Management" and listed "Basic, Advanced & Self Hypnosis/Medical Hypnosis" as "Additional Studies."  (See E**xhibit 25).**

258.    Bill White said he opposed Youth for Christ Club because "Youth for Christ has stated their purpose is a religious one in a social setting. Among the prayers, storytelling, and preaching, they also engage in water baptisms—a sacred religious rite symbolic of washing away sin and admitting a person into Christianity. This is a religious rite performed under the auspices of a religious organization… What might simply be a club becomes a religious institution when it identifies itself as having the purpose to socialize, educate, and provide religious teaching, training, and prayer, or exposure to religious concepts—and in fact performs these characterizations. It is plain as day that this Youth for Christ is a religious body meeting every conceivable criterion and must be accorded the treatment spelled out in Section[s] 16.01 and 16.11 of the zoning ordinance, which serves to guide the decision for religious institutions." **Exhibit 24,** at 3-4.

259.    Another opponent of Youth for Christ, Sarah Mills, told the Planning Commission, "The claim that Youth for Christ should be classified as a club for zoning purposes must be rejected on the basis of legal distinction. The organization's [sic] operations, including baptisms, organized ministry, its 501(c)(3) status as a church are functionally inconsistent with the definition of a club under zoning law." **Exhibit 24** at 10.

260.    Sarah Mills explained that opposition to Youth for Christ Club was based not on a regulatory designation of real property land uses but was rather opposition to the *content* of Youth for Christ's "programs" and the religious nature of the speech of those assembling at the property. Sarah Mills said the opponents objected to, "A programmatic level, which is concerned with what the organization does—a descriptive label for activities. It runs activities called "clubs. " In a programmatic sense, a club is a marketing and relational term that describes a specific model of interaction rather than a land use category.... A programmatic club could be anywhere—school

cafeteria, a living room, a park; it is defined by the people and the curriculum, not the physical building." *Id.*

261. Anna Hogan then spoke noting "[Youth for Christ Club's] operations, including baptisms, organized ministry, and its 501(c)3 status as a church establishment, are functionally inconsistent with the definition of a private social lodge or club under zoning law." *Id*. at 11.

262. Keith Ashley, Jacob Denzinger and others then spoke and asked the Planning Commission to disregard the Township's attorney, Brad Wierda's, Legal Opinion and hire a new lawyer to provide an alternative opinion.

263. Kieth Ashley asked the members of the Planning Commission to disregard Brad Wierda's Legal Opinion because, "[Brad Wierda is] a Calvin College graduate. [Calvin College's] motto is 'think deeply, act justly, live wholeheartedly as Christ's agents for renewal of the world.' They boast that their faculty is 100% committed Christians. [Brad Wierda] was a consistory [sic] member of the Faith Reformed Church, which is the focus on spiritual growth of the congregation including worship and education. [Brad Wierda] was a school board member of the Traverse City Christian School whose motto is 'glorify God by partnering with parents and equipping students to transform the world of Jesus Christ.'" *Id.* at 8.

264. Dan Brugeman told the Planning Commission that, "it is deeply disturbing Mr. Wierda didn't recuse himself. His clear bias in this matter is documented. Given Wierda's history with Calvin College, Spring Arbor Methodist College, Traverse City Christian, and also an evangelistic Faith Reformed Church he should have passed this assignment on to a neutral co-worker." *Id.* at 7-8.

265. In response to those activists opposing to Youth for Christ Club, Lee Cory, the new Chairwoman of the Planning Commission, and a majority of the Planning Commission (all

members except Steve Scales) voted to disregard Brad Wierda's Legal Opinion and table Youth for Christ's application for a Special Use Permit until the Township hired new legal counsel to provide an alternative legal opinion.

266.    The Minutes of the February 18 meeting state that Chairwoman Cory said, "RLUIPA applies in this case.  She [Lee Cory] wants to know why or how this applies." **Exhibit 23** at 3.

> ### *11.    The Township's new attorney, Tom Grier, provided the Planning Commission two alternative proposals, one denying and one granting Youth for Christ the right to assemble at the Property.*

267.    Leland Township Supervisor, Clint Mitchell, approved the Township paying $2,000 to retain new legal counsel to provide the Planning Commission an alternative legal opinion. The Planning Commission retained Traverse City attorney Tom Grier to advise the Planning Commission. Tom Grier did not, however, provide a legal opinion but, rather, provided the Planning Commission members two alternative drafts of Findings and Conclusions. One draft of the Findings and Conclusions approved Youth for Christ's Special Use Permit application (**Exhibit 8-A**) and another draft of Findings and Conclusions denied Youth for Christ's Special Use Permit application. (**Exhibit 8-B**).

> ### *12.    The April 15, 2026 meeting of the Planning Commission.*

268.    The Planning Commission's next meeting was scheduled for March 18, 2026. The March 18 meeting was subsequently cancelled and rescheduled for April 15.

269.    On April 15, 2026, the Planning Commission met and considered the two-alternative draft Findings and Conclusions Tom Grier provided the Planning Commission members.  The Planning Commission voted four-to-one to adopt the draft Findings and Conclusions denying Youth for Christ Club's application for a Special Use Permit to assemble at the Property.  See **Exhibit 26** (April 15 Agenda) and **Exhibit 27** (April 15 Minutes).  Chairwoman

Lee Cory, Skip Telgard, Sam Simpson, and Brian Fenlon voted to deny Youth for Christ the right to assemble for prayer and Bible study. Planning Commission member Steve Scales voted to allow Youth for Christ the right to meet at the Property.

270. By denying Youth for Christ Club's application for a Special Use Permit, Leland Township denied Youth for Christ Club the right to assemble for speech, prayer, Bible study, worship and association at the private property on North Lake Street.

> **13.** **The aftermath of the Planning Commission's April 15 decision to deny Youth for Christ Club the right to assemble and the corrected Findings and Conclusions.**

271. Following the Planning Commission's April 15 vote to deny Youth for Christ's application for a Special Use Permit, Apollos and Youth for Christ paid a $300 fee and filed an appeal with the Leland Township Board of Zoning Appeals. See **Exhibit 28** (April 23, 2026 Notice of Appeal).

272. Following the Planning Commission's April 15 vote to adopt the Findings and Conclusions denying Youth for Christ Club the right to assemble at the Property, Tom Grier contacted Robert Parker, counsel for Youth for Christ and the property owner, Apollos. Tom Grier told Robert Parker that the Findings and Conclusions the Planning Commission adopted at the April 15 meeting contained significant material factual errors concerning the history of the Zoning Ordinance. Tom Grier told Robert Parker that the Planning Commission intended to schedule an "emergency" meeting to correct the April 15 Findings and Conclusions.

> **14.** **Jacob Danziger's March 17, 2026 and April 13, 2026 Letters to the Planning Commission.**

273. Jacob Danziger is a lawyer with a prestigious Washington, D.C. based law firm. Jacob Danziger is also a resident of Suttons Bay Township. Jacob Danziger does not represent

77

any party in this matter.  Jacob Danziger wrote the Planning Commission a letter on March 17, 2026.  See **Exhibit 29**.

274.    On April 13, 2026, Jacob Danziger, in his individual capacity, wrote a second letter to the Planning Commission.  See **Exhibit 30**.

275.    Jacob Danziger objected to Youth for Christ Club meeting at the private North Lake Street property.  Jacob Danziger offered his gratuitous views opposing Youth for Christ Club's application for a Special Use Permit to assemble.  The essence of Jacob Danziger's letters to the Planning Commission is Jacob Danziger's contention that the "legislative history" of the October 2016 amendment to Leland Township's Zoning Ordinance meant that "club" means only a "Standard Restaurant" serving food, alcohol, and dancing.  Jacob Danziger's opinion and interpretation of the "legislative history" of Leland's Zoning Ordinance is contrary to all tenants of the interpretation of legal text. *READING LAW: THE INTERPRETATION OF LEGAL TEXTS,* 2012, pp. 369-390. ("From the beginnings of the Republic, American law followed what is known as the 'no-recourse doctrine' that in the interpretation of a text, no recourse may be had to legislative history."  Justice Scalia and Bryan Garner noted, "the use of legislative history to find a 'purpose' in a statute is a legal fiction that provides great potential for manipulation and distortion.") *Id*. at 376, and Count XII, *infra*.  Jacob Danziger's recourse to the supposed "legislative history" of Leland Township's Zoning Ordinance is contrary to this authority.

276.    Jacob Danziger's letters to the Planning Commission also ignore the overarching principle that Leland Township's Zoning Ordinance must be interpreted in light of Leland Township's authority (or lack thereof) under the United States and Michigan constitutions and federal and Michigan civil rights laws.

**15.      Troposphere's April 9, 2026 Memorandum opposing Youth for Christ Club.**

277.    On April 9, 2026, Chris Bzdok and Sean Clark sent the Township a second memorandum (the Troposphere Memorandum II) on behalf of Fishtown Preservation Society.  See **Exhibit 31**.  The Troposphere Memorandum II reiterated the errors Bzdok and Clark made in their first memorandum.

**16.      Leland Township counsel, Tom Grier's, May 4, 2026 "Letter of Clarification."**

278.    On May 4, 2026, the Township's new attorney, Tom Grier, advised the Planning Commission members that they need to meet and "clarify" the Planning Commission's April 15 Findings and Conclusions.  Tom Grier told the members that they must meet to "clarify" the April 15 Findings and Conclusions because of material inaccuracies in the factual record upon which the Planning Commission based the April 15 Findings and Conclusions.  See, "Amendment of Findings in Support of Denial of [Youth for Christ Club's] Special Use Permit Application," with exhibits.  See **Exhibit 9-A** (Letter) and **Exhibit 9-B** (Exhibits).

**17.      Thor Hearne's May 5, 2026 Memorandum to Leland Township Planning Commission.**

279.    On May 5, 2026, Thor Hearne wrote a third memorandum.  Thor Hearne's May 5 memorandum was to the Planning Commission members, and the Township's legal counsel, Tom Grier, and Brad Wierda.  See **Exhibit 32** (Thor Hearne Memorandum III).  This memorandum advised the Planning Commission,

> Denying Youth for Christ the right to meet at the North Lake Street property violates the United States Constitution and numerous federal civil rights laws, including the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. 2000cc-2000cc-5 (RLUIPA)…

> This is not a typical zoning matter.  Youth for Christ's right to meet at the North Lake Street property implicates the Constitution and civil rights issues of the greatest magnitude.  Youth for Christ's right to assemble at the North Lake Street

79

property concerns fundamental constitutional rights and legal principles that are currently pending on the United States Supreme Court's docket.  Youth for Christ's right to meet at the North Lake Street property concerns policies that are the subject of Presidential Executive Orders and enforcement by the Department of Justice…

The Troposphere memoranda and Danzinger's letters are contrary to all controlling authority and law.  Most importantly, the Troposphere memoranda and the Danzinger letters are flatly contrary to the Supreme Court's decisions, the explicit text of the relevant federal civil rights statutes and the memoranda and letters entirely ignore the United States Department of Justice's guidance concerning religious freedom, free speech, and enforcing federal civil rights statutes protect these constitutionally guaranteed freedoms…

The Supreme Court's First and Fifth Amendment jurisprudence emphatically supports Youth for Christ's right to assemble at the North Lake Street property.  In just the past month, the Supreme Court issued two decisions reaffirming the Constitution's robust protection of free speech, the right of assembly, the right to religious freedom and the right of association.  These Supreme Court decisions bear directly upon Leland Township's decision to deny Youth for Christ the right to assemble at the North Lake Street property…

Michigan's state constitution and corollary statutory protections of the right of free speech, the right of association and assembly and the right to worship likewise protect Youth for Christ Club's right to assemble pray and speak at the North Lake Street property.

I encourage you to reread the foregoing quotes from the Supreme Court's decisions in *First Choice* and *Chiles*…

The Supreme Court's recent decisions and the Court's previous First Amendment jurisprudence is clear, robust, and emphatic.  So too is the Department of Justice's guidance and the Department's enforcement of RLUIPA. The Justice Department is vigilantly pursuing President Trump's commitment to eradicate anti-Christian and antisemitic bias and protect the right of individuals and faith-based organizations such as Youth for Christ to assemble, speak, and worship. I encourage you to read the Justice Department Task Force's report on eliminating anti-Christian bias. *Eradicating Anti-Christian Bias within the Federal Government.* https://www.justice.gov/opa/pr/task-force-publishes-report-eradicating-anti-christian-bias-and-restoring-religious-liberty.  The Justice Department released this report last week.

Note especially the discussion on pages 141- 142 where the Task Force details the Justice Department's enforcement of RLUIPA against townships and local governments that use zoning ordinances to prohibit faith-based groups from meeting.  In my earlier memorandum I included the Department of Justice guidance on RLUIPA and enforcement of this civil right statute against local government zoning authorities.  I encourage you to read the Justice Department's guidance and

80

the    authorities    the    Justice    Department    references.    See,
https://www.justice.gov/crt/media/1344151/dl ...

Leland Township simply cannot defend its denial of Youth for Christ Club's right
to meet at the privately-owned North Lake Street property. Leland's zoning
ordinance will likely be declared unconstitutional both on its face and, certainty, as
applied to Youth for Christ.  Denying Youth for Christ the right to meet at the North
Lake Street property will expose Leland Township to potentially millions of dollars
in financial liability.  Leland Township will also be subject to possible enforcement
action brought by the Department of Justice…

This risk is entirely avoidable.  At the May 6 meeting, the Planning Commission
has opportunity to correct course. Rescinding the April 15 Findings and granting
Youth for Christ's special use permit application would resolve this matter and
avoid further *Sturm und Drang*.  Rescinding the April 15 findings and granting
Youth for Christ's application to meet would also eliminate the significant risk and
expense of litigation and enforcement action by the Department of Justice…

As discussed above, the Planning Commission's decision will not survive strict
scrutiny.  The court will likely declare Leland Township's zoning ordinance to be
facially unconstitutional, and will certainty declare the Townships enforcement of
this ordinance as applied against Youth for Christ to be unconstitutional…

As a member of the Leland community and as one with particular experience
arguing constitutional and civil rights cases, I encourage the Planning Commission
to rescind the April 15 Findings and grant Youth for Christ's right to meet at the
North Lake Street property.  On Wednesday [May 6], please take the wise and
prudent path.

280.    The Planning Commission had the benefit of all of this background and analysis
when the Planning Commission members next met on May 6.

### 18.    The Planning Commission's May 6, 2026 meeting to correct the Planning Commission's April 15 Findings and Conclusions.

281.    The Planning Commission met again on May 6, 2026 to consider the "corrected
and clarified" Findings and Conclusions Tom Grier prepared.

282.    On May 5, the Planning Commission adopted a corrected or "clarified" version of
the Findings and Conclusions.  A majority of the Planning Commission members (Lee Cory, Skip
Telgard, Sam Simpson, and Brian Fenlon) again voted to deny Youth for Christ Club's application

81

for a Special Use Permit.  Planning Commission member Steve Scales voted to grant Youth for Christ Club the right to assemble at the North Lake Street property.  See **Exhibit 33** (May 6, 2026 Planning Commission Agenda), **Exhibit 9-A** (May 4 Letter from Tom Grier Re: Clarifying Record), and **Exhibit 9-B** (Exhibits to Letter Clarifying Record).

283.    During the May 6 meeting, a majority of the Planning Commission members again voted to deny Youth for Christ Club, and Youth for Christ Club's members, the right to meet at the North Lake Street property.  See **Exhibit 34** (Amended Findings and Conclusions of Denial by the Planning Commission).

284.    During both the April 15 and the May 6 meetings, the Planning Commission concluded that Youth for Christ Club is a "church" not a "club" under the Zoning Ordinance and, thus, held that Youth for Christ Club was prohibited from assembling at the Property for prayer, speech, and other Christian faith-based activities.

285.    Leland Township's prohibition against Youth for Christ Club assembling at the Property was based upon the content of the speech and religious nature of the activities (prayer and Bible study) that persons engaged in at the Property and not any physical condition of the property, nor upon any content-neutral, generally applicable regulation such as the fire code. The Findings and Conclusions a majority of the Planning Commission adopted at the April 15 and May 6 meetings affirmatively *disclaimed* any content-neutral, generally applicable health and safety justification for denying Youth for Christ Club the right to assemble at the Property.

286.    On May 11, after the Planning Commission denied Youth for Christ Club's application for a permit to meet at the North Lake Street property, the Leland Township Board appointed Bill White to the Planning Commission.  **Exhibit 35** (Copy of Leland Township Agenda for May 11).  Bill White is one of the leading activists opposing Youth for Christ's ministry in

Leelanau County.  Bill White spoke against Youth for Christ Club numerous times before the Planning Commission.

### 19.    The appeal of the Planning Commission's denial of Youth for Christ Club's Special Use Permit application.

287.    On May 15, following the May 6th Planning Commission's adoption of the corrected Findings and Conclusions denying Youth for Christ Clubs's and Apollos's Special Use Permit application, Youth for Christ Club and Apollos paid Leland Township another $300 fee and filed another notice of appeal to the Leland Township Zoning Board of Appeals.  Youth for Christ Club and Apollos asked the appeals be consolidated in a single proceeding before the Leland Township Zoning Board of Appeals.  **Exhibit 36**.

288.    The Leland Township Trustees met on May 11.  At this meeting the Leland Township Trustees voted to engage a third attorney, Lauren Teichner, "to provide legal representation for the planning commission and Youth for Christ matter."  See **Exhibit 35** (Agenda of Leland Township Board of Trustees).

289.    Leland Township has devoted substantial financial resources to the Township's opposition of Youth for Christ Club.  See **Exhibit 37** (copies of bills, invoices and other payments by Leland Township to Brad Wierda, Tom Grier, and engagement agreement with Lauren Teichner).

290.    Leland Township Supervisor Clint Mitchell disputed Lee Cory's authority as the Chairwoman of the Planning Commission to authorize the Township to pay Tom Grier (the second lawyer the Planning Commission hired) for Tom Grier's work for the Planning Commission.  See **Exhibit 38** (Copy of *Leelanau Enterprise* article "*LEGAL REPRESENTATION APPROVED FOR YFC APPEAL*").

291.    Lee Cory, Chairwoman of the Planning Commission, was also a member of the Zoning Board of Appeals that heard appeals of the Planning Commission's decisions.

292.    Before the May 11 meeting of the Leland Township Board of Trustees, Lee Cory resigned from the Zoning Board of Appeals but remained Chairwoman of the Planning Commission.  Brian Fenlon, the newly appointed member of the Planning Commission to fill Ross Satterwhite's position, was appointed to the Zoning Board of Appeals.  Brian Fenlon had voted twice to deny Youth for Christ Club's application for a Special Use Permit to meet at the North Lake Street property.

293.    On May 11 the Leland Township Board of Trustees appointed Bill White to the Planning Commission, and Lauren Cypher, the ex-daughter-in-law of deceased Zoning Administrator Tim Cypher, to the Zoning Board of Appeals.  See **Exhibit 35**

294.    The members of the Leland Township Zoning Board of Appeals, as presently constituted, are Brian Fenlon, Brooks Bunbury, James Carpenter, Lauren Cypher, and Cathy Dawkins is the Chairwoman.  (As previously noted, Brooks Bunbury resigned in June.)

295.    It is not known whether Brian Fenlon, who (as a member of the Planning Commission voted to deny Youth for Christ's application for a permit) will recuse himself from the Zoning Board of Appeals' consideration of the pending appeal of a decision Brian Fenlon voted for.  It is also not known whether Bill White, who repeatedly spoke in opposition to Youth for Christ Club during the Planning Commission hearing, will recuse himself should Youth for Christ's permit be remanded to the Planning Commission for further consideration.  And it is not known who Leland Township will appoint to replace Brooks Bunbury on the Zoning Board of Appeals.

296.    To confuse matters further, Leland Township held two meetings to appoint members and alternates to the Zoning Board of Appeals.  See **Exhibit 47** and **Exhibit 49**.  These meetings were on July 15 and July 20, but due to the number of people seeking to comment, the meeting were rescheduled to larger venues.  See **Exhibit 50.**  Leland Township met a third time on July 28 to appoint members to the Zoning Board of Appeals. See **Exhibit 51**.

### *20.    Leland Township's continued prohibition against students assembling for prayer and Bible study at the North Lake Street property.*

297.    Youth for Christ Club paid a $300 fee and filed an appeal of the Planning Commission's April 15, 2026 denial of the Special Use Permit. See **Exhibit 28**.

298.    After the Planning Commission met on May 6, 2026, at which time a majority of the Planning Commission again voted to deny Youth for Christ Club the right to assemble at the North Lake Street property, Youth for Christ Club filed a second appeal and paid another fee of $300.  See **Exhibit 36**.

299.    The Zoning Ordinance provides, "Section 4.07 Stay.  An appeal shall stay all proceedings in furtherance of the action appealed from unless the Zoning Administrator certifies to the Zoning Board of Appeals after notice of appeal has been filed with the Zoning Administrator, that by reason of facts stated in the certificate a stay would, in the Administrator's opinion, cause imminent peril to life or property, in which case the proceedings shall not be stayed otherwise than by a restraining order, which may be granted by the Zoning Board of Appeals, or, on application, by court of record."

300.    Robert Parker asked Tom Grier whether Leland Township would enforce the prohibition and penalties against Youth for Christ Club (and students participating in Youth for Christ activities) during the pendency of the appeal to the Zoning Board of Appeals.  See **Exhibit 39**, (letter from Robert Parker to Tom Grier.).

301.    The Township and the Township's new counsel, Lauren Teichner, did not tell Robert Parker whether Leland Township would honor this provision of the Township's ordinances and stay any enforcement of the prohibition against Youth for Christ Club meeting at the North Lake Street property during the pendency of the appeal to the Zoning Board of Appeals.

302.    The Leland Township Zoning Administrator did not certify to the Zoning Board of Appeals that a stay of enforcement would, in the Zoning Administrator's opinion, "cause imminent peril to life or property."

303.    On May 29, 2026, Sara Schroeder, Leland Township's Planner of Record, sent an email to Robert Parker regarding efforts to schedule a hearing before the Zoning Board of Appeals. Sara Schroeder said the earliest she could schedule a meeting of the Zoning Board of Appeals was July 30 and said there may only be three members attending the meeting and asked if he still wanted to attend if that were the case.

304.    On June 9, 2026, Sara Schroeder again sent an email to Robert Parker and told him, "the Township would like to collect escrow to cover professional fees that it anticipates incurring with this request … please deposit $8,000 escrow to the Township Treasurer for this application [for an appeal]."  See **Exhibit 40**.  On July 9, Apollos paid Leland Township the $8,000.  See **Exhibit 41** (Robert Parker's Letter to the Clerk with check).

305.    On Monday, June 8, 2026, the Leland Township Board of Trustees met and considered public comments.  See **Exhibit 42** (Agenda of Leland Township June 8 meeting.) The Township has not yet released a transcript of the meeting.  However, the June 11, issue of *LEELANAU ENTERPRISE* reported the following.  See **Exhibit 43** (Copy of *LEELANAU ENTERPRISE*, June 11.)

306.    "Leelanau County resident Benjamin Crow was the first to make public comment, and questioned what the township 'was doing as a board', 'Why are you not listening to the people

86

of our community?'  Crow said during the public comment.  'The two major issues over the past eight months have been Youth for Christ and Hancock Park.'"

307.    The *LEELANAU ENTERPRISE* account of the June 8th Township public meeting continued and wrote, "Planning Commission Chairperson Lee Cory also spoke during the township's public comment periods, voicing concerns of the townships handling of the Youth for Christ permit application process, specifically in regard to the unpaid $12,000-plus bill for services from Thomas Grier, who provided additional findings/analysis reports to the planning commission to make a final decision in April. … Grier submitted work preparing two sets of alternate proposed findings and conclusions for approval and denial of the YFC permit after the township board voted to approve the motion to authorize the planning commission chairperson to engage services of a planning expert not to exceed $2,000 at a special meeting on Feb. 27."

308.    The *LEELANAU ENTERPRISE* account of the June 8th meeting continued, "Cory said throughout the planning commissions engagement with Grier, the Township Board was copied 'on every legal communication,' and said they were aware his work exceeded $2,000 in billable time. Yet no one contacted me or Mr. Grier or anyone to raise a concern, object, or suggest that he might not be compensated.... instead, you waited for a public meeting to disparage him and disparage me and announce that you would not pay is built.' Cory said, 'What has become clear is that your refusal to fairly compensate Mr. Grier has nothing to do with fiscal responsibility or administrative process, that's retaliation against Planning Commission members, except for Mr. Scales, who rejected flawed legal advice and voted to deny Apollos application because you wanted a different outcome.' "

87

309.    The *LEELANAU ENTERPRISE* reported that, "During the second period of public comment, several township board members responded to Cory's comments about the township's lack of transparency and denied all allegations that were made against them and their motives."

310.    The *LEELANAU ENTERPRISE* also reported that, during the June 6th meeting, Leland Township Supervisor Clint Mitchell said, "in regard to the YFC matter, Mitchell said the issue is being handled by the township's zoning administrator, Sara Kopriva, the attorney, Lauren Teichner, of the Tischner law firm and the Zoning Board of Appeals." And "[i]n the supervisor's written report, [Clint] Mitchell stated that ZBA member Brooks Bunbury also submitted his resignation, effective immediately, citing the lack of flexibility in scheduling of upcoming meetings. Brooks is the third ZBA member to resign since January and leave the ZBA with only three voting members as they work through matters like the YFC permit appeal. The Township is looking for someone who will serve as an alternative or to fill the remainder of Brooks term in the meantime."

311.    Following the June 6 meeting of the Leland Township Trustees, the Township's new attorney, Lauren Teichner, sent Robert Parker a letter advising him that,

> The Township has scheduled the first meeting of the ZBA to consider the appeal for Thursday, July 30, 2026, at 6:30 pm (location TBD).  It is our intent that this meeting includes the public hearing on the appeal, together with the ZBA's deliberations on the issues presented.  Following that meeting, the Township anticipates scheduling a second meeting at which the ZBA will deliberate further, if necessary, and render its decision.  We are presently working to identify a date for that second meeting that accommodates the schedules of the participants and will advise you as soon as that date has been finalized.  (bold deleted.)

Lauren Teichner's letter is attached as **Exhibit 44**.

312.    On July 10, Lauren Teichner prepared a Staff Report to the Leland Township Zoning Board of Appeals.  See **Exhibit 45**.

313.     On July 10, 2026, Lee Cory, represented by Larry Acker, filed a lawsuit against Clint Mitchell, Leland Township Supervisor, in his individual and personal capacity.  See **Exhibit 46** (Case No. 26-11644 Complaint).  Lee Cory's lawsuit asked the court to extend Lee Cory's term as Chairwoman of the Planning Commission from September 1, 2026 until December 1, 2026.

314.     On July 15, 2026, Leland Township held a public meeting to appoint new members to the Zoning Board of Appeals.  See **Exhibit 47** (Agenda to the July 15 Township Board meeting). So many people showed up to participate in the meeting that the Township rescheduled the meeting for July 20 at a larger venue.

315.     Those opposing Youth for Christ Club organized this opposition.  See **Exhibit 48** (Social Media Posts to Attend July 20 Township Board Meeting for Zoning Board of Appeals Appointments).

316.     The new members and alternates the Zoning Board of Appeals have now been appointed but the hearing to consider Youth for Christ Club's appeal of the Planning Commission's denial of the Special Use Application has been delayed and it is not known when the newly constituted Zoning Board of Appeals will meet to consider the appeal.

317.     Almost a year ago, in October 2025, Leland Township prohibited Youth for Christ Club and Apollos from assembling at the North Lake Street property for prayer and Bible study. Leland Township demanded Apollos and Youth for Christ Club apply for, and be granted, a special use permit, in order to meet at the privately property on North Lake Street.  It is now ten months since Leland Township denied Youth for Christ Club the right to meet at this private property.  And Leland Township's prohibition against assembly, speech, worship and association at this private property continues every day.

318.    Leland Township said they will convene a meeting of the Zoning Board of Appeals on July 30 – assuming the Township can actually find and appoint two additional members to serve on the Zoning Board of Appeals.  But, as attorney Lauren Teichner's letter states, the July 30 meeting of the Zoning Board of Appeals will not decide the issue.  Rather, the Zoning Board of Appeals, whenever the Zoning Board of Appeals does meet, will convene a subsequent meeting to consider the appeal before issuing a final decision.

319.    During a phone call with Robert Parker and Thor Hearne on July 15, Lauren Teichner stated that she represented the Zoning Board of Appeals and that any decision concerning whether the Township would recognize the stay in enforcement of the Zoning Ordinance was to be referred to Sara Schroeder, or Brad Wierda as the township attorney.

320.    Michigan statute, MCL 125.3604(3), provides, "An appeal to the zoning board of appeals stays all proceedings in furtherance of the action appealed. However, if the body or officer from whom the appeal is taken certifies to the zoning board of appeals after the notice of appeal is filed that, by reason of facts stated in the certificate, a stay would in the opinion of the body or officer cause imminent peril to life or property, proceedings may be stayed only by a restraining order issued by the zoning board of appeals or a circuit court."

321.    The Leland Township Zoning Board of Appeals will not render a decision on the appeal of the Leland Township Planning Commission's denial of Youth for Christ's right to assemble for Bible study, prayer, and worship at the private property on North Lake Street until after October.  This will be more than one year after Leland Township first denied Youth for Christ Club and Leelanau County students the right to meet at this private property.

322.    Even should the Township Zoning Board of Appeals reverse the two decisions and the Findings and Conclusions of the Planning Commission, the Township will have denied Youth

90

for Christ Club, Apollos, and those individuals seeking to assemble to engage in constitutionally protected First Amendment freedoms the right to do so for a year.

323.    The Supreme Court holds that constitutional rights including the right to assemble, speak, worship, equal protection and enjoyment of private property are violated the moment the government infringes those constitutional rights and that the individuals or organizations whose rights have been violated have an *immediate* right of action and this Court has authority to enforce those rights.  The deprivation of a federal constitutional right gives rise to an immediate cause of action in federal court under 42 U.S.C. § 1983. Except where Congress has expressly required otherwise, a plaintiff is not required to exhaust state administrative or judicial remedies before seeking relief in federal court. *Patsy v. Board of Regents*, 457 U.S. 496 (1982); *Mitchum v. Foster*, 407 U.S. 225 (1972).

324.    Every day that passes during which Leland Township continues to deny the Plaintiffs and those individuals wanting to assemble for Youth for Christ Club activities the right to assemble, speak, pray and worship at the North Lake Street property is a separate and additional violation of the United States Constitution, the Michigan State Constitution, and the various federal and Michigan civil rights laws.

325.    MLive, a Michigan Newspaper and online news media covering Michigan news and events, reported on Leland Township's denial of Youth for Christ Club's right to meet at the North Lake Street property.  MLive reported, "For the people, the town, the city council, this is not about religion," said Ryan Burge, a political scientist who researches religion in America. "But then they're saying, 'You're impinging upon our religious freedom to worship however we see fit.' This is a nightmare for a local government."  See **Exhibit 52** (MLive June 28 Article).

91

## COUNT I[8]
### *Leland Township's Religious Gerrymander Prohibiting*
### *"Churches and Religious Institutions" is a* **per se** *Facially Unconstitutional*
### *Violation of the Free Exercise Clause of the First and Fourteenth Amendments*

**A.      Leland Township's prohibition against persons assembling to pray, worship and study the Bible, is facially unconstitutional under the Free Exercise Clause.**

326.    The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

327.    The First Amendment to the United States Constitution provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  The Fourteenth Amendment Free Exercise clause applies to the states and local governments.  See *Cantwell v. Connecticut*, 310 U.S. 296 (1940), *Wisconsin v. Yoder*, 406 U.S.  205, 215  (1972) ("only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.") and *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15–16 (1947) (" The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can … can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.")

328.    Leland Township's actions have denied the Plaintiffs, Youth for Christ Club, and those individuals seeking to assemble at the North Lake Street property their right to the Free Exercise of Religion.

---

[8] In this, and all subsequent counts, Plaintiffs incorporate and reallege the preceding paragraphs in this Complaint as if fully restated in each separate count.

329.    Leland Township's prohibition against persons assembling for prayer, Bible study and faith-based fellowship (whether such an assembly is denominated as a "club" or a "church") is unequivocally a content-based, subject-matter denial of free speech, right of assembly and an infringement upon the free exercise of religion.

**B.    Relief requested to remedy Leland Township's violation of the First and Fourteenth Amendment protection of the Free Exercise of Religion.**

330.    Plaintiffs respectfully request this Court to enter judgment and:

(a)    Declare the Leland Township Zoning Ordinance to be facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

(b)    Permanently and preliminarily enjoin Leland Township, its employees, officers, and agents, from enforcing any prohibition against "Churches and Religious Institutions," houses of worship, clubs or persons assembling for speech, prayer, or religious assembly in Leland Township;

(c)    Award the Plaintiffs who had to bring this lawsuit to defend their constitutional and civil rights their reasonable costs, including attorneys' fees, incurred in bringing this action pursuant to 42 U.S.C. § 1988 and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(d)    Grant such other and further relief as this Court deems just and proper.

**COUNT II**
*Leland Township's Zoning Ordinance is a* **per se** *Facial Violation of the First and Fourteenth Amendments Guarantee of the Right of Free Speech*

**A.    Leland Township's prohibition against "Churches and Religious Institutions" is a *per se*, facially unconstitutional, violation of Free Speech.**

331.    The First Amendment to the United States Constitution states, "Congress shall make no law ... abridging the freedom of speech, or of the press."  The Fourteenth Amendment

93

incorporates this provision of the Bill of Rights against the states and subordinate government entities.

332.    In *Gitlow v. New York*, 268 U.S. 652 (1925) the Supreme Court held, "Freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and liberties protected by the due process clause of the Fourteenth Amendment from impairment by the States." See also, *Duncan v. Louisiana,* 391 U.S. 145 (1968).

333.    The First Amendment to the United States Constitution prohibits the abridgement of the Freedom of Speech, the Free Exercise of Religion, the Right to Assemble and the Right of Association.

334.    Political and religious speech are the highest and most important forms of speech protected by the First Amendment to the United States Constitution. In *First Choice Women's Resource Centers v. Davenport* 608 U.S. ___, 146 S.Ct. 1114 (2026), the Supreme Court recently held,

> The First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely. Each of these rights, this Court has "'long understood,'" necessarily carries with it "'a corresponding right to associate with others.'" *Americans for Prosperity Foundation v. Bonta,* 594 U.S. 595, 606 (2021) (AFP) (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 1984).

> Without such a right, no two men could safely share the same soapbox, no two women the same church. The government could reduce any assembly to a party of one, and the right to petition would amount to nothing more than the power to sign one's own name alone. Appreciating all this, we have held that government actions tending to "curtai[l] the freedom to associate" warrant "the closest scrutiny" under the First Amendment. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460–461 (1958). We have recognized, too, that associational rights carry special significance for political, social, religious, and other minorities. See *Id*., at 462; *Roberts*, 468 U.S., at 622. With the freedom to associate, minorities can "show their numerical strength," influence policy, and "stimulate competition" in the marketplace of ideas. *1 A. DE TOCQUEVILLE, DEMOCRACY IN AMERICA* 196–197 (H. Reeve transl., rev. ed. 1900). But take that freedom away and "dissident expression" stands particularly

94

vulnerable to marginalization or outright "suppression by the majority," leaving all of society poorer for it. *Roberts*, 468 U.S. at 622.

Our cases have held that governments can [unconstitutionally] infringe freedom of association in varied ways. For example, governments might require a group to accept members it does not want, deny benefits to an organization based on its message, or punish individuals for their affiliations. See *Boy Scouts of America v. Dale,* 530 U.S. 640, 644 (2000); *Healy v. James*, 408 U.S. 169, 174, 181–182 (1972); *Elrod v. Burns*, 427 U.S. 347, 355 (1976) (plurality opinion).

335.    In *Chiles v. Salazar*, 607 U.S. __, 146 S. Ct.1010 (2026), the Supreme Court held,

The First Amendment "envisions the United States as a rich and complex place" where all enjoy the "'freedom to think as you will and to speak as you think.'" 303 *Creative LLC v. Elenis*, 600 U.S. 570, 584, 603 (2023) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 660–661 (2000)).

Often, speech may prove illuminating and inspiring. Sometimes, it can be misguided, offensive, or cause "incalculable grief." *Snyder v. Phelps*, 562 U. S. 443, 456 (2011). But either way, the First Amendment protects the inalienable right of every individual to decide for himself "how best to speak." *Riley v. National Federation of Blind of N. C., Inc*., 487 U. S. 781, 791 (1988). In this Nation, no official – "high or petty"- may command our tongues or silence our voices. *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

Consistent with the First Amendment's jealous protections for the individual's right to think and speak freely, this Court has long held that laws regulating speech based on its subject matter or "communicative content" are "presumptively unconstitutional." *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015). As a general rule, such "content based" restrictions trigger "strict scrutiny," a demanding standard that requires the government to prove its restriction on speech is "narrowly tailored to serve compelling state interests." Ibid. Under that test, it is "'rare that a regulation . . . will ever be permissible.'" *Brown v. Entertainment Merchants Assn.,* 564 U.S. 786, 799 (2011) (quoting *United States v. Playboy Entertainment Group, Inc.,* 529 U. S. 803, 818 (2000)).

We have recognized, as well, the even greater dangers associated with regulations that discriminate based on the speaker's point of view. When the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular "opinion or perspective" individuals may express on that subject, "the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector and Visitors of Univ. of Va*., 515 U. S. 819, 829 (1995). "Viewpoint discrimination," as we have put it, represents "an egregious form" of content regulation, and governments in this country must nearly always "abstain" from it. Ibid.; see also *Iancu v. Brunetti*, 588 U. S. 388, 393 (2019) (describing "the bedrock First Amendment principle that the government cannot discriminate" based on

95

viewpoint (internal quotation marks omitted)); *Good News Club v. Milford Central School,* 533 U. S. 98, 112–113 (2001); *Barnette*, 319 U. S. at 642.

336.    Justices Kagen and Sotomayer concurred in *Chiles* to emphasize,

As the Court states, governments must "nearly always" abstain from adopting viewpoint-based restrictions. Those laws represent a particularly "egregious form" of content-based regulation, implicating First Amendment concerns to the highest possible degree. *Ibid.*; see *Iancu v. Brunetti*, 588 U. S. 388, 393 (2019). A law drawing a line based on the "ideology" of the speaker—disadvantaging one view and advantaging another—skews the marketplace of ideas our society depends on to discover truth. *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 829 (1995). And such a law suggests an impermissible motive - that the government is regulating speech because of its own "hostility" toward the targeted messages. *R. A. V. v. St. Paul,* 505 U. S. 377, 386 (1992). If the First Amendment prohibits anything, it is the "official suppression of ideas." Id., at 390; see *Reed v. Town of Gilbert*, 576 U. S. 155, 181 - 183 (2015) (Kagan, J., concurring in judgment). Because viewpoint-based laws always raise that specter, they are the most suspect of all speech regulations. So much so that this Court has refused to permit viewpoint discrimination even within unprotected categories of speech, like fighting words or obscenity. See *R. A. V*., 505 U. S., at 384–390.

337.    Last month the Court issued its decision in *National Republican Senatorial Committee, et al., Petitioners v. Federal Election Commission, et al.*, 609 U.S. __, (2026), holding,

This Court's precedents start with the basic precept that when "the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. Federal Election Comm'n*, 572 U.S. 185, 210, (2014) (plurality opinion) (quotation marks omitted)…

In recent cases such as *McCutcheon* and *Cruz*, the Court has stressed that, in order to satisfy closely drawn scrutiny, a regulation may not be "disproportionate" and must be "necessary" and "narrowly tailored" to its asserted goal. *McCutcheon*, 572 U.S. at 199 (law must avoid "unnecessary" abridgment of speech to survive "rigorous" review (quotation marks omitted)); *Id*., at 218 (law must be "narrowly tailored" to meet the objective (quotation marks omitted)); *Id.*, at 220 (law cannot be "disproportionate to the Government's interest"); *Cruz*, 596 U.S. at 306 (law must be "necessary for the interest it seeks to protect").

609 U.S. __ (2026) Slip Op. at p. 9.

338.    While arising in the context of political speech, *Nat. Rep. Senatorial Comm'n,* applies with equal (or even greater) weight to religious speech.  Faith-based groups and individuals assembling for prayer, Bible study, and worship enjoy the highest level of protection under the

96

First Amendment.  Any government restriction against such speech is subject to the strictest scrutiny.

339.    Leland Township's prohibition against persons assembling for prayer, Bible study and faith-based fellowship (whether such an assembly is denominated as a "club" or a "church") is unequivocally a content-based denial of Free Speech, the Right of Assembly and an infringement upon the Free Exercise of Religion.

340.    Leland Township's Zoning Ordinance and Master Plan adopted an absolute prohibition against "Churches and Religious Institutions" assembling in five zoning districts of Leland Township.

341.    Leland Township's Planning Commission extended and enforced this absolute prohibition against "Churches and Religious Institutions" to include a prohibition against faith-based "clubs" and persons assembling to pray, study the Bible, fellowship, or engage in discussion of Christianity.  Leland Township's prohibition against, and regulation of, individuals assembling for prayer and Bible study is a blatant infringement of Free Speech and the Free Exercise of Religion.

342.    Leland Township's prohibition against faith-based assembly and speech is not narrowly tailored to advance any compelling government interest.  Leland Township's prohibitions against and regulation of religious speech and assembly fail to satisfy the "strict scrutiny" standard of constitutional review.

343.    Leland Township's prohibition against "Churches and Religious Institutions" is unconstitutional under even the intermediate level of scrutiny.  See *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432 (1985).  Indeed, Leland Township's prohibition against faith-

based clubs meeting at private property to pray and study the Bible is unconstitutional under even the rational basis standard.

344.    Leland Township's prohibition against, and regulation of, "Churches and Religious Institutions" is unconstitutional because, *inter alia*: (i) the prohibition against "Churches and Religious Institutions" does not advance any compelling government interest; and (ii) the prohibition against "Churches and Religious Institutions" is not narrowly tailored to meet any compelling interest that can withstand the strict standard of constitutional scrutiny.  Leland Township has interpreted its Zoning Ordinance to extend the prohibition against "Churches and Religious Institutions" to include student clubs, faith-based assemblies, and persons gathering for prayer and Bible study at private property.

345.    Leland Township adopted a religious gerrymander with the Township's Master Plan and Zoning Ordinance land use scheme.  Leland Township excludes and forbids religious assembly, speech, worship, fellowship and prayer at *any* private property in Leland Township. And, even in those limited districts in Leland Township where the Zoning Ordinance permits religious speech and assembly, Leland Township requires the persons seeking to engage in such religious assembly and speech to first pay a fee and request the Township to grant the "Church or Religious Institution" a permit to assemble and speak.

346.    Thus, even at that property where Leland Township may permit religious assembly and speech, Leland Township unconstitutionally requires persons desiring to assemble for prayer, Bible study and worship to first: (a) pay Leland Township a fee, (b) submit an application for a Special Use Permit, and (c) not assemble until, and unless, the Township grants the permit. Furthermore, Leland Township requires that religious assemblies comply with "Special Performance Standards".  See, Zoning Ordinance Section 16.11.  Compliance with these "Special

Performance Standards and the other land use requirements is not required for secular businesses or assemblies.

347. For all these reasons, Leland Township's Zoning Ordinance and Master Plan are facially unconstitutional and violate the First Amendment right of Free Speech, Assembly, the Free Exercise of Religion and are an unconstitutional prior restraint on speech, assembly and the free exercise of religion.

**B.      Relief requested to remedy Leland Township's violation of the First and Fourteenth Amendments Right to Free Speech.**

348. Plaintiffs respectfully request this Court enter judgment and:

(a)      Declare the Leland Township Zoning Ordinance prohibition against, and regulation of, "Churches and Religious Institutions" to be facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

(b)      Permanently and preliminarily enjoin Leland Township, its employees, officers, and agents, from enforcing any prohibition against religious speech including prayer and worship at "Churches and Religious Institutions," or persons assembling for speech, prayer, or religious worship in Leland Township;

(c)      Award the Plaintiffs who had to bring this lawsuit to defend their constitutional and civil rights the reasonable costs, including attorneys' fees, the Plaintiffs incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(d)      Grant such other and further relief as this Court deems just and proper.

## COUNT III
### *Leland Township's Zoning Scheme is an Unconstitutional Prior Restraint Upon Those Freedoms Protected by the First Amendment*

**A.       Leland Township's requirement that persons assembling for religious speech and worship may only do so if the Township grants a Special Use Permit is an unconstitutional prior restraint of those Freedoms guaranteed by the First and Fourteenth Amendments.**

349.    Leland Township adopted a religious gerrymander denying "Churches and Religious Institutions," including religious assemblies, faith-based groups of persons and student clubs, from assembling to speak, worship, fellowship and pray at private property.

350.    Leland Township prohibits "Churches and Religious Institutions" *anywhere* in Leland Township.  Nowhere in Leland Township are "Churches or Religious Institutions" allowed to assemble for prayer, worship, and Bible study as a matter of right.

351.    For those limited areas of Leland Township where "Churches and Religious Institutions" are permitted, Leland Township requires the persons desiring to assemble for prayer, Bible study and worship to first pay Leland Township a fee, submit an application for a Special Use Permit and denies them the right to assemble unless the Township first grants the permit. See, Zoning Ordinance, cited in Paragraph 25(p) and 25(q), *supra.*

352.    Leland Township's requirement that Youth for Christ Club, other faith-based organizations and individuals apply for and be granted a permit before Leland Township allows them to assemble at private property, engage in speech, prayer, and Bible study is a flagrantly unconstitutional prior restraint on the First Amendment freedoms of Free Speech, Assembly, and the Free Exercise of Religion.

353.    Even in those zoning districts where a "Church" or "Religious Institution" is a permitted use, religious assembly, speech and worship is only allowed after the Church or

100

Religious Institution first applies for and is granted a special use permit. See Leland Township Master Plan and Zoning Ordinance.  See, Zoning Ordinance Article 6.11

354.    Leland Township's land use scheme absolutely excludes religious speech, assembly, worship, prayer and Bible study from a significant part of Leland Township, where the Township does not even allow for the possibility of a Special Use Permit allowing such religious assemblies.

355.    "Churches and Religious Institutions," and persons desiring to assemble for religious speech and worship, may only do so in certain designated areas of Leland Township and then only if the Township first grants those seeking to assemble a Special Use Permit and the persons comply with "Special Performance Standards" Leland Township imposes upon "Churches and Religious Institutions."  Leland Township's "Special Performance Standards" are applicable to only "Churches and Religious Institutions."

356.    The "Special Performance Standards" Leland Township imposes upon persons assembling for prayer and worship include a requirement that "the structure [at which they assemble]… not result in accrual of distributable profits, realization of private gain resulting from payment or compensation in excess of a reasonable and customary allowance for salary or other compensation for services rendered, or any other form of private gain."  The terms "accrual of distributable profits", "realization of private gain" and "a reasonable and customary allowance for salary or other compensation for services rendered" are note defined in Leland Township's Zoning Ordinance.

357.    Leland Township's Zoning Ordinance imposes these undefined (indeed undefinable), vague and arbitrary requirements upon "Churches and Religious Institutions" and those persons seeking to assemble for worship and religious speech.  These "Special Performance

101

Standards" only apply to "Churches and Religious Institutions" assemblies.  No other use of any property in any zoning district in Leland Township is subject to such "Special Performance Standards."

358.    The "Special Performance Standards" Section 16.11(d) that Leland Township's Zoning Ordinance imposes on "Churches and Religious Institutions" are not "narrow, definite or objective."  The "Special Performance Standards" are not related to any compelling, legitimate or even rational interest that Leland Township has in the regulation of the use of private property. The "Special Performance Standards" Leland Township imposes upon Churches and Religious Institutions are not "neutral [and are] not of general application."

359.    The Supreme Court has declared, "that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional."  *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969).

360.    The Supreme Court held, "It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Shuttlesworth* 394 U.S. 147 at 151, (quoting *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958).)

361.    The Supreme Court wrote, "our decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license. 'The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack

its constitutionality, because he has not yielded to its demands.'" *Shuttlesworth,* 394 U.S. at 150–52, (citing and quoting, *Jones v. City of Opelika*, 316 U.S. 584, 602 (1942) (Stone, C.J., dissenting), adopted *per curiam* on rehearing.

362.    The Supreme Court has consistently condemned licensing schemes that vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places.  See, *Kunz v. New York*, 340 U.S. 290, 293—294 (1951). See also *Saia v. New York*, 334 U.S. 558 (1948); and *Niemotko v. Maryland*, 340 U.S. 268 (1951).

363.    The Supreme Court explained such licensing or permitting requirements are unconstitutional, "[e]ven when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community." *Shuttlesworth*, 394 U.S. at 153.[9]

364.    In *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130–33 (1992) the Supreme Court held, "A law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." (Citing *Shuttlesworth*, 394 U.S. at 150–51, and *City of Lakewood v.*

---

[9] See *Lovell v. City of Griffin*, 303 U.S. 444 (1938); *Hague v. C.I.O.*, 307 U.S. 496 (1939); *Schneider v. State*, 308 U.S. 147, 163—165 (1939); *Cantwell v. Connecticut*, 310 U.S. 296 (1940); *Largent v. Texas*, 318 U.S. 418 (1943); *Jones v. City of Opelika*, 316 U.S. 584, 600, 611 (Stone, C.J., dissenting) (Murphy, J., dissenting), vacated and previous dissenting opinions adopted *per curiam*, 319 U.S. 103; *Marsh v. Alabama*, 326 U.S. 501 (1946); *Tucker v. Texas*, 326 U.S. 517 (1946); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952); *Gelling v. Texas*, 343 U.S. 960 (1952); *Superior Films, Inc. v. Department of Education, etc.*, 346 U.S. 587 (1954); *Cox v. Louisiana*, 379 U.S. 536 (1965); and *Interstate Circuit, Inc. v. Dallas*, 390 U.S. 676 (1968).

*Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (invalidating permitting scheme granting officials "unbridled discretion")).

365.    "A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous scrutiny." *Church of the Lukumi*, 508 U.S. at 546.

366.    Government permitting schemes regulating free speech, assembly or religious worship in which "a municipality retains discretion to grant individualized exemptions, strict scrutiny likewise applies." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–35 (2021). And, the Court held, "[m]oreover, permit schemes affecting First Amendment activity must contain 'narrow, objective, and definite standards.'" *Id.* (Citing *Shuttlesworth,* 394 U.S. at 150–51).

367.    Chief Justice Hughes wrote: "The chief purpose of the guaranty [of freedom of the press] is to prevent previous restraints upon publication." *Near v. Minnesota*, 283 U.S. 697 (1931). See also *New York Times Co. v. United States,* 403 U.S. 713 (1971) in which Justice Black wrote, "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."

368.    Leland Township's Zoning Ordinance enacted a government permitting scheme that does not provide "narrow, objective, and definite standards" to govern the licensing of Churches and Religious Institutions or those persons seeking to assemble for religious speech and worship.  To the contrary, Leland Township's Zoning Ordinance imposes "Special Performance Standards" upon "Churches and Religious Institutions" that are arbitrary, vague, standardless and have no relationship to any legitimate government purpose.

369.    Leland Township's Special Use Permit requirement and "Special Performance Standards" are unique and specific to "Churches and Religious Institutions" and are not

104

requirements "generally applicable" to secular uses of property.  As such, Leland Township's regulation of "Churches and Religious Institutions" are not neutral or generally applicable.

370.    Prior restraints upon First Amendment freedoms are presumptively unconstitutional. The government bears a heavy burden to justify them.

371.    Leland Township's requirement that "Churches and Religious Institutions" pay a fee, submit a Special Use Permit application satisfy the "Special Performance Standards" and the Township hold public hearings and approve the Special Use Permit application before a "Church or Religious Institution" and its members may assemble at private property for prayer, speech, and worship is an unconstitutional prior restraint on the First Amendment freedoms of Free Speech, Assembly, the Free Exercise of Religion, and the Right of Association.

**B.    Relief necessary to remedy Leland Township's unconstitutional prior restraint upon First Amendment freedoms.**

372.    The Plaintiffs respectfully request this Court to enter judgment and:

(a)    Declare the Leland Township Zoning Ordinance to be an unconstitutional prior restraint upon the First Amendment freedoms of Free Speech, Assembly and Association, and Free Exercise of Religion;

(b)    Permanently and preliminarily enjoin Leland Township, its employees, officers, and agents, from enforcing any requirement that "Churches," "Religious Institutions," or persons assembling at private property apply for and obtain a permit before assembling to study the Bible, speak, worship, fellowship, or pray at any private property in Leland Township.;

(c)    Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

105

(d)    Grant such other and further relief as this Court deems just and proper.

## COUNT IV
### *Leland Township's Zoning Ordinance violates the*
### *First and Fourteenth Amendments Protection of the Right of Assembly*

**A.**    **Leland Township's prohibition against persons assembling to pray, study the Bible and worship is facially unconstitutional under the First and Fourteenth Amendments.**

373.    The First Amendment prohibits government from abridging the freedom to assemble and the right of expressive association.  The First Amendment, incorporated against the states through the Fourteenth Amendment, provides, "Congress shall make no law ... abridging the right of the people peaceably to assemble."

374.    In *Roberts v. United States Jaycees*, 468 U.S. 609, 617-618 (1984) the Supreme Court held, "[o]ur decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties."

375.    Leland Township's Zoning Ordinance, as written, forbids association and assembly when those gathered engage in religious activity, speech and worship.  Leland Township has interpreted and enforced this restriction against "Churches and Religious Institutions" to apply to

106

religious assemblies such as Youth for Christ Club and meetings of high school students gathered for prayer, Bible study and related activities.

376.    Faith-based groups and individuals assembling for prayer, Bible study, and worship enjoy the highest level of protection under the First Amendment to the United States Constitution. Any government restriction upon such assembly is subject to strict scrutiny.

377.    The First Amendment prohibits the abridgement of the Freedom of Speech, the Free Exercise of Religion, and the Right to Assemble.  Political and religious speech are the highest and most important forms of speech protected by the First Amendment to the United States Constitution.  See *First Choice Women's* and *Chiles* cited above.

378.    Any government restriction upon such assembly is subject to strict scrutiny that can be only satisfied if the government interest is compelling and the restriction upon religious speech and freedom is narrowly tailored to achieve a compelling government interest that cannot be achieved in a less restrictive manner.  Leland Township's prohibition against, and regulation of, "Churches and Religious Institutions" cannot satisfy this level of constitutional scrutiny.

379.    Leland Township's religious gerrymander excluding "Churches and Religious Institutions" from assembling and requiring the "Church or Religious Institution" to comply with "Special Performance Standards" and regulations imposed upon Youth for Christ is neither *neutral* nor *generally applicable* regulation that applies equally to religious and secular assemblies.  As such, Leland Township has violated the First Amendment's requirement of neutrality and general applicability that the government must satisfy in adopting and enforcing laws regulating speech, assembly, and the free exercise of religion.

380.    "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.  See *Masterpiece Cakeshop,*

107

*Ltd. v. Colorado Civil Right Comm'n*, 584 U.S. 617 (2018)." *Church of the Lukumi*, 508 U.S. at 533.

381.    Leland Township's prohibition against persons assembling for prayer, Bible study and faith-based fellowship (whether such an assembly is denominated as a "club" or a "church") is unequivocally a content-based, subject-matter denial of the free exercise of religion and free speech.

382.    Leland Township's Zoning Ordinance and Master Plan adopted an absolute prohibition against "Churches and Religious Institutions" assembling in five zoning districts of Leland Township.  See the discussion regarding Leland Township's Zoning Ordinance and Master Plan in Section C above.

383.    Leland Township extended this absolute prohibition against, and regulation of, "Churches and Religious Institutions" to include high school students meeting at a faith-based club to pray, study the Bible, fellowship, and engage in discussion of Christianity and religion.

384.    Leland Township's prohibitions against churches and faith-based assembly and speech are not narrowly tailored to advance any compelling government interest.  Leland Township's prohibitions against, and regulation of, religious speech and assembly do not satisfy the "strict scrutiny" standard of constitutional review.  Leland Township's prohibition against "Churches and Religious Institutions" is unconstitutional under the intermediate level of scrutiny. See *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432 (1985).  Leland Township's prohibition against faith-based clubs meeting at private property is unconstitutional under even the lowest level of constitutional review, the rational basis standard.

385.    For all these reasons, Leland Township's Zoning Ordinance and Master Plan are facially unconstitutional and violate the First Amendment the free exercise of religion and are an unconstitutional prior restraint on the free exercise of religion.

**B.      Relief requested to remedy Leland Township's violation of the First and Fourteenth Amendments' Right of Assembly.**

386.    Plaintiffs respectfully request this Court to enter judgment and:

(a)     Declare the Leland Township Zoning Ordinance to be facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

(b)     Permanently and preliminarily enjoin Leland Township, its employees, officers, and agents, from enforcing any prohibition against "Churches and Religious Institutions," or persons assembling for speech, prayer, Bible study, or religious worship in Leland Township;

(c)     Award the Plaintiffs who had to bring this lawsuit to defend their constitutional and civil rights monetary damages for Leland Township's denial of their constitutional right to assemble, speak and worship;

(d)     Award the Plaintiffs who had to bring this lawsuit to defend their constitutional and civil rights their reasonable costs, including attorneys' fees, incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(e)     Grant such other and further relief as this Court deems just and proper.

**COUNT V**
*Leland Township's Zoning Ordinance Violates the*
*Equal Protection Clause of the United States Constitution*

A.    **Leland Tonwhip's discriminatory regulation of "Churches and Religious Institutions," including Youth for Christ Club, violates the Equal Protection Clause of the Constitution.**

387.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution states, "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."

388.    The Supreme Court held,

Ratified in 1868, the Equal Protection Clause provides that no State shall deny "to any person within the jurisdiction the equal protection of the laws."  U.S. Const., Amend. 14.  That command "must coexist with the practical necessity that the most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons."  *United States v. Skrmetti*, 605 U.S. 495, 509 (2025) (quotation marks omitted)…

*West Virginia v. B.P.J,* 609 U.S. __ (2026). Slip. Op. at 15.

[T]his Court's equal protection precedents allow general classifications like those made in the West Virginia and Idaho laws so long as there is at least a substantial relationship between the classification and the State's interests.  See *United States v. Virginia*, 518 U.S. at 533.

*Id*. at Slip. Op. at 18.

389.    Leland Township adopted a religious gerrymander denying "Churches and Religious Institutions" (including faith-based clubs, and persons participating in religious and faith-based activity), the right to assemble for religious speech, worship, fellowship, Bible study, or prayer on private property.

390.    Leland Township's Zoning Ordinance distinguishes between "Churches and Religious Institutions" and imposes upon "Churches and Religious Institutions" land use burdens, restrictions, and "Special Performance Standards" that are not applied to secular and non-faith-

110

based assemblies.  See discussion of Leland Township's Zoning Ordinance and Master Plan at Section C above.

391.    Section 16.11 of Leland Township's Zoning Ordinance imposes "Special Performance Standards" upon "Churches and Religious Institutions".  These "Special Performance Standards" and the other land use requirements of Section 16.11 apply only to "Churches and Religious Institutions" and do not apply to other uses of property that are allowed by right or with a special use permit such as "adult related businesses", banks, professional offices, residences, retail shops, art studios, bookstores and administrative offices for charitable and not-for-profit entities.

392.    Leland Township's Zoning Ordinance imposes upon "Churches and Religious Institutions" those additional requirements, burdens and obligations contained in Article 16 including unique and onerous building setback requirements, parking requirements and acreage requirements that are not applicable to secular, non-religious and other uses of property.

393.    Leland Township requires that "Churches and Religious Institutions," persons or "clubs" seeking to assemble for prayer, Bible study and worship must first pay Leland Township a fee and submit an application for a Special Use Permit and the Township grant the application for a permit before persons may assemble at any property in any part of Leland Township.

394.    Leland Township's requirement that "Churches and Religious Institutions" and persons pay a fee, apply for a permit and the Township approve the permit application before the person, "Church" or "Religious Institution" may assemble at private property does not apply to secular and non-religious uses of property in Leland Township.

395.    Leland Township permits "adult related businesses" (*i.e.* strip clubs), marijuana stores, and whiskey distilleries in the C-1 zoning districts, but Leland Township has an absolute prohibition against "Churches and Religious Institutions" in this zoning district.

396.    There is no compelling (or even rational) interest Leland Township has for imposing these unique restrictions and burdens upon "Churches," "Religious Institutions" and faith-based assemblies including high school students meeting to pray and study the Bible.

397.    Leland Township's zoning scheme with its church-free zones and imposition of "Special Performance Standards" on Churches and Religious Institutions is not a neutral regulation of general applicability justified by any legitimate government interest.

398.    Leland Township's selective and discriminatory imposition of onerous burdens upon "Churches and Religious Institutions" violates the Equal Protection Clause of the United States Constitution.

**B.    Relief requested because Leland Township's Zoning Ordinance violates the Equal Protection Clause of the United States Constitution.**

399.    The Plaintiffs respectfully request this Court to enter judgment and:

(a)    Declare the religious gerrymander enacted in Leland Township's Zoning Ordinance, Master Plan, and the "Special Performance Standards" of Section 16.11 to be a violation of the Equal Protection Clause of the United States Constitution;

(b)    Permanently and preliminarily enjoin Leland Township, its employees, officers, and agents, from enforcing any provision of Leland Township's Zoning Ordinance and Master Plan against any "Church" or "Religious Institution," including any "club" Leland Township considers to be subject to these provisions of the Leland Township Zoning Ordinance;

112

(c)     Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in

bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees,

litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(d)     Grant such other and further relief as this Court deems just and proper.

**COUNT VI**
*Leland Township's Enforcement of its Zoning Ordinance* **as** *Applied*
*to Youth for Christ Club is Unconstitutional*

**A.       Leland Township's enforcement of is Zoning Ordinance, as applied to Youth for Christ Club, violates the United States Constitution.**

400.    The Leland Township Zoning Ordinance is unconstitutional as applied to, and as enforced (or threatened to be enforced) against, Youth for Christ Club and those persons desiring to assemble and participate in Youth for Christ Club activities at the North Lake Street property.

401.    Youth for Christ Club and those students assembled for prayer, Bible study, and fellowship assembled at the North Lake Street property until October 2025 when Leland Township demanded they no longer meet at this private property.

402.    Leland Township demanded Youth for Christ Club and Apollos pay a fee and apply for a Special Use Permit.  Youth for Christ Club and Apollos paid the fees and submitted an application for a Special Use Permit.

403.    Leland Township's Planning Commission twice denied Youth for Christ's application for a Special Use Permit and denied Youth for Christ Club and its members the right to assemble at the Property.  See **Exhibits 8-A**, **8-B**, and **34**.

404.    Leland Township's General Code Penalty Ordinance (ordinance 2016-02) provides, "The penalty for a misdemeanor violation shall be a fine not exceeding $500 (plus costs of prosecution), or imprisonment not exceeding 93 days, or both… Each day on which any violation

113

of an ordinance continues constitutes a separate offense and shall be subject to penalties or sanctions as a separate offense."

405.    Should Youth for Christ Club or its members assemble for prayer and Bible study at the North Lake Street property the individuals assembling at the property, and Apollos as the property owner, are subject to this sanction that includes incarceration and a significant fine.

**B.    Relief requested because Leland Township's Zoning Ordinance as applied to Youth for Christ Club and its members is an unconstitutional violation of those freedoms guaranteed by the First Amendment.**

406.    The Plaintiffs respectfully request this Court to enter judgment and:

(a)    Declare the Leland Township Zoning Ordinance violates the First and Fourteenth Amendments to the United States Constitution as applied to, and enforce against, Youth for Christ Club and those individuals seeking to participate in Youth for Christ Club activities;

(b)    Permanently and preliminarily enjoin Leland Township, its employees, officers, and agents, from enforcing any requirement that Youth for Christ Club, Apollos, or those persons participating in prayer, religious speech, assembly, or Bible study at the North Lake Street property apply for and obtain a permit or any other permission from the Township before assembling to study the Bible, speak, worship, fellowship, or pray at private property in Leland Township;

(c)    Award the Plaintiffs who had to bring this lawsuit to defend their constitutional and civil rights monetary damages in an amount to be proven at trial;

(d)    Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(e)    Grant such other and further relief as this Court deems just and proper.

## COUNT VII
### *Leland Township Violated the Civil Rights Protected by the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)*

**A.      Leland Township's Zoning Ordinance and the Township's enforcement of the Zoning Ordinance prohibiting "Churches and Religious Institutions" violates RLUIPA.**

> **i)      Congress adopted RLUIPA to prohibit states and local governments from using zoning laws to burden or discriminate against an individual's right to the free exercise of religion and religious assembly.**

407.      In *Cutter v. Wilkinson*, 544 U.S. 709, 714–17 (2005), the Supreme Court described the history that prompted the enactment of RLUIPA. "RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with [Supreme Court] precedents." *Id*. at 714.

408.      The Supreme Court explained, "[t]he story begins with the Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990). The *Smith* Court held that the Free Exercise Clause generally does not exempt religious conduct from burdens imposed by neutral laws of general applicability." *Id.* at 878–82.

409.      Congress responded to *Smith* by passing the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq*. See *Cutter,* 544 U.S. at 714. RFRA broadly prohibited both the federal government and the states from substantially burdening a person's religious exercise "even if the burden results from a rule of general applicability" unless the government could demonstrate that the burden survives strict scrutiny.  42 U.S.C. § 2000bb–1. Four years after RFRA's enactment, the Supreme Court invalidated RFRA as applied to the states and their subdivisions.  *City of Boerne v. Flores,* 521 U.S. 507, 532–36 (1997) (holding RFRA exceeded Congress's power under Section 5 of the Fourteenth Amendment).

410.      Congress responded to *Flores* by enacting RLUIPA. *Cutter,* 544 U.S. at 715. "Less sweeping than RFRA ... RLUIPA targets two areas."  *Id.*  Section 2 of RLUIPA addresses land use

115

regulation. 42 U.S.C. § 2000cc. RLUIPA includes a rule of construction, that it "shall be construed in favor of a broad protection of religious exercise, *to the maximum extent* permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g). (emphasis added.).

411.    In *Holt v. Hobbs*, 574 U.S. 352, 356-358 (2015), the Supreme Court held,

Congress enacted RLUIPA and its sister statute, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. §200bb *et seq.*, "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014) …

RLUIPA concerns two areas of government activity: Section 2 governs land-use regulation, § 2000cc; …

Several provisions of RLUIPA underscore its expansive protection for religious liberty.  Congress defined "religious exercise" capaciously to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000-cc-5(7)(a).  Congress mandated that this concept "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc-3(g).  And Congress stated that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." § 2000cc-3(c).  See *Hobby Lobby, supra*, at 695-696, 730.

412.    RLUIPA expressly provides a cause of action against state and local governments that violate the requirements of RLUIPA.  "A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." § 2000cc–2(a).

413.    The phrase "appropriate relief" does not include money damages against states. *Sossamon v. Texas,* 563 U.S. 277 (2011) (holding that RLUIPA does not unambiguously abrogate the sovereign immunity of the states from damages claims).  By contrast, however, money damages are available under RLUIPA against political subdivisions of states, such as municipalities and counties. See*, e.g., Centro Familiar Cristiano Buenas Nuevas v. City of Yuma,* 651 F.3d 1163, 1168–69 (9th Cir. 2011) (holding that municipalities and counties may be liable for money damages under RLUIPA); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,* 510 F.3d

253, 260–61 (3d Cir. 2007) (same); see also *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280–81 (1977) (recognizing that political subdivisions of states do not enjoy Eleventh Amendment immunity).

414.    Money damages are, however, available against municipal entities unless "Congress has given clear direction that it intends to *exclude* a damages remedy" from a cognizable cause of action. *Sossamon,* 563 U.S. at 287 (citing *Franklin v. Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 70–71 (1992) (emphasis in original). RLUIPA contains no indication, much less clear direction, that it intends to exclude a money damages remedy. Thus, Leland Township may be held liable for money damages under RLUIPA.

### ii)    RLUIPA prohibits states and local government from imposing "substantial burdens" on religious assembly and speech and prohibits government from treating religious assemblies differently than nonreligious or secular assemblies.

415.    Section 2 of RLUIPA which protects religious land uses and contains two subsections that limit land-use regulations. The first subsection contains the *Substantial Burden Clause*, which prohibits the imposition or implementation of a land use regulation in a manner that imposes a "substantial burden" on a person's assemblies, or institution's religious exercise unless the government can show that the regulation furthers a "compelling governmental interest" by "the least restrictive means." § 2000cc(a).

416.    The second subsection contains three provisions under the heading "Discrimination and exclusion." § 2000cc(b). The *Equal Terms Clause* prohibits imposing or implementing a land use regulation so as to treat a religious assembly "on less than equal terms" than a nonreligious assembly. § 2000cc(b)(1).  The *Nondiscrimination Clause* prohibits imposing or implementing a land use regulation so as to discriminate against an assembly or institution on the basis of religion. §2000cc(b)(2).

417.    The third provision of RLUIPA concerns "*Exclusions and Limits*" and contains two subparts that prohibit: (A) "totally exclud[ing] religious assemblies from a jurisdiction"; and (B) imposing or implementing a land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." § 2000cc(b)(3).

418.    The statutory text of the Equal Terms Clause provides: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." § 2000cc(b)(1).

419.    RLUIPA defines "government" to include, *inter alia,* "a State, county, municipality, or other governmental entity created under the authority of a State."  Leland Township is a governmental entity subject to RLUIPA.

420.    Section 2000cc–5(5) defines "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land ..." Leland Township's Zoning Ordinance and Master Plan are "land use regulation" subject to RLUIPA.

421.    Leland Township's zoning ordinance and the Township's enforcement of its land use scheme against Youth for Christ Club and Apollos violates *all* the provisions of RLUIPA.

422.    Leland Township's Zoning Ordinance establishes a religious gerrymander that explicitly excludes "Churches and Religious Institutions" and imposes "Special Performance Standards" upon "Churches and Religious Institutions."  As such, Leland Township's Zoning Ordinance treats "Churches or Religious Institutions" "on less than equal terms with a nonreligious assembly or institution." § 2000cc(b)(1).

> **iii)** **When a zoning ordinance expressly differentiates religious land uses from nonreligious land uses, the Plaintiff has established a *prima facia* violation of RLUIPA and the burden shifts to the government to justify, under the strict scrutiny standard of constitutional review.**

423.    *The government* (here, Leland Township), not the persons assembling for religious speech and activity, bears the burden of persuasion once the plaintiffs have established a *prima facie* case a violation of RLUIPA. Because the Plaintiffs have provided *prima facie* evidence demonstrating that Leland Township has violated the Free Exercise Clause or a violation and, Section 2 of RLUIPA, Leland Township now must bear the burden of persuasion on any element of the claim. RLUIPA § 2000cc–2(b).

424.    The Ninth Circuit held an ordinance that expressly differentiates religious land uses from nonreligious land uses establishes a prima facie case for a facial Equal Terms Clause claim under RLUIPA.  See *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma,* 651 F.3d 1163, 1171(9th Cir. 2011) ("[T]he express distinction drawn by the ordinance establishes a *prima facie* case for unequal treatment.").  See also *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012).

425.    Leland Township's zoning ordinance expressly and explicitly distinguishes between religious and nonreligious land uses.  Leland Township's Zoning Ordinance and Master Plan are, by their explicit text, a *prima facie* violation of RLUIPA.

426.    The Equal Terms provision of RLUIPA prohibits local governments from treating a religious assembly or institution on less than equal terms than a "nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

427.    RLUIPA prohibits governments from treating persons assembling for a religious purpose "on less than equal terms with a nonreligious assembly or institution." In *Elijah Group, Inc. v. City of Leon Valley,* 643 F.3d 419 (5th Cir. 2011). The Fifth Circuit explained that this

119

statutory language "requires that the religious institution in question be compared to a nonreligious counterpart, or 'comparator.' " *Id.* at 422.

428.    All Equal Terms cases under RLUIPA involve a comparison between a religious entity and a nonreligious entity. Congress specified those entities as: "assemblies" and "institutions." 42 U.S.C. § 2000cc(b)(1); see *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230–31 (11th Cir. 2004).

429.    An "assembly" is "[a] group of persons gathered together for a common reason." *American Heritage Dictionary of the English Language* (4th ed. 2000); *see also Webster's Encyclopedic Unabridged Dictionary of the English Language* (1996) (defining assembly as "a group of persons gathered together, usually for a particular purpose, whether religious, political, educational, or social"). And that group of people typically has a degree of "affinity, organization, and unity around [that] common purpose." *River of Life Kingdom Ministries v. Village of Hazel Crest, Ill.*, 611 F.3d 367, 390 (7th Cir. 2010) (Sykes, J., dissenting).

430.    An "institution" is "[a]n established organization or foundation, especially one dedicated to education, public service, or culture." *AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE* (4th ed. 2000); see also *BLACK'S LAW DICTIONARY* (7th ed. 1999) (defining "institution" as "[a]n established organization, esp. one of a public character, such as a facility for the treatment of mentally disabled persons").

431.    The Fifth Circuit held, "[s]o long as a plaintiff [bringing a RLUIPA case] can point to a nonreligious 'assembly' or 'institution,' [that is treated differently than the religious assembly] the plaintiff satisfies the third element."  See 42 U.S.C. § 2000cc(b)(1) (requiring comparison with a nonreligious assembly or institution')."

120

432.    Once a plaintiff bringing a RLUIPA case has identified assemblies and institutions, it must then show that the challenged law treats the religious ones on "less than equal terms" than the nonreligious ones.

433.    *Facial inequality*.  A plaintiff bringing a RLUIPA case can show less than equal treatment if the law treats religious assemblies or institutions differently than nonreligious assemblies or institutions by its very terms. An ordinance that permits social clubs but prohibits churches and synagogues is facially unequal.  See, *Midrash Sephardi*, 366 F.3d at 1220. The nonreligious assemblies get in. The religious ones do not. The ordinance thus facially treats religious assemblies—churches and synagogues—on less than equal terms than nonreligious assemblies—social clubs. That is the disparate treatment that the Equal Terms provision prohibits. *Primera Iglesia*, 450 F.3d 1295, 1231 (11th Cir. 2006).

434.    *Gerrymandered inequality*. A plaintiff bringing a RLUIPA case can also show less than equal treatment if the law in question, while facially neutral, nonetheless targets religion through a "religious gerrymander." *Primera Iglesia*, 450 F.3d at 1309 (quoting *Church of the Lukumi*, 508 U.S. at 535). This occurs when the law separates permissible uses in a way that burdens "almost only" religious groups. *Id.*

435.    *As-applied/selective inequality*. Finally, a plaintiff bringing a RLUIPA case can show less than equal treatment if the government selectively applies a facially-neutral law in a way that excludes religious assemblies or institutions. See *River of Life*, 611 F.3d at 383 (Sykes, J., dissenting).

436.    When the plaintiff bringing a RLUIPA claim makes out a *prima facie* case under the Equal Terms provision, RLUIPA shifts the burden to the government. 42 U.S.C. § 2000cc-2(b).

121

437.    In *Church of the Lukumi*, the City of Hialeah passed several ordinances prohibiting animal sacrifice, a practice of the Santeria faith.  *Id.* at 524–528. The City claimed that the ordinances were necessary in part to protect public health, which was "threatened by the disposal of animal carcasses in open public places." *Id.* at 544. But the ordinances did not regulate hunters' disposal of their kills or improper garbage disposal by restaurants, both of which posed a similar hazard. *Id.* at 544–545. The Court concluded that this and other forms of underinclusiveness meant that the ordinances were not generally applicable. *Id.* at 545–546. *Fulton*, 593 U.S. at 532–34.

438.    In the C-1 mixed-use district, Leland Township permits *as of right* retail businesses, banks, residential financial institutions, and art studios and allows cemeteries, parks, schools, libraries, bed and breakfasts, and "adult related businesses."  See Zoning Ordinance Article 2.

439.    While allowing property in the C-1 mixed-use district to be used for these purposes by right or by permit, Leland Township absolutely prohibits "Churches and Religious Institutions" from assembling at private property in the C-1 mixed-use district, the C-2 mixed use district, and the various overly districts.

440.    Leland Township's prohibition against Youth for Christ Club assembling is not a "neutral and generally applicable" regulation.  See *Church of the Lukumi*, 508 U.S. at 531–532.

441.    Leland Township's absolute prohibition against Youth for Christ Club meeting at the North Lake Street property, while allowing or permitting residences, banks, professional offices, art studios, tattoo and massage parlors, bars, restaurants and adult- related businesses to meet and assemble, is facially unequal treatment of religious and nonreligious assemblies.

442.    Leland Township cannot justify this unequal treatment of religious and nonreligious assemblies on the basis of any compelling (or even rational) government interest that satisfies the constitutional strict scrutiny standard.

122

443.    Leland Township was advised by their legal counsel and other prominent attorneys that denying Youth for Christ Club's application for a special use permit and that the Township's prohibition against students meeting at the North Lake Street property violates federal and Michigan civil rights law including RLUIPA. See **Exhibit 13**, **Exhibit 16**, **Exhibit 21**, and **Exhibit 32**.

444.    Leland Township officials, including the members of the Planning Commission, were provided the United States Department of Justice's guidance concerning RLUIPA and were aware of the enforcement cases the Department of Justice has brought against townships and local governments for violating RLUIA.

445.    Leland Township and the Township's legal counsel were aware of the Department of Justice's enforcement of RLUIPA in *Anchor Stone Christian Church v. City of Santa Ana*, United States District Court for the Central District of California, Civil Action No. 8:25-cv-215 ECF Doc. 56 (Justice Department's Statement of Interest in Support of Plaintiff's Motion for Preliminary Injunction), *United States of America v. Borough of Kingston*, United States District Court for the Middle District of Pennsylvania, Civil Action No. 3:26-cv-00269 ECF No. 4 (Consent Order of February 11, 2026), *United States of America v. City of Troy, Idaho*, United States District Court for the District of Idaho, Civil Action No 3:25-cv-00-262, ECF Doc. 1 (United States's complaint against the City of Troy). *Harbor Missionary Church Corp. v. City of San Buenaventura*, 62 Fed.Appx. 726 (9th Cir. 2016), *Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295 (11th Cir. 2006), *K Church Corp. v. Town of Brookfield, Connecticut*, Case No. 3:25-cv-1223.  All of these cases and the relevant pleadings are posted on the Department of Justice website.

446.    In its official guidance on RLUIPA and its "Place to Worship Initiative," the Department of Justice repeatedly explained that a municipality cannot exclude a church, mosque, synagogue, or other religious assembly from a zoning district while allowing comparable secular assemblies.

447.    In its 2018 "Statement of the Department of Justice on the Land Use Provisions of RLUIPA," the Justice Department explained that: "Churches cannot be denied the right to meet in rented storefronts ... [and] in all sorts of buildings that were permitted when they generated traffic for secular purposes."

448.    The Department of Justice further explains that zoning codes and land use regulations frequently violate RLUIPA when they: "exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes."

449.    The Department of Justice provides an example of a RLUIPA violation that is directly relevant to Leland Township. "A mosque leases a storefront space, but the city denies an occupancy permit because zoning restrictions prohibit houses of worship while allowing fraternal organizations, meeting halls, and banquet facilities. [The Department of Justice] identifies this as a potential RLUIPA violation."  See, https://www.justice.gov/crt/place-worship-initiative.

450.    Leland Township officials and the Planning Commission members were told of the Justice Department's RLUIPA enforcement and "Place to Worship Initiative."  The Township's own attorney, Brad Wierda, advised the Planning Commission members that denying Youth for Christ the right to meet potentially violated RLUIPA. See **Exhibit 13**.

451.    Notwithstanding the Township's knowledge of RLUIPA, the Township attorney's advice, a majority of the Planning Commission members *twice* voted to deny Youth for Christ

124

Club's application for a Special Use Permit and prohibited Youth for Christ Club from assembling at this private property.

452.    On June 30, the Supreme Court granted a petition for certiorari to hear the Sixth Circuit's decision in *Grand v. City of University Heights, Ohio*, 159 F.4th 507 (6th Cir. 2025), No. 965, 607 U.S. __ (June 30, 2026), 2026 WL1871301 (memorandum granting petition for writ of certiorari).

453.    In *Grand*, the Sixth Circuit considered whether an Orthodox Jewish group of men that had applied for, and were denied, a special use permit to meet on the Jewish Sabath and High Holidays had a ripe RLUIPA action when the landowner subsequently withdrew the application for a special use permit and stated they no longer "wished to operate a house of worship." 159 F.4th at 510.

454.    Because the plaintiff in *Grand* withdrew the application for a special use permit, the district court dismissed the RLUIPA claim "without prejudice for lack of ripeness."  The Sixth Circuit concluded, "most of *Grand's* challenges to the ordinance are unripe."  *Id*. at 512.  The Sixth Circuit then held, "Even though *Grand* did not need to exhaust his local remedies, he did need to obtain a final decision [to bring a RLUIPA action]."  *Id*. at 513.

455.    Following the Sixth Circuit panel's decision, Daniel Grand filed a *pro se* petition for a writ of certiorari to the United States Supreme Court.  Grand noted that the Circuits are split on what constitutes a ripe RLUIPA claim.  A number of *amici* filed *amici curiae* briefs in support of Grand.

456.    On June 30, 2026, the Supreme Court granted Grand's petition for a writ of certiorari. *Grand v. University Heights, Ohio*, 2026 WL1871301.

125

457.    The ripeness considerations upon which Grand's RLUIPA case was dismissed by the Sixth Circuit do not apply to these Plaintiffs because, *inter alia*,

(a)  these Plaintiffs have not dismissed their application for a Special Use Permit;

(b)  Leland Township does not have the legal authority to require these Plaintiffs to apply for a Special Use Permit;

(c)  Leland Township first violated these Plaintiffs' First Amendment rights almost a year ago when Leland Township prohibited Youth for Christ Club form continuing to assemble at the private property on North Lake Street;

(d)  Leland Township's Zoning Ordinance and land use scheme prohibiting "Churches and Religious Institutions" is facially unconstitutional totally apart from RLUIPA; and,

(e)  Leland Township's refusal to schedule and repeated delays of hearings of Youth for Christ Club's and Apollos Properties application for a Special Use Permit renders the requirement of a Special Use Permit meaningless under *Knick v. Scott Township*, 588 U.S. 180 (2019), and no legitimate basis upon which the Plaintiffs' RLUIPA claim is not ripe.

458.    Under the facts of this case, the Plaintiffs' RLUIPA claim is unquestionably ripe for this Court to address and resolve.  Leland Township denied Youth for Christ Club and those individuals assembling for prayer and Bible study.  Leland Township threatens those who meet at the North Lake Street property with criminal prosecution.  Leland Township has denied Youth for Christ Club and those seeking to assemble for Youth for Christ Club activities the right to do so since last October.

459.    Furthermore, and totally apart from Leland Township's enforcement of its zoning and land use scheme against the Plaintiffs and Youth for Christ Club, Leland Township's Zoning Ordinance is a *per se* facial violation of RLUIPA.

**B.        Relief requested to remedy Leland Township's violation of RLUIPA.**

460.     In addition to declaring Leland Township's Zoning Ordinance and enforcement of the Township's Zoning Ordinance to be unconstitutional as detailed in the other Counts in this Complaint, the Plaintiffs request this Court to order Leland Township to remedy the Township's violations of the United States and Michigan constitutions and the federal and state civil rights statutes and enjoin Leland Township, its agents, agencies, subdivisions, entities, employees, successors, and all other persons or entities from;

(a)     Imposing, enforcing or implementing a land use regulation in a manner that treats a "Church" or "Religious Institution" (including a "club" or persons assembling for religious speech, worship, Bible study and fellowship) on less than equal terms than Leland Township imposes upon a secular or nonreligious assembly, business, gathering, or institution;

(b)     Imposing, implementing or enforcing any ordinance, law or regulation applicable to churches, religious assemblies, clubs, institutions, or structures that is not content-neutral, generally applicable to religious and non-religious assemblies equally, neutral as to the content of the speech of those persons and entities subject to the regulation and is the least restrictive means to achieve a compelling government interest; or

(c)     Coercing, intimidating, threatening, interfering with, or retaliating against any person in the exercise or enjoyment of, or on account of his or her having exercised

or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise of enjoyment of, any right granted or protected by RLUIPA.

461.    The Plaintiffs further request this Court to order that Leland Township amend its Zoning Ordinance and Master Plan as follows:

(a)    Delete Section 16.11 and eliminate any other prohibition against, or regulation of, "Churches and Religious Institutions" that is not a neutral health and safety regulation generally and equally applicable to religious and non-religious assemblies.    This deletion and amendment to the Leland Township Zoning Ordinance and Master Plan includes any prohibition against or regulation of a "club," houses of worship, or other assembly of persons gathering for religious speech, prayer, Bible study, discussion, or fellowship or a requirement that such assemblies apply for and be granted a Special Use Permit;

(b)    Delete the acreage requirements applicable to "Churches and Religious Institutions" currently in Section 16.11 of the Zoning Ordinance;

(c)    Delete in its entirety, Section 16.11(B) of the Zoning Ordinance imposing "Special Performance Standards" upon "Churches and Religious Institutions"; and,

(d)    Remove or revise the greenspace and parking requirements applicable to "Churches and Religious Institutions" such that any structural, land use, parking, green space and other requirements applicable to "Churches and Religious Institutions" are no more burdensome or onerous than requirements applicable to secular businesses, offices retail stores, and other places of assembly such as libraries, museums, and offices of not-for-profit and charitable organizations.

462.    The Plaintiffs request this Court order Leland Township to report to this Court the Township's compliance with this Court's Order every month until the foregoing amendments to Leland Township's Zoning Ordinance are adopted and have become effective.

463.    The Plaintiffs request this Court order Leland Township to post and maintain a Public Notice of this Court's order at a conspicuous place on Leland Township's official website. The format of the notice must be consistent with the format of Leland Township's other official posted notices and its official website as approved by this Court.

464.    Upon receiving any application or inquiry by any future applicant for a permit or permits for a zoning or land use determination concerning a property intended to be used for, or currently used for, religious or faith-based assemblies, Leland Township shall provide the applicant or the person inquiring, a copy of this Court's Order.

465.    Order Leland Township to adopt a Complaint Procedure to address complaints by any person who believes Leland Township may have violated RLUIPA or otherwise discriminated based on an applicant's faith or religious views.    The Complaint Procedure shall also include a Complaint Form that Leland Township submits to this Court for review and which this Court approves.  The Complaint Form shall be published on Leland Township's website.  Leland Township shall respond in writing to any written or oral complaints within fifteen days of its receipt of such complaint.  Leland Township shall accept and maintain each original written complaint, its records concerning each written or oral complaint, and any proposed or actual action taken in response to any complaint.

466.    The Plaintiffs request this Court to order Leland Township to require all employees, elected officials, other officials, contractors, consultants, code enforcement, and building occupancy, including the Township Trustees, Supervisor, Clerk, Zoning Administrator, Planning

Commission members, and members of the Zoning Board of Appeals, and all clerical staff (Covered Officials) to review this Court's Order.

467.    The Plaintiffs request this Court to order Leland Township to provide live, in-person training on RLUIPA and instruct all Covered Officials on Leland Township's obligations under RLUIPA and the terms of this Court's order.  Leland Township will retain an independent, qualified, third-party individual with knowledge of RLUIPA and experience in the enforcement of RLUIPA to develop the curriculum and present the training for review and approval by this Court.  Leland Township shall bear all expenses associated with the training.  Leland Township shall maintain copies of the written materials provided for each training and the names of those individuals attending the RLUIPA training and the dates of each RLUIPA training session.

468.    The Plaintiffs request this Court to order Leland Township to obtain a signed statement from each Covered Official stating that the person attended the training, received and understands this Court's order and its mandates, and understands that a violation of this Court's Order may result in further court action against Leland Township.  Within thirty days after any newly elected, appointed or hired person or consultant enters office or begins service or employment, Leland Township shall provide such individual a copy of this Court's order and a statement of the required RLUIPA training required by this Court's order.

## COUNT VIII
### *Violation of the Civil Rights Act of 1871 (the Ku Klux Klan Act), 42 U.S.C. § 1983*

**A.    Leland Township violated the Civil Rights Act of 1871.**

469.    As demonstrated in the other paragraphs of this Complaint, Leland Township violated Youth for Christ's and Apollo's First Amendment freedoms including the Right to Free Speech, Assembly, Right of Association, Right to Free Exercise of Religion, and guarantee of Equal Protection under the law.

470.    Leland Township has no compelling government interest justifying the prohibition Leland Township imposed upon Youth for Christ's and its members constitutionally protected Free Exercise of Religion, Right to Assemble, Freedom of Speech, and Equal Protection.  Leland Township's prohibition against, and regulation of, "Churches and Religious Institutions" is not narrowly tailored to achieve any compelling government interest.  Leland Township's prohibition against, and regulation of, "Churches and Religious Institutions" is not generally applicable, nor is Leland Township's prohibition against and regulation of "Churches and Religious Institutions" neutral and equally applicable to religious and secular assemblies.

471.    By imposing these restrictions upon individuals assembling for religious worship, speech, and association Leland Township violated the First Amendment, the Fourteenth Amendment, and numerous federal civil rights laws and Michigan's constitution and civil rights laws.

472.    Leland Township and those government officials, employees that violated the First and Fourteenth Amendments of the United States Constitution were acting under the color of law when they denied Youth for Christ Club's and those persons participating in Youth for Christ Club activities their constitutionally protected rights and freedoms guaranteed by the First Amendment.

473.    Section 1 of the Ku Klux Klan Act of April 20, 1872, now 42 U.S.C. § 1983, provides,

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

474.    In *Monroe v. Pape*, 365 U.S. 167 (1961), the Supreme Court explained:

> Section 1979 [codified today as Section 1983] came onto the books as § 1 of the Ku Klux Act [this section] was one of the means whereby Congress exercised the

131

power vested in it by § 5 of the Fourteenth Amendment to enforce the provisions of that Amendment.  Senator Edmunds, Chairman of the Senate Committee on the Judiciary, said concerning this section:

> The first section is one that I believe nobody objects to, as defining the rights secured by the Constitution of the United States when they are assailed by any State law or under color of any State law, and it is merely carrying out the principles of the civil rights bill, which has since become a part of the Constitution," viz., the Fourteenth Amendment.

Its purpose is plain from the title of the legislation, "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes."  Allegation of facts constituting a deprivation under color of state authority of a right guaranteed by the Fourteenth Amendment satisfies to that extent the requirement of [Section 1983]. See *Douglas v. Jeannette*, 319 U.S. 157, 161-162. So far petitioners are on solid ground.

475.    In *Douglas*, the *Supreme* Court held,

We think it plain that the district court had jurisdiction as a federal court to hear and decide the question of the constitutional validity of the ordinance …

We have repeatedly held that the Fourteenth Amendment has made applicable to the states the guaranties of the First.  *Schneider v. State*, 308 U.S. 147, 160, note 8 (1939), and cases cited; *Jamison v. Texas*, 318 U.S. 413 (1943).  Allegations of fact sufficient to show deprivation of the right of free speech under the First Amendment are sufficient to establish deprivation of a constitutional right guaranteed by the Fourteenth, and to state a cause of action under the Civil Rights Act, whenever it appears that the abridgment of the right is effected under color of a state statute or ordinance.

*Id*. at 161-162.

476.    As such, Section 1983 creates a private federal cause of action allowing individuals to sue state and local governmental entities that qualify as "persons" under the statute. See, *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  A municipality or local government entity may be sued directly under § 1983 if the constitutional violation was caused by an official policy, custom, or decision of the municipal or local government.

132

477.    Youth for Christ and those individuals wishing to participate in Youth for Christ Club activities are entitled to punitive damages against officials under 42 U.S.C. § 1983 "when the [official's] conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

478.    A majority of the Leland Township Planning Commission members voted to deny Youth for Christ Club and individuals seeking to pray, worship, and speak at the North Lake Street property their constitutional rights including the Right to Assemble, Free Speech, Association, and the Free Exercise of Religion.

479.    The members of the Planning Commission and Leland Township officials and employees demonstrated reckless and callous disregard for the constitutional rights and freedoms of Youth for Christ Club and the students, parents, staff, and others participating in, or desiring to participate in, prayer, Bible study, assembly, and religious activities at the North Lake Street property.

480.    Leland Township and the Leland Township officials and members of the Planning Commission were repeatedly told that denying Youth for Christ Club the right to assemble at the private property on North Lake Street violated these constitutionally protected rights and violated civil rights laws including RLUIPA and the Civil Rights Act of 1871.

481.    Leland Township and the Planning Commission members were told by their own legal counsel that denying Youth for Christ the right to assemble for prayer, speech, worship at the North Lake Street property was a potential (even likely) violation of the United States Constitution, RLUIPA, and other civil rights laws.

482.    Yet, rather than consider and follow the counsel and sound advice of the Township's attorney, a majority of the members of the Leland Township Planning Commission fired their legal counsel and instructed another lawyer, Tom Grier, to draft Findings and Conclusions denying Youth for Christ Club the right to meet at the North Lake Street property.

483.    A majority of the members of the Planning Commission (Lee Cory, Skip Telgard, Sam Simpson, and Brian Fenlon) then voted to deny Youth for Christ Club's application for a Special Use Permit and thereby denied Youth for Christ Club and its members their constitutionally guaranteed First Amendment Freedom to assemble at the North Lake Street property.  Steve Scales voted to allow Youth for Christ Club to assemble the North Lake Street property.

**B.      Relief requested to remedy Leland Township's violation of the Civil Rights Act of 1871.**

484.    Plaintiffs respectfully request this Court to enter judgment and:

(a)     Declare Leland Township's adoption of, and enforcement of, the Leland Township Zoning Ordinance against Youth for Christ and Apollos violates those constitutional and civil rights protected by the United States Constitution, specifically the First Amendment freedoms of Free Speech, Assembly, Free Exercise of Religion, Right of Association, and the guarantee of Equal Protection;

(b)     Permanently and preliminarily enjoin Leland Township and its officials, employees and contractors from enforcing Leland Township's Zoning Ordinance against Youth for Christ Club, Apollos, or any individual assembling at the North Lake Street property for religious or faith-based activity or speech;

(c)     Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(d)      Grant such other and further relief as this Court deems just and proper.

**COUNT IX**
***Leland Township Violated the Constitutional and Civil Rights Guaranteed***
***by Article I of Michigan's State Constitution***

**A.      Leland Township's Zoning Ordinance and enforcement of the Township's Zoning Ordinance against Youth for Christ Club violates Article I of the Michigan Constitution.**

485.      Article I of Michigan's Constitution provides, "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin. …  The people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances. … Every person shall be at liberty to worship God according to the dictates of his own conscience. … The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief … Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

486.      Article I of Michigan's state constitution independently and additionally protects the freedom of speech, assembly, worship, and expressive activity. The Michigan Supreme Court holds that Michigan's constitutional protections of speech, worship, and assembly extend beyond even those protections the First Amendment of the United States Constitution guarantees for such activity.  See *People v. Howell,* 238 N.W.2d 148 (1976); *People v. Collins*, 475 N.W.2d 684 (1991). (Holding that political and expressive activity occupies the highest rung of constitutional protection under Michigan law.)  See, *In re Request for Advisory Opinion Regarding*

*Constitutionality of 2005 PA 71*, 740 N.W.2d 444 (2007) (dissenting opinion of J. Cavanagh). (Though expressed in a dissenting opinion, this statement was not disputed by the majority.)

487.    Article I, § 5 of the Michigan Constitution independently and additionally protects freedom of speech assembly, worship, and such expressive activity.[10]  The Michigan Supreme Court holds that Michigan's constitutional protections of speech, worship, and assembly extend beyond even the protection the First Amendment of the United States Constitution guarantees for such activity.  See *People v. Howell,* 238 N.W.2d 148 (1976); *People v. Collins*, 475 N.W.2d 684 (1991). (Holding that political and expressive activity occupies the highest rung of constitutional protection under Michigan law.)   See also *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 740 N.W.2d 444 (2007).

488.    Leland Township's prohibitions against, and regulation of, "Churches and Religious Institutions," and Leland Township's religious gerrymander scheme creating church-free zones in Leland Township adopted in Leland Township's Zoning Ordinance and Master Plan violate the freedoms guaranteed by Article I of the Michigan Constitution.

---

[10] See *Sitz v. Department of State Police,* 506 N.W.3d 209 (Mich. 1993) (Michigan courts are free to interpret the Michigan Constitution independently of the United States Constitution and, where appropriate, to provide greater protection.); *Woodland v. Michigan Citizens Lobby*, 378 N.W.2d 337 (Mich. 1985) (the Michigan Constitution may be interpreted independently and examined Michigan free-speech protections separately from federal doctrine.); *People v. Nash*, 341 N.W.2d 439 (Mich. 1983) (Michigan constitutional provisions need not always be interpreted identically to analogous federal provisions.); *People v. DeJonge*, 501 N.W.2d 127 (Mich. 1993) (The rights guaranteed by the Michigan state constitution may exceed those rights guaranteed under the United States Constitution.); and, *Advisory Opinion re Constitutionality of 1972 PA 294*, 208 N.W.2d 469 (Mich. 1973) (Michigan's religion clause contains language not found in the First Amendment to the United States Constitution including: "Every person shall be at liberty to worship God according to the dictates of his own conscience."

**B.**      **Relief requested to remedy Leland Township's violation of Article I of Michigan's state constitution.**

489.    This Court should declare Leland Township's Zoning Ordinance, Master Plan and prohibitions against, and regulation of, "Churches and Religious Institutions," including Youth for Christ Club, to violates those rights and freedoms guaranteed by Article I of Michigan's state constitution.

490.    This Court should enjoin Leland Township and its agents, agencies, subdivisions, entities, employees, successors, and all other persons or entities from;

(a)    Imposing, enforcing or implementing any land use regulation that denies a "Church", "Religious Institution", "club" or group of persons the right to assemble for religious speech, worship, Bible study or fellowship at any private property in Leland Township;

(b)    Imposing, implementing or enforcing any ordinance, law or regulation applicable to  churches, religious assemblies, clubs, institutions, or structures at which such persons assemble that is not content-neutral, generally applicable to religious and non-religious assemblies equally, neutral as to the content of the speech or nature of the purpose for which those persons and entities subject to the regulation assemble and is the least restrictive means to achieve a compelling government interest;

(c)    Coercing, intimidating, threatening, interfering with, or retaliating against any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise of enjoyment of the right to assemble for worship, speak, pray and study the Bible at private property in Leland Township;

137

(d)     Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(e)     Grant such other and further relief as this Court deems just and proper.

**COUNT X**
***Leland Township Violated the***
***Elliott-Larsen Civil Rights Act, MCL 37.2101**, et seq.*

**A.     Leland Township violated the Elliott-Larsen Civil Rights Act when the Township discriminated against Youth for Christ because of Youth for Christ's religious beliefs and activities.**

491.    The Michigan Elliott-Larsen Civil Rights Act, codified as MCL 37.2101 (ELCRA), provides "The opportunity to obtain employment, housing, and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, familial status, or marital status as prohibited by this act, is recognized and declared to be a civil right."

492.    Leland Township is a public-service provider subject to ELCRA.   Leland Township's zoning administration, permitting, occupancy approvals, and land-use decisions constitute public services.

493.    Youth for Christ Club is an organization and assembly of persons that gathers for the purpose of prayer, Bible study and fellowship.  While Leland Township's Zoning Ordinance permits "clubs" to meet at the North Lake Street property, Leland Township's Planning Commission concluded that Youth for Christ Club was not a permitted "club" but is a "Church or Religious Institution" that is prohibited from meeting at the North Lake Street property.

494.    The Planning Commission members twice denied Youth for Christ Club's application for a permit to meet because opponents of Youth for Christ and a majority of the

138

Case 1:26-cv-02307    ECF No. 1,  PageID.152    Filed 08/10/26    Page 152 of 169

members of the Planning Commission concluded Youth for Christ is not a secular club.  Because Youth for Christ Club engages in activity the Township determined to be a "Church" or "Religious Institution," the Township denied Youth for Christ and its members the right to assemble at the North Lake Street property.

495.    The Township's denial of Youth for Christ Club's application for a Special Use Permit was because Youth for Christ Club assembled for religious speech, Bible study, and worship at the private property.

496.    Michigan's Elliott-Larsen Civil Rights Act guarantees persons the opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination.  Religious speech, belief, and worship is recognized and declared to be a civil right. Michigan's ELCRA declares that discrimination on the basis of religious belief is illegal and prohibited.

497.    Leland Township treated (and treats) Youth for Christ Club less favorably and less equally than the Township treated (and treats) similarly situated secular assemblies, businesses and persons assembling for a nonreligious purpose such as a library, art studio, bank, a bar or restaurant.

498.    Leland Township denied Youth for Christ Club and Apollos the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of Youth for Christ Club's religious beliefs and the religious activities of those persons assembling at the private North Lake Street property.

499.    Leland Township's discriminatory treatment of Youth for Christ Club and Apollos occurred because the Township and the members of the Township Planning Commission determined that Youth for Christ Club is a religious organization and that the property owner,

Apollos, allowed the private property to be used for religious and faith-based activities such as prayer and Bible study.

500.    Leland Township's discrimination against Youth for Christ Club, Apollos and those persons seeking to participate in religious study, prayer, worship and speech at the North Lake Street property violates the religious freedom protected by ELCRA.

**B.    Relief requested to remedy Leland Township's violation of Michigan's Elliott-Larsen Civil Rights Act.**

501.    Plaintiffs respectfully request this Court to enter judgment and:

(a)    Declare Leland Township's Zoning Ordinance and enforcement of the Zoning Ordinance to be religious discrimination prohibited by the ELCRA;

(b)     Declare Leland Township's interpretation and enforcement of Leland Township's Zoning Ordinance against Youth for Christ Club to violate ELCRA as prohibited religious discrimination;

(c)    Enjoin Leland Township from enforcing its Zoning Ordinance against the Plaintiffs and those persons seeking to assemble at the North Lake Street property for prayer and Bible study;

(d)    Enjoin Leland Township, or any employee, agent or official with Leland Township from coercing, intimidating, threatening, interfering with, or retaliating against any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise of enjoyment of the right to assemble for worship, speak, pray and study the Bible at private property;

140

(e)     Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in

bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees,

litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(f)     Grant such other and further relief as this Court deems just and proper.

### COUNT XI
*Leland Township's Prohibition Against "Churches and Religious Institutions"*
*Exceeds the Lawful Authority Michigan's Zoning Enabling Act (MCL 125.301, et seq.)*
*Grants Leland Township*

**A.      Leland Township exceeded and violated the Township's lawful authority under Michigan's Zoning Enabling Act.**

502.    Under the Michigan Zoning Enabling Act (MZEA), MCL 125.3101 et seq., a township has limited authority to regulate the use of private land through zoning.  That authority granted townships to regulate an owner's use of private property is subject to the United States and Michigan Constitutions and is significantly constrained when the township seeks to regulate churches and religious institutions.

503.    While a township may regulate the *physical structure* in which persons assemble to worship and speak, townships are not granted authority to regulate the *content* of the speech, nature of the religious assembly, worship or financial administration of a "Church or Religious Institution" where such constitutionally protected speech and worship occur.

504.    A township's zoning authority under the MZEA, especially as applied to churches, religious institutions or persons assembling to engage in religious study, speech, prayer or fellowship, is subject to and subordinate to the United States Constitution, Michigan's constitution, federal and Michigan civil rights statutes such as RLUIPA and the Civil Rights Act of 1871 as detailed in the previous paragraphs.

505.    Any zoning regulation a Michigan township adopts and any land use regulation a township seeks to enforce against a church, religious institution or an assembly of persons

141

gathering to engage in religious speech, prayer or worship must be neutral and must be generally applicable to religious and nonreligious assemblies, institutions, and organizations.

506.    Michigan's Zoning Enabling Act does not authorize Leland Township to prohibit or regulate speech or assembly based upon the content of the speech or the viewpoint of the persons assembling to speak.

507.    A township may not enact or enforce a land use regulation that discriminates against, or that burdens or prohibits, "Churches and Religious Institutions" and faith-based groups of persons from assembling for religious worship, speech, prayer or fellowship.  Should a Michigan township enact, or seek to enforce, such an ordinance, the township is acting *ultra vires* in excess of any lawful authority the township is granted under the MZEA.

508.    The MZEA does not grant Leland Township, or any Michigan township, the authority to enact a blanket prohibition against "Churches and Religious Institutions" or prohibit "Churches and Religious Institutions" and persons seeking to engage in religious speech and activities such as prayer, Bible study, and worship from assembling to do so at private property.

509.    The MZEA does not grant any Michigan township the authority to require persons seeking to assemble for religious speech, prayer and Bible study must first pay the township a fee, apply for a permit and meet certain "Special Performance Standards" as a condition to assemble for prayer, speech, Bible study, or worship.

510.    The MZEA does not grant any Michigan township the authority to review, approve or regulate the financial affairs of churches and religious institutions.

511.    The MZEA does not grant Michigan townships the authority to adopt a religious gerrymander and forbid "Churches and Religious Institutions" simply because they engage in

142

prayer and Bible study nor to exclude "Churches and Religious Institutions" from districts where comparable secular assemblies are allowed.

512. Leland Township's zoning and land use scheme, as written and as applied to and enforced against Youth for Christ Club (that the Township deems to be a forbidden "church" not a permitted "club") exceeds any lawful authority Leland Township is granted under the MZEA.

513. Section 16.11 of the Leland Township Zoning Ordinance, a section that applies only to "Churches and Religious Institutions" provides,

**A. The following site and developmental requirements shall apply:**

1. All ingress and egress for the site shall be from a paved major or minor thoroughfare.

2. The site shall be at least two (2) acres in size.

3. No more than twenty-five (25) percent of the site area shall be covered by buildings. No more than sixty percent (60%) of the site shall be covered by impervious surface.

4. No building shall be closer than fifty (50) feet from any lot line or right-of-way.

5. No building shall be erected to a height greater than that permitted in the district in which it is located unless the building is set back an additional one (1) foot for each one (1) foot of additional height above the district height limitation. A spire is excluded.

**B. Special Performance Standards:**

1. Use of the structure shall not result in accrual of distributable profits, realization of private gain resulting from payment or compensation in excess of a reasonable and customary allowance for salary or other compensation for services rendered, or realization of any other form of private gain.

2. No day care center, private school, or other use requiring a Special Approval shall be allowed without a separately approved Land Use Permit for each use.

3. Signs shall be limited to one (1) identification sign and one (1) changeable message board. The identification sign shall have a maximum area of twenty-four (24) square feet. Both signs may be lighted but not internally.

143

514. These requirements of Leland Township's Master Plan and Zoning Ordinance are unique and specific to "Churches and Religious Institutions.

515. These provisions of Leland Township's Zoning Ordinance and Master Plan are discriminatory against "Churches and Religious Institutions" and impose unique burdens, regulations, and penalties upon persons assembling for religious and faith-based speech and worship.

**B.      Relief requested because Leland Township exceeded its authority under the Michigan Zoning Enabling Act.**

516. Plaintiffs respectfully request this Court to enter judgment and:

(a)   Declare Leland Township's prohibition against, and regulation of, "Churches and Religious Institutions" exceeds the zoning authority Michigan's Zoning Enable Act granted Leland Township;

(b)   Enjoin preliminarily and permanently Leland Township and any of the Township's elected or appointed officials, employees, or contractors from enforcing Leland Township's Zoning Ordinance and Master Plan against Youth for Christ Club, Apollos or any other individuals, organizations, or assemblies seeking to engage in those rights and freedoms guaranteed by the First Amendment;

(c)   Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(d)   Grant such other and further relief as this Court deems just and proper.

**COUNT XII**
*Leland Township Planning Commission's Denial of*
*Youth for Christ Club Special Use Permit to Assemble at the*
*North Lake Street Property is Contrary to Leland Township's Zoning Ordinance*

**A.    Leland Township's Zoning Ordinance specifically allows "Clubs" to assemble at private property in the C-1 mixed-use district.**

517.    Article 12(B) of Leland Township's Zoning Ordinance identifies uses "permitted by right" at private property Leland Township's Master Plan designates to be in the C-1 mixed-use district.  These uses include:

1.    Any generally recognized retail business, except a drive-in business, which supplies commodities on the premises within a completely enclosed building including, but not limited to, foods, drugs, liquor, furniture, clothing, dry goods, notions, books, flowers, jewelry or hardware.

2.    Personal service establishments, except drive-in businesses, which perform services on the premises within a completely enclosed building, such as, but not limited to, repair shops, barber and beauty shops, photographic studios, and dry cleaners.

3.    Office establishments, except drive-in businesses, which perform services on the premises including but not limited to; financial institutions, insurance offices, real estate offices, artist offices and galleries, professional offices for accountants, doctors, lawyers, engineers, and architects, and similar office uses.

4.    Residential uses when occupying the second or third floors, provided that all requirements of the building code are met, and that any new dwelling created must have adequate on site parking.

5.    Accessory uses and structures customarily incidental to and subordinate to the permitted principal use.

6.    Single family dwelling. (Amendment 1997-05).

7.    Standard restaurants. (Amendment 2009-02).

518.    Article 12.01(B) of Leland Township's Zoning Ordinance identifies a number of uses of property that are "Permitted by Right" in the C-2 similar and neighboring mixed use zoning district.  These permitted uses include,

145

Automobile dealership, automobile car wash, offices and showrooms of plumbers, electricians, decorator, or similar trades, wholesale businesses handling candy, drugs, jewelry, novelties, professional barber and beauty supplies, office supplies, radio and television parts, tobacco and similar products, service establishments, including computer services, printing, publishing, photographic reproduction, blueprinting, and related trades or arts, building supply and equipment for predominantly retail sales, *private clubs and meeting halls*, veterinarian clinic, accessory uses and structures customarily incidental to and subordinate to the permitted principal use.  (emphasis added.)

519.    These uses of property as of right in the C-2 zoning district include "private clubs and meeting halls."

520.    These uses of property are *as of right* and do not require the owner to apply for, or be granted, a Special Use Permit.

521.    Article 12.01 (C) lists "Special Land Uses Permitted by Special Use Approval" that are allowed in the C-1 mixed-use district if the owner applying for and the Township granting a Special Use Permit.

522.    The uses of property permitted in the C-2 mixed-use district include:

Public facilities, including parking lots, cemeteries, parks, schools, libraries, and similar uses and activities, including administrative buildings associated with public utilities, motor vehicle, trailer, and boat service and repair stations, open air business including automobile, truck, and boat sales, nursery and landscape supplies sales, sale of lawn furniture, farm equipment, and playground equipment, and similar outdoor businesses, *clubs and other establishments* which provide food or drink for consumption by persons seated within a building that is not part of a drive-in, and may also provide dancing and entertainment (Amendment 2009-02), private parking facility, outdoor commercial recreation, accessory uses to the above permitted uses such as refreshment stands, retail shops selling items related to the above uses, maintenance buildings, offices for management functions, spectator seating and service areas, and locker rooms and rest rooms are permitted, schools under private sponsorship including trade schools, indoor commercial recreation facilities such as indoor theaters, bowling alleys, skating rinks or similar uses, marina, public or private office buildings (Amendment 1997-09), adult related businesses (Amendment 1997-17), single family dwellings, planned unit development (Amendment 2004-07), conversion of existing structure to a condominium project.  (emphasis added.)

146

523.   As written, this section of the Zoning Ordinance, Article 12, Section 12.01 (C)(3), allows "Clubs and other establishments which provide food or drink for consumption by persons seated within a building that is not part of a drive-in, and may provide dancing and entertainment. (Amendment 2009-02), in the C-1 mixed-use district.

524.   *WEBSTER'S NEW INTERNATIONAL DICTIONARY 2ND ED.* defines the word "And" as "In the legal construction of language … 'And,' either word [*and* or *or*] will be treated as if it were the other whenever this construction is plainly required to give effect to the intention of the person using it … thus '*and*' may be read as '*or*.'"

525.   When construing an ordinance or law the court must give words their ordinary and customary meaning unless they are otherwise specifically defined.  Leland Township's Zoning Ordinance is interpreted by the ordinary meaning of the words used in the Zoning Ordinance.

526.   Justice Scalia and Bryan Garner in their work, *READING LAW: THE INTERPRETATION OF LEGAL TEXT*, write,

> Words are to be understood in their ordinary, everyday meanings – unless the context indicates that they bear a technical sense.  (p. 69)

527.   Justice Scalia and Bryan Garner quote Chief Justice John Marshall for the point that words used in constitutions as well as statutes are to be given the words ordinary meaning and "natural sense."

> The enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.

> *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1,71 (1824).

528.   Justice Scalia and Bryan Garner conclude by noting, "[t]he ordinary-meaning rule is the most fundament semantic rule of interpretation.  It governs constitutions, statutes, rules, and

private instruments.  Interpreters should not be required to divine arcane nuances or to discover hidden meanings."  *Id*. at 69.

529.    The two Troposphere Memoranda Chris Bzdok and Sean Clark submitted to the Planning Commission on behalf of Fishtown Preservation Society, and the letters Jacob Danziger sent the Planning Commission argued the word "club" as used in the Zoning Ordinance *excludes* clubs in which high school students gather to pray and study the Bible. Bzdok's and Clark's memoranda and Jacob Danziger's letters argue the word "club" means only restaurants serving food and drink and with dancing.

530.    The Fishtown Preservation Society memoranda and the Danziger letters urge the Planning Commission Members to interpret the text of the Zoning Ordinance by *Sprachgefül*, divining the intentions of the Township from a supposed interpretation of the 2009 amendment to Section 12.01(B)(7) of the Zoning Ordinance.[11]  On this basis, Bzdok, Clark, and Danziger contend that the 2009 amendment including "standard restaurants" as a use by right instead of a use requiring a Special Use Permit means the word "club" refers to only "standard restaurants."  This is not what the language of the Zoning Ordinance says.  The written text of the Zoning Ordinance cannot be reinterpreted by having some jurisdictional séance to reimagine what the ordinance was intended to mean.

531.    The Minutes from the April 15 meeting of the Planning Commission record,

Corey asks Telgard, as a long standing member of the PC, his experience with the PC [Planning Commission] as a Leland restaurateur as it pertains to the 2008 amendment made to the ordinance, particularly as it relates to C1.

Telgard running restaurant and found with older restaurants there tended to be encroachments that put businesses in non-conforming status.  Suggestion of Cypher to send letter to PC to move standard restaurants from a use by approval to a use by right status.  PC put on schedule and Telgard recused.  PC deliberated and voted to

---

[11] *Sprachgefül* refers to an intuitive, almost mystic, notion of the meaning of a phrase or sentence.

move standard restaurants from a use by special approval to a use by right.  Clubs and other such businesses stayed in the same special use category.

Corey asks if type of club PC envisioned in language has not changed.  Telgard confirms no change and PC assumed that a supper club or music type of club could come in and be restaurants.

532.    Skip Telgard provided his comments as a, past and current, member of the Planning Commission.  What is omitted from the dialogue between Lee Cory and Skip Telgard (and which everyone in Leland knows) is that Skip Telgard and his family owns the Blue Bird restaurant. The Blue Bird restaurant is in the C-1 mixed-use district across the street from the North Lake Street property.

533.    The 2009 amendment benefited the Blue Bird restaurant and Skip Telgard's family by allowing a "Standard Restaurant" in the C-1 mixed-use district without the owner having to apply for a Special Use Permit.

534.    The Telgard family sought to demolish the historic Blue Bird restaurant structure and build a new and different restaurant on the same property.

535.    The Blue Bird restaurant has been an iconic feature of Leland for generations and is a dearly-loved restaurant and gathering place.  But, due to his and his family's personal interest in the 2009 amendment to the Zoning Ordinance, Skip Telgard's opinion as to the purpose and intention for which this provision of Leland Township's Zoning Ordinance should be interpreted is not credible authority upon which the Planning Commission can interpret and enforce this provision of the Zoning Ordinance to exclude Youth for Christ Club from meeting at the North Lake Street property.

536.    The notion that the word "club," as used in Leland Township's Zoning Ordinance, Section 12.01 (C)(3), means only "standard restaurants" and the word "establishments" is used in

the restrictive conjunctive sense, meaning only restaurants with drinks and dancing, redefines the word "club" that is semantically and grammatically incorrect as a matter of basic English language.

537.    A "club" (such as a book club, a chess club, a sailing club or a Bible study club) is a permitted use and a "standard restaurant" that serves alcohol and provides a venue for dancing is not an accurate reading of the word "club." "Other establishments which provide food or drink for consumption by persons seated within a building that is not part of a drive-in, and may provide dancing and entertainment" may, some would argue, be "club" in the same way an "adult related strip club is a club."  But the reference to providing food and drinks and allowing dancing does not cabin the definition of the word "club."

538.    Correctly understood, the words "other establishments which provide food or drink… and may provide dancing" describe *additional* permitted uses, they are not words limiting or cabining the meaning of "club" to *exclude* clubs that do not "provide food or drink ... or may provide dancing and entertainment."

539.    Leland Township's Zoning Ordinance defines "club" as "An organization of persons for special purposes or for the promulgation of sports, arts, science, literature, politics, agriculture or similar activities, but not operated for profit and open only to members and not the general public."  The definitions that Leland Township uses do not limit the word "club" to only a "Standard Restaurant" that provides food and drink and dancing.

540.    *WEBSTER'S NEW INTERNATIONAL DICTIONARY* defines. "club" as "an association of persons for the promotion of some common object, as literature, science, politics, good fellowship etc. ... To gather or combine into a clublike mass or body."

541.    Leland Township's Zoning Ordinance defines,

150

**Restaurant, Standard**: An establishment whose principal business is the sale of food and/or beverages to customers in a ready-to-consume state, and whose principal method of operation includes one or both of the following characteristics:

a.   customers, normally provided with an individual menu, are served their food and beverage by a restaurant employee, at the same table or counter at which food and beverage are consumed;

b.   a cafeteria-type operation where food and beverage generally are consumed within the restaurant building.

The term "standard restaurant" shall not be interpreted to mean or include a drive-through restaurant.

542.    Thus, the text of Leland Township's Zoning Ordinance specifically allows the property on North Lake Street to be used by the Youth for Christ Club as a "club" at which students, their parents and Youth for Christ staff meet for Bible study, prayer and fellowship.

543.    Both Leland Township's zoning administrator, Tim Cypher, and the Township's attorney, Brad Wierda, told the Planning Commission members that Youth for Christ Club is a permitted use of the North Lake Street property in the C-1 mixed-use district.

**B.      Relief requested because Leland Township's Zoning Ordinance allows Youth for Christ Club to assemble at the North Lake Street Property.**

544.    The Plaintiffs respectfully request this Court to:

(a)     Declare that Youth for Christ Club assembling at the North Lake Street property is a permitted use of the North Lake Street property under Leland Township's Zoning Ordinance and Master Plan;

(b)     Order Leland Township to rescind the Planning Commission's Findings and Conclusions denying Youth for Christ's application for a Special Use Permit to assemble at the North Lake Street property and direct the Township to allow Youth for Christ Club to assemble at the North Lake Street property;

151

(c)    Order Leland Township to reimburse the Plaintiffs for those attorney fees, litigation costs and other expenses the Plaintiffs incurred bringing this action to enforce their right to assemble at the North Lake Street property;

(d)    Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(e)    Grant such other and further relief as this Court deems just and proper.

## COUNT XIII
### *Leland Township Violated Apollos's*
### *Fifth Amendment Right to Private Property*

**A.    Leland Township violated the Fifth Amendment by taking Apollos' right to own and use its private property without paying just compensation and without legitimate public purpose.**

545.    The Fifth Amendment to the United States Constitution provides, "No person shall…be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use, without just compensation."

546.    Apollos purchased the North Lake Street property with the intention of allowing Youth for Christ Club and those individuals seeking to participate in activities including prayer and Bible study at the North Lake Street property.

547.    James VanSteenhouse and his legal counsel, Robert Parker, met with Leland Township's Zoning Administration, Tim Cypher, to discuss the intended use of the North Lake Street property before Apollos closed on the purchase of the Property.

548.    Apollos' right to allow Youth for Christ Club to use a portion of the North Lake Street property for student Bible studies and youth ministry was a material, motivating reason why Apollos purchased the North Lake Street property.

549.    The Leland Township Zoning Ordinance explicitly permits "clubs" in the C-1 mixed-use district. See Article 12 §12.01(C)(3). See also §12.02(B)(7) that permits clubs as a use "permitted by right" in the C-2 zoning district. (See Count XII *supra*.).

550.    In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 394 (1922), Justice Holmes famously wrote, "While property may be regulated to a certain extent, if regulation goes too far, it constitutes a taking."

551.    In *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926), the Court upheld zoning and land use regulation generally but provided that such zoning is constitutional only if it bears a substantial relation to the public health, safety, moral, or general welfare. The Court recognized that a zoning scheme can be unconstitutional if it is arbitrary or confiscatory. Justice Sutherland wrote that a zoning ordinance that is "clearly arbitrary and unreasonable" violates the constitution.

552.    Similarly in *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304 (1987), the Court held that land use regulation is a taking for which the Fifth Amendment requires the owner to be compensated – not merely an invalidation of the regulation. See also, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), and *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) and *Horne v. Dept. of Agriculture*, 576 U.S. 350 (2015).

553.    More recently, the Supreme Court in *Knick* affirmed the property owner's right to proceed in federal court to enforce the owner's Fifth Amendment right to his private property without having to first exhaust state law administrative remedies. *Knick* overruled *Williamson County's* holding that an owner must exhaust state administrative remedies before the owner's federal constitutional action was ripe.

153

554.    Leland Township's prohibition of Apollos leasing the North Lake Street property to Youth for Christ Club is an unconstitutional taking of private property that violates the Fifth Amendment.  See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992); *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001); *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021); and *Knick v. Scott Township*, 588 U.S. 180 (2019).

**B.    Relief necessary to address Leland Township's taking and regulation of Apollos's private property in violation of the Fifth Amendment.**

555.    Because Leland Township violated Apollos's Fifth Amendment right to its private property and Apollos's right to lease the North Lake Street property to Youth for Christ Club, this Court should order Leland Township to:

(a)    Declare that Leland Township's prohibition against "Churches and Religious Institutions" assembling at the North Lake Street property violates Apollos's Fifth Amendment right to own and use this private property;

(b)    Pay Apollos for the loss of use of the North Lake Street property for that period during which Leland Township prohibited Youth for Christ Club from assembling at the North Lake Street property;

(c)    Award the Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action and reimburse the Plaintiffs' attorney fees, expert witness fees, litigation expenses, and costs, as provided by 42 U.S.C. §1988; and,

(d)    Grant such other and further relief as this Court deems just and proper.

**WHEREFORE**, Plaintiffs respectfully request this Court to grant that relief described in Count I through Count XIII above and order Leland Township to comply with this Court's orders remedying Leland Township's violation of the Plaintiffs' constitutional and civil rights as detailed above.

**VERIFICATION OF COMPLAINT**

I, James VanSteenhouse, Elizabeth VanSteenhouse, Micah Cramer, and Kya Cramer declare that the factual statements made are true and correct to the best of our knowledge, information, and belief.

_____          _____
JAMES VANSTEENHOUSE                          ELIZABETH VANSTEENHOUSE


_____          _____
MICAH CRAMER                                        KYA CRAMER

155

*/s/ Mark F. (Thor) Hearne, II*
MARK F. (THOR) HEARNE, II
TRUE NORTH LAW, LLC
112 South Hanley Road, Suite 200
St. Louis, MO  63105
Phone: (314) 296-4000
thor@truenorthlawgroup.com
Michigan Bar No. P40231

TODD MILLAR
PARKER HARVEY, PLC
901 S. Garfield Ave., Suite 200
Traverse City, MI 49686
Michigan Bar No. P48819
Phone: (231) 486-4519
tmillar@parkerharvey.com

*Counsel for the Plaintiffs*

156