UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APOLLOS PROPERTIES, LLC, *et al*,

Plaintiffs,

v.

LELAND TOWNSHIP, MICHIGAN, *et al,*

Defendants.

Case No.: 1:26-cv-2307

Honorable Paul L. Maloney


| | |
|---|---|
| Mark F. (Thor) Hearne, II (P40231)<br>TRUE NORTH LAW, LLC<br>Attorneys for Plaintiffs<br>112 South Hanley Road, Suite 200<br>St. Louis, MO 63105<br>Phone: (314) 296-4000<br>thor@truenorthlawgroup.com<br><br>Todd Millar (P 48819)<br>PARKER HARVEY, PLC<br>Attorneys for Plaintiffs<br>901 S. Garfield Ave., Suite 200<br>Traverse City, MI 49686<br>Phone: (231) 486-4519<br>tmillar@parkerharvey.com | Bogomir Rajsic, III (P79191)<br>Tracey R. DeVries (P84286)<br>McGRAW MORRIS MASUD<br>Attorneys for Defendants<br>44 Cesar E. Chavez Avenue, SW, Suite 200<br>Grand Rapids, MI 49503<br>(616) 288-3700/Fax (248) 502-4001<br>brajsic@mcgrawmorris.com<br>tdevries@mcgrawmorris.com |


**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii
EXHIBITS ..... iv
I. INTRODUCTION ..... 1
II. STATEMENT OF FACTS ..... 1
A. Acquisition of the Property and Initial Zoning Process ..... 1
LAW AND ARGUMENT ..... 8
III. STANDARD OF REVIEW ..... 8
IV. PLAINTIFFS DO NOT HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS. ..... 9
A. Plaintiffs' Claims are Not Ripe. ..... 9
B. Free Exercise ..... 15
C. Content Based Restriction ..... 18
1. Speech or Non-Expressive Conduct? ..... 19
2. Content Neutrality ..... 21
3. The LTZO Passes Intermediate Scrutiny ..... 22
D. Prior Restraints ..... 23
E. Plaintiffs' RLUIPA claims. ..... 24
1. Equal Terms ..... 24
2. Substantial Burden ..... 29
3. Nondiscrimination. ..... 32
V. PLAINTIFFS DO NOT SATISFY THE REMAINING PRELIMINARY INJUNCTION STANDARDS. ..... 34
A. Plaintiffs Cannot Show Irreparable Harm in the Absence of a Preliminary Injunction. ..... 34
B. The Public Interest and Balance of Harms Favor Denying Plaintiffs' Request for a Preliminary Injunction. ..... 36
CONCLUSION ..... 36

TABLE OF AUTHORITIES

**Cases**

*Adcock v. Firestone Tire and Rubber Co.*, 822 F.2d 623 (6th Cir. 1987) .................................. 10
*Adhi Parasakthi Charitable, Med., Edu., and Cultural Soc'y v. Twp. of West Pikeland*, 721 F.Supp.2d 361 (E.D. Pa. 2010) ................................................................................ 20
*Alger Bible Baptist Church v. Tp. of Moffatt*, 2014 WL 462354, at *10 (E.D. Mich., Feb. 5, 2014)........................................................................................................ 32
*Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531 n. 12 (1987)........................ 9
*Andon, LLC v. City of Newport News, VA*, 813 F.3d 510 (4th Cir. 2016)............................ 31, 32
*Arnett v. Myers*, 281 F.3d 552 (6th Cir. 2002)........................................................................ 10
*Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1362 (6th Cir. 1992).................................... 12
*Bigelow v. Mich. Dept. of Natural Res.*, 970 F.2d 154 (6th Cir. 1992) ...................................... 12
*C.L.U.B. v. City of Chicago*, 157 F.Supp.2d 903 (N.D. Ill. 2001)........................................... 20
*Catholic Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442 (6th Cir. 2023)11, 13, 30, 31
*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183 (2d Cir. 2014) ................................................................................................ 33
*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)....................... 16
*Church v. City of St. Michael*, 205 F. Supp. 3d 1014 (D. Minn. 2016) ...................................... 22
*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) .................................... 24
*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)............................................. 18, 22
*Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003) .......... 29, 31
*Cmty. Treatment Centers, Inc. v. City of Westland*, 970 F. Supp. 1197 (E.D. Mich. 1997)......... 36
*Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464 (8th Cir. 1991) ........................... 22
*Country Mill Farms, LLC v. City of East Lansing*, 2019 WL 13164267, at *12 (W.D. Mich., Dec. 18, 2019)........................................................................................................ 19
*Dana Corp. v. Celotex Asbestos Settlement Tr.*, 251 F.3d 1107 (6th Cir. 2001)........................... 9
*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 466 F.3d 391 (6th Cir. 2006)........................................................................................................ 9
*Dilaura v. Ann Arbor Charter Tp.*, 30 Fed. Appx. 501 (6th Cir. 2002) ...................................... 15
*Fresh Start Center v. Twp. of Gross Ile*, No. 24-12140, 2024 WL 4063554, at *6 (E.D. Mich., Sept. 5, 2024) ..................................................................................... 31, 35, 36
*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)............................................................. 17
*Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir.2006) ................ 16
*Insomnia Inc. v. City of Memphis, Tenn.*, 278 Fed. Appx. 609 (6th Cir. 2008)............... 11, 12, 13
*Jones v. Caruso*, 569 F.3d 258 (6th Cir. 2009).................................................................... 8
*Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*, 699 F.2d 303 (6th Cir. 1983) ....................................................................................... 15, 19
*Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000) ................................................................. 8
*Liberty Coins, LLC v. Goodman*, 748 F.3d 682 (6th Cir. 2014)................................................ 9
*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007)....... 16
*Living Water Church of God v. Charter Twp. of Meridian*, 258 Fed. Appx. 729 (6th Cir. 2007) 29
*Livingston Christian Schs. v. Genoa Charter Township*, 858 F.3d 996 (6th Cir. 2017) ........ 30, 32
*McCullen v. Coakley*, 573 U.S. 464 (2014) ..................................................................... 21, 22

*McNeilly v. Land*, 684 F.3d 611 (6th Cir. 2012) ..... 9
*McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997) ..... 19
*Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587 (6th Cir. 2001) ..... 9
*Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004) ..... 17, 18
*Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533 (6th Cir. 2010). 11, 12, 13
*Mission Oaks Mobile Home Park v. City of Hollister*, 989 F.2d 359 (9th Cir.1993) ..... 36
*Mount Elliott Cemetery Ass'n v. City of Troy,* 171 F.3d 398 (6th Cir.1999) ..... 15
*Muslim Cmty. Ass'n of Ann Arbor & Vicinity v. Pittsfield Charter Tp.*, 947 F.Supp.2d 752 (E.D. Mich. 2013) ..... 32
*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803; 123 S.Ct. 2026 (2003) ..... 10
*New Harvest Christian Fellowship v. City of Salinas*, 29 F.4th 596 (9th Cir. 2022) ..... 26
*New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) ..... 36
*Northeast Ohio Coalition for Homeless & Service Employees Int'l Union v. Blackwell*, 467 F.3d 999 (6th Cir. 2006) ..... 9
*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2002) ..... 8, 36
*Pakdel v. City & Cty. of San Francisco*, 594 U.S. 474, 478 (2021) ..... 11, 13
*Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503 (6th Cir. 2001) ..... 24
*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ..... 18
*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ..... 21
*Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435 (6th Cir. 1998) ..... 21
*River City Capital, LP. v. Bd. of Cty. Comm'rs*, 491 F.3d 301 (6th Cir. 2007) ..... 10
*River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367 (7th Cir. 2010) (en banc) ..... 18, 28
*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) ..... 23
*Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393 (6th Cir. 1997) ..... 9
*Speet v. Schuette*, 726 F.3d 867 (6th Cir. 2013) ..... 19, 21
*Tandon v. Newsom*, 593 U.S. 61 (2021) ..... 17
*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002) ..... 20
*There to Care, Inc. v. Comm'r of Indiana Dept. of Revenue*, 19 F.3d 1165 (7th Cir.1994) ..... 20
*Tini Bikinis-Saginaw, LLC v. Saginaw Charter Twp.*, 836 F.Supp.2d 504 (E.D. Mich. 2011)... 13
*Tini Bikinis-Saginaw, LLC v. Saginaw Charter Twp.*, 836 F.Supp.2d 504 (E.D. Mich. 2011).... 13
*Tree of Life Christian Schs. v. City of Arlington*, No. 2:11-cv-009, 2011 WL 13311862 (S.D. Ohio, April 27, 2011) ..... 35, 36
*Tree of Life Christian Schs. v. City of Upper Arlington*, 905 F.3d 357 (6th Cir. 2018) ... 23, 25, 28
*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ..... 18
*United States Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 330 F.3d 747 (6th Cir. 2003) ..... 10
*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ..... 18
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ..... 33
*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..... 18, 21, 23
*Warshak v. United States*, 532 F.3d 521 (6th Cir. 2008) ..... 10
*Williamson Cnty. Reg.'l Planning Comm'n v. Hamilton Bank of Johnson City*, 73 U.S. 172 (1985) ..... 11
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..... 8

**Statutes**

MCL 125.3603(1) .......... 13

**Other Authorities**

§ 2000cc–5(7) .......... 29
42 U.S.C. § 2000cc(a)(1) .......... 29
42 U.S.C. § 2000cc(b)(1) .......... 24, 25
42 U.S.C. § 2000cc(b)(2) .......... 32

**Constitutional Provisions**

U.S. Const. amend. I .......... 15

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Leland Township Zoning Ordinance |
| Exhibit B | - | Affidavit of Lee Cory |
| Exhibit C | - | Email chain |
| Exhibit D | - | Affidavit of Sara Schroeder |
| Exhibit E | - | Leland Township Master Plan |
| Exhibit F | - | Affidavit of Bob White |

## I. INTRODUCTION

Leland Township (the "Township") does not ban religion, and it does not stop anyone from praying, studying the Bible, or gathering to worship. Plaintiff Apollos Properties, LLC ("Apollos"), did not apply to operate as a church or religious institution. Instead, Apollos acquired a building historically used for retail shops in the Township's small, retail-oriented, pedestrian heavy, and tourist-focused village commercial district, and sought to host a private, invitation-only Youth for Christ Club there, a self-imposed description. The Leland Township Zoning Ordinance ("LTZO") does not permit private clubs – religious or secular – in the village commercial district but does permit them elsewhere in the Township. Churches are permitted on the residentially and agriculturally-zoned property that accounts for more than 98% of the land in the Township. The Township was never asked and did not pass on the question of whether a church may locate in the village commercial district. Plaintiffs' claim that the Township bans churches and discriminates against religion is a post hoc mischaracterization of what this case is about.

The motion fails at the threshold. Plaintiffs' own appeal to the Zoning Board of Appeals ("ZBA") remains pending, so there is no final decision and their claims are not ripe. The Township has never threatened Plaintiffs with a citation, a fine, or jail, and has no intent to stop Plaintiffs from using the property during the pendency of the ZBA appeal. Plaintiffs can show neither a strong likelihood of success on the merits of their claims nor irreparable harm, and the equities weigh decisively against federal intervention in an ongoing local zoning process.

## II. STATEMENT OF FACTS

### A. <u>Acquisition of the Property and Initial Zoning Process</u>

Apollos, an LLC owned by Plaintiffs James and Elizabeth VanSteenhouse, acquired a commercially zoned property located at 110 N. Lake Street in Leland, Michigan in February, 2025

(the "Property"). (ECF No. 11-13, PageID.1620; ECF No. 13-3). The Property is in the C-1 Village Commercial District. (ECF No. 11-13, PageID.1620; Exhibit A, LTZO, Section 12.01). Prior to Apollos purchasing the Property, it was utilized for retail purposes, including as a tasting room for Grand Traverse Distillery. (ECF No. 11-12, PageID.1603; ECF No. 11-13, PageID.1620). Apollos intended to continue leasing portions of the building to retail businesses. (ECF No. 13-3, PageID.2415).



Apollos claims it purchased the Property to provide a location for "Youth for Christ Club" to assemble for prayer, Bible study, and fellowship. (ECF No. 13-3, PageID.2412). Plaintiff James VanSteenhouse described the use as a club, not a church. (*Id.* at PageID.2416). And the club was not meant to be open to the public; it was intended to be a private club. (ECF No. 11-12, PageID.1607).

Apollos was aware before purchasing the property that it would need to obtain a special land use permit ("SLUP") to operate as a club. (ECF No. 13-5). According to its attorney, Robert Parker, the Township's former Zoning Administrator Timothy Cypher told him in January, 2025,

that a SLUP would be required because the use described by Apollos would be a club. (*Id.* at PageID.2432).[1] Mr. VanSteenhouse nonetheless claims that, following Attorney Parker's due diligence, he and his wife "understood that the proposed use might not require a [SLUP]." (ECF No. 13-3, PageID.2415).

Despite that advice, Apollos began hosting its private Youth for Christ Club at the Property in the spring of 2025 without applying for zoning approval. (*Id.* at PageID.2416). Mr. VanSteenhouse contends that, after a complaint, Apollos was told it could not continue to meet at the Property until it obtained a SLUP – exactly what Apollos had been told before it bought the Property. (*Id.* at PageID.2417). Attorney Parker's Affidavit does not identify who told him this. (ECF No. 13-5, PageID.2431). He later wrote that the Club had "suspended its activities at the property while it awaited issuance of a special land use permit." (ECF No. 13-7, PageID.2452).

On October 17, 2025, Apollos applied for a SLUP to operate the "Leelanau Youth for Christ ('YFC') Youth Club Center". (ECF No. 11-12, PageID.1605). Apollos took the position that "clubs are a use permitted" in the C-1 District as a special land use and noted that its club "is not open to the general public." (ECF No. 11-13, PageID.1620). Apollos even rejected the "objection" that "[t]he proposed use is not a *club* but rather a place for religious assembly," insisting that "[t]he club format is very much the focus of the YFC activities." (*Id.* at PageID.1622) (emphasis in original). The application never mentions a church.

The self-imposed private club moniker is important. Within the C-1 District, private clubs are permitted neither by right nor as a special land use; only "[c]lubs and other establishments which provide food or drink for consumption by persons seated within a building that is not part of a drive-in, and may also provide dancing and entertainment" are permitted as a special use.

---

[1] Mr. Cypher unfortunately passed away earlier in 2026.

(LTZO, Section 12.01(C)(3)). In the C-2 General Commercial District, by contrast, "[p]rivate clubs and meeting halls" are permitted by right, while food-and-drink "[c]lubs and other establishments" are a special use, just as in the C-1 District. (LTZO, Section 12.02; ECF No. 11-34, PageID.1918).

The Planning Commission first considered the application in November, 2025, when Mr. VanSteenhouse presented and the Planning Commission heard public comment. (ECF No. 13-3, PageID.2418; Exhibit B, Affidavit of L. Cory). In January, 2026, while the Planning Commission awaited a memorandum from Township Attorney Brad Wierda, then-Chairman Ross Satterwhite resigned, and Lee Cory later became Chairwoman. (Exhibit B).

The Planning Commission met again on February 18, 2026. (ECF No. 11-26). Chairwoman Cory recalled receiving the expected memorandum from Attorney Wierda the day before the February 18th meeting. (*Id.*). After she received the memorandum, she had significant questions about the completeness of its analysis, particularly whether the use met the definition of a "club" in the C-1 District. (*Id.*). She proposed obtaining an additional opinion regarding Apollos' SLUP application. The goal was for the Planning Commission to take up and resolve the SLUP application at a March, 2026 Planning Commission meeting, but due to a snowstorm, that meeting was cancelled. The Planning Commission, therefore, next convened in April, 2026. (*Id.*; ECF No. 11-30).

At the April, 2026 meeting, the Planning Commission voted 4-1 to deny the application. (ECF No. 11-30). On May 6, 2026, it adopted corrected findings and again denied the application. (ECF No. 13-3, PageID.2419).

The distinction between types of clubs took center stage in the Planning Commission's findings of fact. (ECF No. 11-37). Apollos, by its own application, proposed a private club, not a

restaurant or food-and-drink establishment. The LTZO defines a "club" as "[a]n organization of persons for special purposes or for the promulgation of sports, arts, science, literature, politics, agriculture or similar activities, but not operated for profit and open only to members and not the general public." (LTZO, Section 2.02). Such "private clubs and meeting halls" are allowed by right in the C-2 District, but not at all in the C-1 District.

The legislative history explains the distinction. The C-1 District "clubs and other establishments" provision was meant to account for uses such as a supper club or yacht-club bar and grill – not a club primarily for meeting purposes, which the LTZO treats as a distinct land use. When it recommended the amendment, the Planning Commission stated its intent to "broaden the special land uses permitted by special approval to include clubs that may provide food, drink, dancing and entertainment." (ECF No. 11-34, PageID.1917).

This change to the LTZO came in 2009. The Planning Commission's findings of fact note:

> In an email to the Township Planning Commission (or "PC"), dated October 31, 2008, **Ex 21**, Skip Telgard, the long-time owner of the Blue Bird Restaurant, and long-time Leland resident, expressed concern that under the then current version of ZO Article 12, Section 12.01. C. 3., "standard restaurants" "clubs" and "other establishments" "which provide food and drink for consumption by persons seated within a building . . ." were being treated as a special use within the C-1 Village Commercial district. This treatment would then subject his, and other existing restaurants within C-1, to non-conforming use status requiring variances, etc. if changes were made.

(ECF No. 11-37, PageID.1956).

Mr. Telgard's concern was then addressed at a PC meeting, dated November 5, 2008. The PC Minutes are included within **Ex 22.** The Minutes reflect the following discussion and action:

> Mr. Ashley asked whether any logical reason existed not to allow standard restaurants as a use by right in the C-1 district. Mr. Cypher noted that a site plan would be required in any case.
>
> **Action:** Ms. Keen (PC Member) moved to take the following Article 12.02 amendments to public hearing: allow standard restaurants as uses permitted by right in C-1 and C-2; and broaden the special land uses permitted by special approval to include clubs that may provide food, drink, dancing and entertainment. The motion was supported by Mr. Bardenhagen. Motion carried. Ms. Campbell will draft the amendment.

The Township Board approved this amendment as Ordinance 2009-02 on January 30, 2009. (ECF No. 11-37, PageID.1956). Before the amendment, Section 12.01(C)(3) treated "[s]tandard restaurants, clubs and other establishments which provide food or drink for consumption by persons seated within a building that is not part of a drive-in, and may also provide dancing and entertainment" as special land uses in the C-1 District. (ECF No. 11-37, PageID.1956-1957).

After Ordinance 2009-02 was adopted, standard restaurants were permitted by right in both the C-1 and C-2 Districts. (*Id.* at PageID.1957). And, critically, the following was added to the special land use section of both the C-1 and C-2 Districts: "Clubs and other establishments which provide food or drink for consumption by persons seated within a building that is not part of a drive-in, and may also provide dancing and entertainment." (*Id.*).

| **Restaurant Uses in the C-1 Village Commercial District** | |
|---|---|
| **Before Ordinance 2009-02** | **After Ordinance 2009-02** |
| Use by Right | Use by Right |
| None | Standard restaurants |

| Special Land Uses | Special Land Uses |
|---|---|
| Standard restaurants, clubs and other establishments which provide food or drink for consumption by persons seated within a building that is not part of a drive-in, and may also provide dancing and entertainment. | Clubs and other establishments which provide food or drink for consumption by persons seated within a building that is not part of a drive-in, and may also provide dancing and entertainment. |

The intent is clear from the splitting of the previously-combined term: "standard restaurants" were removed from the special land uses and permitted by right in the C-1 District, while other club-like restaurants remained permitted, but only as a special land use. The Planning Commission reached this conclusion in its findings of fact:

> Given the history of this amendment, and the wording changes, it is apparent that the foregoing use classification was originally related to restaurant use. Namely, the amendment showed the intention to allow "standard" restaurants (i.e. open to the public for service – like the Blue Bird) as permitted uses within the C-1 and C-2 districts, but also to allow "private" or "club-based" restaurants as special land uses within the C-1 and C-2 districts. For example, this would apply to a yacht club restaurant (i.e. "bar and grill") near the waterfront.

(ECF No. 11-37, PageID.1957).

Apollos appealed to the ZBA, which hears appeals from the Planning Commission. (LTZO, Section 4.04). Mr. VanSteenhouse complains that the "ZBA has not yet met to consider" the appeal and that the hearing "has been rescheduled until October or November." (ECF No. 13-3, PageID.2420). But the Township did not cause that delay. On August 24, 2026, Township Planner/Zoning Administrator Sara Schroeder confirmed to Attorney Parker that the ZBA would hear the appeal on September 23, 2026. (Exhibit C). Attorney Parker responded that, in light of this lawsuit and the forthcoming motion, "we believe it is appropriate that the proceedings before the BZA be stayed or adjourned without date pending resolution of the matter before the Court." (*Id.*). When Township Attorney Lauren Teichner advised that an adjournment must be formally requested (*id.* at p.3), Attorney Parker professed to be "mildly surprised that in light of the pending litigation that the ZBA was not inclined to stay proceedings at the request of the applicant," and

disclosed that because he "thought the hearing would be stayed, I did not raise the fact that I am unavailable on the 23rd." (*Id.* at p.2). The ZBA delayed the hearing to accommodate him, and it still plans to hear the appeal.

Under the LTZO, Apollos' appeal "stay[s] all proceedings in furtherance of the action appealed from" unless the Zoning Administrator certifies that a stay would cause "imminent peril to life or property." (LTZO, Section 4.07). No such certification has been made. (Exhibit D, Afft. of S. Schroeder). The Township has never told Plaintiffs that they must stop gathering at the Property while the appeal is pending, nor has the Township ever threatened enforcement of any kind, despite Plaintiffs' allegations to the contrary. (*See* ECF No. 13-1, PageID.2366; Exhibit D).

## <u>LAW AND ARGUMENT</u>

### III. STANDARD OF REVIEW

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). The Court weighs: (1) whether the movant has shown a *strong* likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (finding that issuance of a preliminary injunction "involv[es] the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it")). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (quoting *Leary*, 228 F.3d

at 739). The movant "bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). The factors are to be balanced against each other. *Id.* (quotation omitted); *see also Northeast Ohio Coalition for Homeless & Service Employees Int'l Union v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (noting that the four factors are not prerequisites that must be established at the outset, but instead are interconnected considerations that must be balanced together).

The standard mirrors that for a permanent injunction, except that the Court assesses likelihood of success rather than actual success. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 466 F.3d 391, 394 (6th Cir. 2006); *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n. 12 (1987). The factors are competing considerations to be weighed and balanced. *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001) (quoting *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 400 (6th Cir. 1997)). But "[i]n the context of a First Amendment claim, the balancing of these factors is skewed toward an emphasis on the first factor," and "the other three factors often hinge on this first factor." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). The decision lies within the Court's discretion. *See Dana Corp. v. Celotex Asbestos Settlement Tr.*, 251 F.3d 1107, 1118 (6th Cir. 2001).

## IV. PLAINTIFFS DO NOT HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. Plaintiffs' Claims are Not Ripe.

A common theme permeates Plaintiffs' papers: confusion about the nature of the proposed use. Plaintiffs argue *ad nauseum* that the LTZO treats churches and religious institutions differently and discriminatorily. But Plaintiffs did not apply to the Township to operate a church;

they applied to operate a private club. The Township has never been presented with an opportunity to decide whether Plaintiffs' use is a church, or whether a church may locate on the Property.

Plaintiffs filed this lawsuit while their ZBA appeal of the Planning Commission's decision was pending. And Plaintiffs never submitted a zoning application to operate as a church or sought an amendment to the LTZO to permit churches in the C-1 District – a mechanism explicitly contemplated to amend the uses permitted in a zoning district under Article 5 of the LTZO.

For land-use claims to be ripe, the municipality must have an opportunity to address the issues and arrive at a final decision regarding the regulations' application to the subject property. Plaintiffs have not given the Township that opportunity.

Finality emanates from Article III, which limits federal jurisdiction to actual cases and controversies and precludes advisory opinions. *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002) (citing *Adcock v. Firestone Tire and Rubber Co.*, 822 F.2d 623, 627 (6th Cir. 1987)). Ripeness "focuses on the timing of the action," *United States Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 330 F.3d 747, 751 (6th Cir. 2003), and encompasses "Article III limitations on judicial power" as well as "prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808; 123 S.Ct. 2026 (2003) (internal citation and quotation marks omitted). It discourages "premature adjudication" of abstract controversies. *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc). Ripeness "is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *River City Capital, LP. v. Bd. of Cty. Comm'rs*, 491 F.3d 301, 309 (6th Cir. 2007) (internal citation and quotation marks omitted).

In *Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533,537 (6th Cir. 2010), the Sixth Circuit explained that, in the land-use context, ripeness becomes an "insistence on finality":

> To decide whether a dispute has ripened into an action amenable to and appropriate for judicial resolution, we ask two questions: (1) is the dispute "fit" for a court decision in the sense that it arises in "a concrete factual context" and involves "a dispute that is likely to come to pass"? and (2) what are the risks to the claimant if the federal courts stay their hand? *Warshak*, 532 F.3d at 525; *see Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507. In the land-use context, the demands of "a concrete factual context" and "a dispute that is likely to come to pass" converge in an insistence on "finality," an insistence that the relevant administrative agency resolve the appropriate application of the zoning ordinance to the property in dispute. In the related context of takings claims under the Fifth and Fourteenth Amendments, courts likewise insist that a claimant "obtain[ ] a final decision regarding the application of the zoning ordinance[s] ... to its property," *Williamson Cnty. Reg.'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), a requirement rooted in ripeness considerations, *see id.* at 186–94, 105 S.Ct. 3108; *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012–13, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In addition to takings claims, we have applied the finality requirement to other constitutional and statutory challenges to local land-use requirements. *See Grace Cmty. Church*, 544 F.3d at 615 (RLUIPA); *Insomnia Inc. v. City of Memphis*, 278 Fed. Appx. 609, 613 (6th Cir. 2008) (Free Speech Clause); *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1362 (6th Cir. 1992) (Equal Protection Clause).

Plaintiffs' First Amendment and RLUIPA claims are not ripe until Plaintiffs prove they have received "a final decision regarding the application of the regulations to the property at issue." *Grace Cmty. Church v. Lenox Tp.*, 544 F.3d 609, 615 (6th Cir. 2008) (internal quotation omitted) (RLUIPA); *see also Insomnia Inc. v. City of Memphis*, 278 Fed. Appx. 609, 613 (6th Cir. 2008) (First Amendment). Finality requires that the government take a "definitive position on the issue [that has] inflict[ed] an actual concrete injury." *Pakdel v. City & Cty. of San Francisco*, 594 U.S. 474, 478 (2021) (quoting *Williamson Cnty. Reg.'l Planning Comm'n v. Hamilton Bank of Johnson City*, 73 U.S. 172, 193 (1985)); *see also Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 448 (6th Cir. 2023). The only exception to the finality requirement is a pure procedural

due process claim, which Plaintiffs do not assert here. *See Bigelow v. Mich. Dept. of Natural Res.*, 970 F.2d 154, 159-160 (6th Cir. 1992).

*Miles Christi* and *Insomnia* illustrate that a final local decision can clarify the ordinance, grant the relief sought, or narrow the dispute. In *Miles Christi*, the decision was not final because the zoning board had not yet ruled on the interpretive questions at issue:

> This position, however, does not square with the relevant regulations. At the time the complaint was filed, the Northville Code provided that "[t]he Zoning Board of Appeals shall be responsible for interpretations to the text of [the zoning ordinances]" and shall be responsible for "interpret[ing] the provisions or meaning of standards of [the ordinances]."
>
> * * *
>
> An administrative appeal to the zoning board thus will resolve at least three questions, all of which lie within the zoning board's plenary interpretive jurisdiction, about Miles Christi's obligations or indeed whether it has any obligations at all: (1) Has Miles Christi put its house to a "more intensive use" within the meaning of § 170–33.2 of the Northville Code? (2) Is the Miles Christi house a "church" within the meaning of § 170–26.2 of the Code? and (3) Does Miles Christi have an obligation to submit a site plan in the first instance in view of the meaning of these ordinances and its request for a variance? Finality requires the input of the zoning board on these unresolved questions.

629 F.3d at 538 (internal citations omitted). The court added:

> An appeal to the zoning board not only will ground this dispute in a concrete legal setting—by permitting the zoning board to clarify the township's application of its land-use laws to this property—but it also may help Miles Christi. The zoning board may grant a variance to the religious order, or it may provide a different intensive-use determination. Both forms of relief will considerably narrow the grounds of dispute between the parties if not end the dispute altogether.

*Id.*

*Miles Christi* is directly on point. Plaintiffs have a pending appeal to the ZBA, which is charged as the final land-use authority in the Township handling appeals from the Planning Commission. (LTZO, Section 4.05(A)). Like the zoning board in *Miles Christi*, the ZBA has the authority to decide a dispositive interpretive question – whether Plaintiffs' proposed use is a "club"

within the meaning of Section 12.01(C)(3). *See* MCL 125.3603(1). The ZBA could reverse the Planning Commission and grant Plaintiffs a SLUP to operate as a private club. That decision would end this dispute altogether.

Plaintiffs' reliance on *Catholic Healthcare* and *Pakdel* is misplaced. (ECF No. 13-1, PageID.2393-2394). Finality may be "relatively modest," but it still requires that the plaintiff show "'there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" *Pakdel*, 594 U.S. at 478 (internal citation omitted). In *Catholic Healthcare*, the township had twice denied the application and no further local proceeding remained. 82 F.4th at 448. Here, Plaintiffs themselves invoked the ZBA's appellate jurisdiction, and that appeal could resolve the very question on which this case turns. This is not exhaustion of remedies. The ZBA, with interpretive and appellate authority under the LTZO, has not yet had an opportunity to weigh in on the SLUP application for a club use. And Plaintiffs' broader theory (that the LTZO unlawfully bars churches from the C-1 District) has never been presented to the Township at all through a proposed amendment to the LTZO, interpretation by the ZBA, etc.

Had Plaintiffs worked through the administrative options available to them, "there is a chance" they would have obtained the approvals they seek to compel, or that the outcome would "further define the contours" of their claims. *Insomnia*, 278 Fed. Appx. at 615-616. *See also Miles Christi*, 629 F.3d 533 (analyzing application of finality requirement in First Amendment context); *Tini Bikinis-Saginaw, LLC v. Saginaw Charter Twp.*, 836 F.Supp.2d 504 (E.D. Mich. 2011) (finding as-applied First Amendment claim not ripe because plaintiff failed to achieve finality).

Instead, Plaintiffs have actively *avoided* a final decision, asking that the ZBA appeal be held in abeyance while this litigation proceeds. Plaintiffs' position turns finality on its head: a plaintiff cannot run to federal court while the local land use agency is still deciding how its

ordinance applies to the property. If Plaintiffs win before the ZBA, this dispute never makes it to court.

Plaintiffs try to manufacture a concrete injury by asserting that they "and others seeking to assemble at the North Lake Street Property are under threat of jail and significant financial penalty should they assemble at the property." (ECF No. 13-1, PageID.2395). Their only evidence is affidavits noting that the LTZO has penalty provisions. (*See* ECF No. 13-5, PageID.2436 (Affidavit of R. Parker) and ECF No. 13-3, PageID.2420 (Affidavit of J. VanSteenhouse)). Mr. VanSteenhouse believes penalties *could* apply, but offers no evidence that the Township has ever said so. Ms. Schroeder has never threatened Plaintiffs with any penalty or citation and has no intention of doing so. (Exhibit D).

Attorney Parker avers that he "sought confirmation from Leland Township that the Township would refrain from enforcing its prohibition against Youth for Christ Club meeting at the North Lake Street property until the ZBA resolved the appeal." (ECF No. 13-5, PageID.2434). That is not what he wrote. He told the Township that "Youth for Christ intends to resume its activities (as outlined to the Planning Commission) at the property commencing Tuesday, May 5th. If the Township contends that there is a legal basis prohibiting resumption, please let me know immediately." (ECF No. 13-7, PageID.2453). He then complains that no response was received (ECF No. 13-5, PageID.2434-2435), but silence was the answer his letter invited: the Township did not contend that anything prohibited resumption. And Ms. Schroeder confirms that she will take no action against Apollos' proposed use of the Property during the ZBA appeal. (Exhibit D). Plaintiffs' claimed "threat" of jail and fines is illusory; the Township has taken no position of *any kind* against Plaintiffs' proposed use of the Property during the appeal. (*Id.*).

Plaintiffs have failed to obtain a final decision from the Township. Their claims are unripe, and the Court lacks subject matter jurisdiction.

B. Free Exercise

The First Amendment's Free Exercise Clause, made applicable to state and local governments by the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. It "does not, however, prevent the government from regulating behavior associated with religious beliefs." *Dilaura v. Ann Arbor Charter Tp.*, 30 Fed. Appx. 501, 508 (6th Cir. 2002) (internal citation omitted). It does not relieve an individual from complying with a valid and neutral law of general applicability. If the LTZO is a "neutral law of general applicability," it does not violate Plaintiffs' free exercise rights. *See Mount Elliott Cemetery Ass'n v. City of Troy,* 171 F.3d 398, 405 (6th Cir.1999) ("the City of Troy's ordinances . . . are neutral laws of general applicability. As a result, we find that judgment was properly entered in favor of the City with respect to the free exercise claim.").

In *Mt. Elliott Cemetery Association*, the Sixth Circuit found as a matter of law that the City of Troy did not violate the plaintiff's First Amendment rights by refusing to grant the plaintiff's application to rezone its property for use as a new Catholic cemetery, *Id.* at 403. The Court found "that the zoning ordinance is a neutral law of general applicability." *Id.* (internal quotation marks omitted); *see also Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*, 699 F.2d 303, 307-308 (6th Cir. 1983) (finding no violation of the plaintiff's free exercise rights due to the city's application of its zoning ordinance to prohibit the building of a church on the plaintiff's property, indicating that "building and owning a church is a desirable accessory of worship, not a fundamental tenet of the [plaintiff]'s religious beliefs."); *Grace United Methodist*

*Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir.2006). As the Tenth Circuit put it: "[A] church has no constitutional right to be free from reasonable zoning regulations nor does a church have a constitutional right to build its house of worship where it pleases." *Grace United Methodist Church*, 451 F.3d at 652 (cleaned up). "A law is neutral so long as its object is something other than the infringement or restriction of religious practices." *Id.* at 649-650 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). The starting point for assessing whether the LTZO is a neutral law "must begin with its text [.]" *Lukumi Babalu*, 508 U.S. at 533.

The LTZO is neutral on its face. Although churches and other religious buildings are not permitted as a matter of right in any of the Township's zoning districts, the same is true for many secular uses, including schools, theaters, landfills, natural resource extraction operations, automobile and service repair stations, commercial stables, kennels, bed and breakfast facilities, and adult related businesses. *See* LTZO, Articles 10 – 13. And, like churches, many secular uses are not permitted, even as a special land use, in the Township's commercial districts, including commercial stables, kennels, landfills, natural resource extraction operations, and purely agricultural activities.

The object of the LTZO is not to restrict religious practice, but to promote and preserve retail and commercial uses in the Village Commercial District. (*See* Exhibit E, Master Plan). Categorizing land uses is not discrimination; religious land uses are permitted in the overwhelming majority of the Township – commercially-zoned land accounts for 199 of the Township's 31,958 acres, or roughly 0.6% of its land. *See Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 277 (3d Cir. 2007) (finding zoning ordinance to be a neutral law because there was no evidence that "the ordinance was passed due to religious animus . . . was discriminatorily

enforced against religious institutions . . . [or] devalued religious reasons by judging them to be of lesser import than nonreligious reasons.") (internal citations omitted)); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234 (11th Cir. 2004) ("Zoning laws inherently distinguish between uses and necessarily involve selection and categorization, often restricting religious assemblies to designated districts and frequently requiring that religious assemblies complete a conditional use application procedure.").

The intent of the C-1 Village Commercial District confirms that its object is land-use effects, not religion:

> The Village Commercial District is intended to provide for central business areas where the presence of retail stores and service establishments address the day-to day retail and service needs of tourists and local residents. This District is intended to provide for a more pedestrian-oriented commercial area than provided for in other commercial districts and promote convenient pedestrian shopping and stability of retail development by encouraging a contiguous retail frontage and by prohibiting automotive related, highway service, and non-retail uses which tend to break up such continuity and the character intended for this District. The Village Commercial District is intended to implement, in part, the Mixed Use Area(s) component of the Leland Township Comprehensive Development Plan.

The LTZO, as applied here, is generally applicable. A law is not generally applicable if it provides "a mechanism for individualized exemptions," or if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533-534 (2021) (internal citations and quotations omitted). Comparability "must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The C-1 District excludes secular private clubs, meeting halls, and other non-retail assemblies on the same terms as religious ones. Nor did the Planning Commission exercise discretion to deny Plaintiffs an exemption; it determined that the proposed use is not one the C-1 District permits at all. (ECF No. 11-37, PageID.1971). A secular book club would receive the same answer.

Plaintiffs' attack on provisions that have never been applied to them (the so called "church free zones") and the church site standards in Section 16.11 (ECF No. 13-1, PageID.2370-2372) fares no better. Apollos applied for a club use, not a church. Excluding churches, along with other non-commercial assemblies, from a commercial district is an ordinary lawful feature of zoning. *See River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 373 (7th Cir. 2010) (en banc); *Midrash Sephardi*, 366 F.3d at 1234. Indeed, a bookstore selling religious books and articles would be permitted in the C-1 District by right. (LTZO, Section 12.01(B)(1)).

C. <u>Content Based Restriction</u>

"The First Amendment generally prevents government from proscribing speech . . . or even expressive conduct . . . because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (internal citations omitted). A content-based regulation restricts speech because of its expressive content, *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994), while a content-neutral regulation is "justified without reference to the content of the regulated speech." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A content-based regulation is presumptively invalid and must satisfy strict scrutiny, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *R.A.V.*, 505 U.S. at 382, while a content-neutral regulation is subject to intermediate scrutiny. *Turner Broad. Sys.*, 512 U.S. at 642.

While Plaintiffs' Complaint vaguely indicates a "facial" challenge claiming that the Township "prohibit[s]" churches and religious institutions, (ECF No. 11, PageID.1319), their current motion does not argue a facial challenge, but instead only an as-applied challenge. (ECF

No. 13-1, PageID.2376-2377) (analyzing "content specific prohibition" in the context of as applied challenge).

To succeed on a facial challenge, a plaintiff generally must establish that the ordinance would not be valid under any set of circumstances, which constitutes an overbreadth challenge. *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013); *see also Country Mill Farms, LLC v. City of East Lansing*, 2019 WL 13164267, at *12 (W.D. Mich., Dec. 18, 2019) (analyzing overbreadth challenge). Plaintiffs make no effort to analyze a facial challenge. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997).

***1. Speech or Non-Expressive Conduct?***

As an initial matter, the Court must first determine whether the LTZO regulates speech protected by the Constitution or merely non-expressive conduct unprotected by the Constitution. Here, the object of the regulation is not to regulate speech, but rather to regulate land use, which is non-expressive conduct.

In *Lakewood, Ohio Congregation of Jehovah's Witnesses v. City of Lakewood*, 699 F.2d 303, 307 (6th Cir. 1983), the Sixth Circuit upheld a zoning plan against a First Amendment challenge because building and owning a church is a "desirable accessory of worship, not a fundamental tenet of [the appellant's] beliefs." The ordinance did not ban worship and left other appropriately zoned areas available. *Id.* at 307. Because it "simply regulates a secular activity and, as applied to the appellants, operates so as to make the practice of their religious beliefs more expensive," the Court applied essentially overlapping standards to the free exercise claim and an implicit free-speech claim. *Id.*

In *C.L.U.B. v. City of Chicago*, 157 F.Supp.2d 903, 915-916 (N.D. Ill. 2001), the Court put it more bluntly: "the operation of a house of worship does not equate with 'religious speech,' any more than the operation of a shoe store equates with commercial speech." (citing *There to Care, Inc. v. Comm'r of Indiana Dept. of Revenue*, 19 F.3d 1165, 1167-1168 (7th Cir.1994) "When the object of the law is unrelated to expression, e.g. harmonious land use here, the free speech clause is not implicated, even if the law in question limits the ability to disseminate one's message." *C.L.U.B.*, 157 F.Supp.2d at 915. Opening a YFC clubhouse might enable religious speech, but opening a physical location is not, on its own, protected speech.

The Third Circuit in *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 163 (3d Cir. 2002) explained why:

> Otherwise, the act of constructing houses of worship would implicate the Free Speech Clause, whereas courts consistently analyze the constitutionality of zoning regulations limiting such construction under the Free Exercise Clause, not the Free Speech Clause. *See, e.g., City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *Messiah Baptist Church v. County of Jefferson*, 859 F.2d 820, 823–26 (10th Cir.1988); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 307–08 (6th Cir.1983); *Church of Jesus Christ of Latter–Day Saints v. Jefferson County*, 741 F.Supp. 1522, 1527–34 (N.D.Ala.1990); *cf. Congregation Kol Ami v. Abington Township*, 2002 WL 31312280 (3d Cir. Oct.16, 2002). Moreover, if solely the act of erecting a wall separating the interior of a building from the secular world constituted "speech," every religious group that wanted to challenge a zoning regulation preventing them from constructing a house of worship could raise a "hybrid" rights claim triggering strict scrutiny, *see Employment Division v. Smith*, 494 U.S. 872, 881–82, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), a notion so astonishing that we are unaware of any court—or even any law review article—that has suggested it.

*See also Adhi Parasakthi Charitable, Med., Edu., and Cultural Soc'y v. Twp. of West Pikeland*, 721 F.Supp.2d 361, 373-374 (E.D. Pa. 2010) (reasoning that the building of a place of worship was not expressive conduct protected by the First Amendment as "Plaintiff has not introduced any evidence to attempt to show that the building itself will convey some attitude or belief, and,

therefore, we cannot find any violation of the First Amendment's Free Speech Clause in relation to any denial of permission to build a temple on the property.”).

### 2. *Content Neutrality*

Whether a regulation is content neutral is a threshold determination. *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 438 (6th Cir. 1998). The question is whether the regulation stems from a disagreement with the message conveyed – that is, whether it can be “justified without reference to the content of the regulated speech.” *Ward*, 491 U.S. at 791. Content-based restrictions trigger strict scrutiny, “which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.” *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (internal quotation omitted). Content-neutral regulations trigger intermediate scrutiny, which permits the government to “impose reasonable restrictions on the time, place, or manner of protected speech,” so long as “they are narrowly tailored to serve a significant governmental interest, and . . . they leave open ample alternative channels for communication of the information.” *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (internal quotation omitted).

Plaintiffs assert an as-applied challenge, contending that the Planning Commission’s denial “is exclusively, totally and entirely based upon the fact that those assembling at the property were pray and studying the Bible instead of engaging in activities such as selling alcohol or operating a dance hall.” (ECF No. 13-1, PageID.2377). An as applied challenge “argues that a law is unconstitutional as enforced against the plaintiff [ ] . . . .” *Speet*, 726 F.3d at 872.

Plaintiffs applied to operate a private club, not a church. Either way, the findings and conclusions of the Planning Commission do not show that it denied the application because of Plaintiffs’ speech, viewpoint, or message. Rather, the denial was “justified without reference to the content of the regulated speech.” *Ward*, 491 U.S. at 791. The Planning Commission concluded

that the proposed use was not consistent with the objectives, intent, and purpose of the LTZO because it did not meet the definition of a club. (ECF No. 11-37, PageID.1971). It concluded that "[p]rivate clubs, meeting halls, churches and religious institutions are not allowed as permitted or as special land uses in the C-1 district." (*Id.*). The use simply was not a permitted club. (*Id.* at PageID.1971-1974, 1980). The same conclusion would apply to a private knitting club discussing new patterns for the Fall of 2026 or a private club of paper salespeople debating the merits of double bonded paper. The content of the speech is irrelevant.

Even if the Court were to treat Plaintiffs' application as one involving a religious use, the same outcome would result. Zoning classifications that restrict churches and religious uses to certain districts are content neutral. *See Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 468 (8th Cir. 1991) (concluding that zoning regulation that restricted churches to certain zoning districts – including prohibiting churches in the central business district – was content neutral); *Church v. City of St. Michael*, 205 F. Supp. 3d 1014, 1038 (D. Minn. 2016) (concluding that zoning ordinance that prohibited churches in a business zoning district was content neutral).

***3. The LTZO Passes Intermediate Scrutiny***

Because the LTZO is content neutral, the Township may impose reasonable restrictions that "are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *McCullen*, 573 U.S. at 477. The LTZO satisfies each element.

First, the Township has a significant interest in preserving a compact, pedestrian-oriented retail district that serves residents and tourists and sustains the local economy. A municipality's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *Renton*, 475 U.S. at 50 (internal quotation and citation omitted); *see also Tree of Life*

*Christian Schs. v. City of Upper Arlington*, 905 F.3d 357, 371-372 (6th Cir. 2018) (reasoning that revenue generation is a legitimate regulatory purpose). The C-1 District is intended to promote "a contiguous retail frontage" by "prohibiting . . . non-retail uses which tend to break up such continuity." (LTZO, Section 12.01).

Second, the regulation is narrowly tailored. It "need not be the least restrictive or least intrusive means" of serving the government's interest; rather, it suffices that it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 798-799 (quotation omitted). The C-1 District covers a small fraction of the Township and excludes only non-retail uses (both secular and religious) that would break up the retail frontage of the commercial core.

Third, ample alternatives remain. Churches and religious institutions may locate as special land uses throughout the residential and agricultural districts that make up more than 98% of the Township, including land within blocks of Leland Public School. Indeed, there are two churches within a block of Leland Public School where Plaintiffs could (and do) gather to meet for their club. Moreover, private clubs and meeting halls are permitted by right in the C-2 District. (LTZO, Section 12.02). Nothing in the LTZO prevents Plaintiffs from praying, studying the Bible, or gathering to practice their religion in voluminous alternative locations.

D. Prior Restraints

Plaintiffs also contend that requiring a SLUP is an unconstitutional prior restraint under *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969). (ECF No. 13-1, PageID.2377-2380). But as Plaintiffs concede, those cases concern licensing of expression in public fora. (*Id.* at PageID.2378). Plaintiffs fail to identify what portion of the LTZO allegedly constitutes a prior restraint, but a review of the portions relevant to this case demonstrates that no such prior restraint

exists. First, as discussed at length *supra*, the LTZO is content neutral. When an "ordinance leaves entirely untouched the substance of what performers choose to say . . . the chief concern" of the prior restraints doctrine "the fear of censorship and thought control – is not raised by the ordinance's" content-neutral regulation. *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 509 (6th Cir. 2001).

Even when an ordinance is content-neutral, it may not yet be out of the woods. "A content-neutral regulation that '[places] unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *Id.* (quoting *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988)). A regulation that "fails to place appropriate limits on the discretion of public officials to administer the law in a manner that is abusive of speech, the result should be no different than if the law had brazenly set out to discriminate on the basis of content." *Id.* Here, the LTZO does not place unbridled discretion in the hands of public officials. The LTZO lists the uses permitted in each district, and the decision here turned on an objective threshold question: whether a private club is a use the C-1 District permits at all. (ECF No. 11-37, PageID.1971-1974). No official exercised "unbridled discretion" based on the content of Plaintiffs' message.

E. Plaintiffs' RLUIPA claims.

***1. Equal Terms***

RLUIPA's equal-terms provision bars governments from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). A prima facie case requires proof of the religious group's treatment compared to "a nonreligious assembly or institution" to determine whether the terms facing the religious group were "less than equal." *Tree*

*of Life Christian Schs. v. City of Upper Arlington*, 905 F.3d 357, 367 (6th Cir. 2018) (*Tree of Life III*). The elements of a *prima facie* equal terms claim include: (1) the imposition or implementation of a land-use regulation; (2) by a government; (3) on a religious assembly or institution; and (4) the religious assembly is treated on less than equal terms with a nonreligious institution or assembly. *Tree of Life III*, 905 F.3d at 368-370.

The difficulty lies in determining "what constitutes a proper comparator" between religious and secular assemblies and institutions. *Tree of Life III*, 905 F.3d at 367. A "comparator" is "a nonreligious assembly or institution" courts examine to determine whether the government "treat[ed] a religious assembly or institution on less than equal terms." *Id.* (quoting 42 U.S.C. § 2000cc(b)(1)). "[A] comparator for an equal terms claim must be similarly situated *with regard to the regulation at issue*." *Id.* at 368 (emphasis in original) (internal citation omitted). "[T]he comparison required by RLUIPA's equal terms provision is to be conducted with regard to the legitimate zoning criteria set forth in the municipal ordinance in question." *Id.* at 369.

Plaintiffs' argument rests on the faulty premise that they are a church or religious institution under the LTZO. Apollos applied to operate as a club, and the Planning Commission was never asked whether Apollos qualifies as a church or religious institution. The LTZO's church provisions have not been applied to Plaintiffs at all. *Tree of Life III* directs the Court to the regulation actually at issue – here, the C-1 Village Commercial District's treatment of private clubs and other non-retail assemblies – not the zoning ordinance at large.

Plaintiffs' comparators appear to be restaurants, retail businesses, museums, libraries, strip clubs, whiskey distilleries, marijuana dispensaries, and massage parlors. (ECF No. 13-1, PageID.2383). Apollos' proposed club is not similarly situated to any of them. It does not serve meals or sell products, including whiskey or marijuana; it is not a museum or library; and it is

obviously not a strip club. Plaintiffs offer no explanation or evidence of how their use is similarly situated to these uses – none of which is even an assembly.

Plaintiffs' reliance on *New Harvest Christian Fellowship v. City of Salinas*, 29 F.4th 596 (9th Cir. 2022), is misplaced. (*See* ECF No. 13-1, PageID.2388). The Township does not point to a few "unlucky" secular groups that are treated as poorly as Plaintiffs; the C-1 District's classification itself excludes every private, members-only assembly use, secular or religious. Plaintiffs offer no logical comparators, and that failure should end their quest for a preliminary injunction on the equal terms claim.

The LTZO treats similarly situated non-religious institutions and assemblies on equal terms. Realistic comparators for Apollos' proposed use are secular assemblies, including private clubs, meeting halls, conference halls, meeting facilities, banquet halls, funeral homes, and fine and performing art facilities. The LTZO does not permit these uses by right or as a special use in the C-1 District. As discussed above, the C-1 District is intended to encourage "a contiguous retail frontage" and to prohibit "non-retail uses which tend to break up such continuity." (LTZO, Section 12.01).

The Township's 2025 Master Plan explains that industrial and commercial uses "take up little land in Leland Township – approximately 0.008% as of 2024. These uses are primarily found in the villages [Leland and Lake Leelanau], with a small concentration on South Schomberg Road." (Exhibit E at 41, Section 4.2.6). Yet these "business establishments and various types of enterprise . . . contribute significantly to the tax base and local economy." (*Id.* at 16, Section 2.3.3). In Leland Village, the core commercial area includes "restaurants, retail shops, cottage industries, and professional offices that provide goods and services." (*Id.* at 16-17).

"Commercial Use Characteristics":

> The Commercial Character of the Township is exemplified by the small, diverse commercial uses within the villages of Leland and Lake Leelanau. This type of development should be encouraged in the Lake Leelanau Village along with the ability of residential uses to be located on upper-level floors to provide for housing of business owners, employees, or others needing housing in the Township.

(*Id.* at 56, Section 6.4).

Among the Township's goals is to "strengthen the local economy through the development and retention of enterprises, which provide employment opportunities . . . and to [p]reserve Leland Township as a tourist-friendly community." (*Id.* at 68). The Master Plan emphasizes the importance of thriving commercial uses within the core commercial district – exactly where the Property is located:

> 8.6 Leland Village Mixed-Use
>
> The Leland Village Mixed-Use category is intended to accommodate a mixture of residential and commercial land uses in a similar manner as it has accommodated such uses to this point in time. It is the intent of this Master Plan that Leland Village maintain its compact developed pattern and *"small village"* character and that all future development or redevelopment be of such character and design to continue the Village's existing identity and current character. Specific recommendations regarding future land use in the Village of Leland include:
>
> A. Land devoted to commercial use should generally not be expanded within the Village beyond its current limits. Retail orientated establishments should be primarily limited to the rectangular area formed by Lake Street, William Street, First Street, and the Leland River, and extending along both sides of the river to include Fishtown area to the west and along the north side of the river to Chandler Street to the east, with the provision for transitional uses beyond the core. This Master Plan encourages the continuance of the commercial land uses located south of Leland River on the east side of M-22 between Pine and Thompson Streets but strongly discourages the expansion of commercial uses into other areas south of the Leland River.
>
> B. While Fishtown is within the commercial area discussed above, the Fishtown area is unique in character and design, and thus merits some special considerations. In the 2005 survey findings, the residents of Leland Township indicated a strong desire to see Fishtown continue "as is". As such, an overlay district or separate zoning district was created to specifically accommodate the unique situation of Fishtown and allow for the continuation of this area which is a vital part of the unique charm of Leland.
>
> C. The Village may want to consider in the future other overlay districts to address nonconforming uses and structures.

D. Uses which are not as retail orientated as the balance of the Village's Core business district, or which do not benefit as greatly from being located within a central retail or business area or in close proximity to high levels of pedestrian and/or vehicular traffic, should continue to be located in that area of the Village defined by the Leland River, Oak Street, and Chandler St.

E. The balance of the Leland Village area should be used primarily for accommodating existing and future single residential development. Development densities should be similar to development densities currently existing in the Village and measures should be taken to minimize the negative impacts of new developments and redevelopment projects upon surrounding properties. Developments of particularly high density, such as multiple family developments, should be limited to locations outside of the central village area where the village character is not as dominant, and where ease of access to M-22 is available.

Based on the description in Section 8.6(A), the core area where retail-oriented business establishments are to be located is identified below:




The Property is in the heart of the area designated for retail-oriented businesses. *Tree of Life III* recognized that revenue maximization is a legitimate regulatory purpose. 905 F.3d at 371-372. And excluding non-commercial assemblies, secular and religious alike, from a commercial district is a valid regulatory purpose under RLUIPA. *See River of Life*, 611 F.3d at 371-373.

Measured against these legitimate zoning criteria, Plaintiffs' comparators are not similarly situated to the proposed Apollos' use, which is treated exactly like its true secular counterparts.

### 2. *Substantial Burden*

RLUIPA's substantial burden provision provides in pertinent part:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). The statute defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" including "[t]he use, building, or conversion of real property for the purpose of religious exercise ... of the person or entity that uses or intends to use the property for that purpose." *Id.* § 2000cc–5(7). The statute, however, does not define "substantial burden." *See Living Water Church of God v. Charter Twp. of Meridian*, 258 Fed. Appx. 729, 734 (6th Cir. 2007).

Courts apply the Supreme Court's interpretation of "substantial burden" from the Free Exercise context. *Id.*; *see also, e.g., Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003). As the Sixth Circuit summarized in *Living Water*:

> [W]hile the Supreme Court generally has found that a government's action constituted a substantial burden on an individual's free exercise of religion when that action forced an individual to choose between following the precepts of her religion and forfeiting benefits or when the action in question placed substantial pressure on an adherent to modify his behavior and to violate his beliefs, ... it has found no substantial burden when, although the action encumbered the practice of religion, it did not pressure the individual to violate his or her religious beliefs.

A burden is "substantial" if it has "some degree of severity" and is "more than an inconvenience." *Catholic Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 448 (6th Cir. 2023). "[T]aking seriously the requirement that a burden be 'substantial' is necessary in order to avoid an interpretation of RLUIPA that would exempt religious institutions from all land-use regulations." *Livingston Christian Schs. v. Genoa Charter Township*, 858 F.3d 996, 1003 (6th Cir. 2017) (citing *Living Water*, 258 Fed. Appx. at 736. A religious institution can show a substantial burden by demonstrating that (1) it has no "feasible alternative location from which it can carry on its mission;" (2) it has or "will suffer substantial delay, uncertainty, and expense due to the imposition of the regulation," and (3) it did not impose the burden upon itself. *Livingston Christian Schs.*, 858 F.3d at 1004.

Plaintiffs contend that the Township's requirement that Plaintiff Apollos participate in the routine, generally applicable process of applying for a SLUP constitutes a substantial burden under RLUIPA. But as Plaintiffs admit, this issue "is still unresolved" because Plaintiffs have not obtained a final decision from the Township. (ECF No. 13-1, PageID.2384). And Plaintiffs have fallen well short of the clear showing required for a preliminary injunction; they do not even address two of the three ways of demonstrating a substantial burden.

First, Plaintiffs have not shown that they lack a feasible alternative location. Mr. VanSteenhouse asserts only that no available property was "comparable" to the Property, which he considers ideal for its central location, harbor views, and readiness for use. (ECF No. 13-3, PageID.2414-2416). But being the ideal location is not the test. Churches and religious institutions may locate on more than 98% of the Township's land, including residentially-zoned land surrounding Leland Public School. Moreover, private clubs and meeting halls are permitted by right in the C-2 District. (LTZO, Section 12.02). And three churches – Immanuel Lutheran Church,

directly across North Grand Avenue from the school; Leland Community United Methodist Church, about a block away; and St. Peter's Episcopal Chapel – are a short walk from the school, two of them closer than the Property. (Exhibit B). Mr. VanSteenhouse was able to spend $1.5 million on a commercially-zoned building to host a non-profit club; that other land may be expensive or difficult to come by does not "by itself support a substantial burden claim." *Andon, LLC v. City of Newport News, VA*, 813 F.3d 510, 516 (4th Cir. 2016); *Civil Liberties for Urban Believers*, 342 F.3d at 762 (concluding that the "scarcity of affordable land available" and costs "incidental to any high-density urban land use" represent "ordinary difficulties associated with location" and do not support a substantial burden claim under RLUIPA). Finally, Youth for Christ continues to meet and engage in their proposed club use at the Immanuel Lutheran Church in Leland. (Exhibit F, Affidavit of Bill White).

Second, Plaintiffs have not shown impermissible delay or expense. In *Catholic Healthcare*, the plaintiff expended $38,000.00 in application fees alone and waited more than two years for the administrative proceedings to be completed. 82 F.4th at 447. Here, according to Mr. VanSteenhouse, Plaintiffs paid approximately $8,600.00 in administrative fees related to the initial SUP and ZBA appeal. (ECF No. 13-3, PageID.2419).[2] The entire administrative process had taken approximately eight months before Plaintiffs filed suit, and the ZBA hearing was delayed only at Plaintiffs' request. These are the ordinary delays and costs of any special land use application. *See Fresh Start Center v. Twp. of Gross Ile*, No. 24-12140, 2024 WL 4063554, at *6 (E.D. Mich., Sept. 5, 2024) (denying motion for preliminary injunction in RLUIPA claim and concluding that "the

[2] Plaintiffs chose to retain multiple attorneys to prosecute their SLUP application, including the drafting of several legal memoranda to the Planning Commission, which according to Mr. VanSteenhouse added up to legal fees of nearly $100,000. But the Township did not make Plaintiffs incur this expense, and the Sixth Circuit's analysis in *Catholic Healthcare* did not consider the applicant's own attorney fees.

only costs referenced in the Complaint are the costs associated with the special land use and variance applications, costs that any property owner would pay when seeking a special land use approval.”).

Finally, any burden is self-imposed. Apollos purchased the Property knowing that it was zoned in the C-1 District and that its attorney had been told a SLUP would be required. (ECF No. 13-5, PageID.2432). At most, the VanSteenhouses understood that the use “might not” require one. (ECF No. 13-3, PageID.2415). A burden is self-imposed when a religious claimant acquires property knowing that it is subject to land-use restrictions. *See Andon*, 813 F.3d at 515.

***3. Nondiscrimination***

RLUIPA’s nondiscrimination clause provides that “[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.” 42 U.S.C. § 2000cc(b)(2). Few courts have applied it. *See Muslim Cmty. Ass’n of Ann Arbor & Vicinity v. Pittsfield Charter Tp.*, 947 F.Supp.2d 752, 765 (E.D. Mich. 2013) (noting that there “are few published cases discussing RLUIPA’s nondiscrimination provision, and the Court has not located a single decision in the Sixth Circuit discussing a claim under this subsection.”). The Sixth Circuit in *Livingston Christian Schs. v. Genoa Charter Tp.*, 858 F.3d 996, 1005 (6th Cir. 2017), recognized the provision but did not articulate a test. In *Pittsfield Chater Township*, the Eastern District reasoned that a plaintiff must “create an inference that the decision to deny [a] rezoning application was based on its religious faith.” 947 F.Supp.2d at 765; *see also Alger Bible Baptist Church v. Tp. of Moffatt*, 2014 WL 462354, at *10 (E.D. Mich., Feb. 5, 2014) (granting motion to dismiss RLUIPA nondiscrimination claim as the plaintiff had failed to raise an inference that its rezoning request was denied because of its religious beliefs).

Plaintiffs cite no case applying RLUIPA's nondiscrimination provision. Instead, they rely on free-exercise neutrality decisions such as *Masterpiece Cakeshop* and *Roberts v. Neace*, and argue that "it is not necessary for Plaintiffs to establish that Leland Township acted out of anti-Christian bigotry to find that Leland Township violated RLUIPA." (ECF No. 13-1, PageID.2386). But the statute requires discrimination "on the basis of religion," and the C-1 District treats religious and secular private clubs identically.

Courts applying the provision have concluded that "establishing a claim under RLUIPA's nondiscrimination provision, as with the Supreme Court's equal protection precedent, requires evidence of 'discriminatory intent.'" *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 198 (2d Cir. 2014) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). In *Arlington Heights*, the Supreme Court explained:

> The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.
>
> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

429 U.S. at 267 (citation cleaned up and internal citations omitted). Plaintiffs appear to rely on a similar test. (ECF No. 13-1, PageID.2385).

Plaintiffs have not presented any evidence of "invidious purpose" in the historical background of the Planning Commission's decision. *Arlington Heights*, 429 U.S. at 267.

First, Plaintiffs cite *public comment* as evidence of discrimination. But *Arlington Heights* looks to "statements by members of the decisionmaking body". *Id.* Plaintiffs have not pointed to a

single comment by a member of the Planning Commission that would create even circumstantial evidence of discriminatory animus. The views of opponents (including the objection to Attorney Wierda's alma mater) were not the Planning Commission's views, and Plaintiffs offer no evidence the Planning Commission adopted them.

Second, Plaintiffs contend that the Planning Commission's decision to obtain a second legal opinion is evidence of discrimination. The record belies that claim. The February 18, 2026 minutes show that the decision was based on gaps the Planning Commission identified in Attorney Wierda's opinion – gaps it considered important in evaluating the SLUP application. (ECF No. 11-26, PageID.1820-1821). Plaintiffs do not suggest that Attorney Grier's work reflected hostility to religion; by their own account, he prepared alternative findings both approving and denying the application. (ECF No. 13-1, PageID.2387). Seeking additional legal analysis is not discrimination, and the review of Apollos SLUP application followed a standard process.

Finally, Plaintiffs contend that the LTZO itself is evidence of discriminatory intent. (ECF No. 13-1, PageID.2386). That argument fails for the reasons stated in the Free Exercise and Equal Terms sections above.

Perhaps on a developed record Plaintiffs *might* be able to make out a RLUIPA claim. But the potential for liability at some point in the future does not meet the high burden of showing a *strong* likelihood of success on the merits.

## V. PLAINTIFFS DO NOT SATISFY THE REMAINING PRELIMINARY INJUNCTION STANDARDS.

### A. Plaintiffs Cannot Show Irreparable Harm in the Absence of a Preliminary Injunction.

Plaintiffs make no effort to analyze the irreparable harm standard. Instead, they simply assert that because they believe they are likely to succeed on the merits of the First Amendment claims, no further showing of irreparable harm is necessary. (ECF No. 13-1, PageID.2390-2391).

While Plaintiffs do cite the proper standard within the context of a First Amendment claim, they do not just seek a preliminary injunction on First Amendment grounds.

To the extent the Court determines that Plaintiffs are *not* likely to succeed on the merits of their First Amendment claims, Plaintiffs have completely abdicated their obligation to show irreparable harm in the RLUIPA context. *Tree of Life Christian Schs. v. City of Arlington*, No. 2:11-cv-009, 2011 WL 13311862 (S.D. Ohio, April 27, 2011) (analyzing irreparable harm and balancing the equities in a motion for preliminary injunction in case under RLUIPA); *Fresh Start Ctr. v. Twp. of Grosse Ile*, 2024 WL 4063554 (E.D. Mich., Sept. 5, 2024) (same).

Plaintiffs have provided no evidence as to *why* or *what* irreparable harm they would suffer in the absence of a preliminary injunction. While they claim throughout their motion that they have been unable to gather at the Property, as the Township has presented, it appears that Plaintiffs' own actions have been the only thing stopping them from using the Property. They planned to proceed with the use during the pending ZBA appeal and the Township has done nothing to stop them. Moreover, the Zoning Administrator has no intent to issue any citations while the ZBA appeal is pending. Apollos' own attorney told the Township it planned to use the Property while the matter was before the ZBA; it simply chose not to. Finally, Plaintiffs have provided no evidence that it has no other options beyond the Property to host its club or that the club *must* take place at the Property. As they admit, this is a private use taking place on private property. This is not a situation where the use involved is in a public forum. As the Township presented via affidavit, there are at least two churches within a block where Plaintiffs could conceivably gather their club to pray, worship, and study the Bible. The Township also has evidence that Youth for Christ is gathering and engaging in their club use at the Lutheran Church – undermining any claim of irreparable harm. (Exhibit F).

Plaintiffs have not undertaken any effort to establish irreparable harm.

B. The Public Interest and Balance of Harms Favor Denying Plaintiffs' Request for a Preliminary Injunction.

The public interest and balance of harms also weigh against Plaintiffs' motion, because there is no reason for the Court to prohibit the Township from enforcing its own ordinances. As with irreparable harm, Plaintiffs make no effort to analyze these factors beyond their merits arguments. To the extent the Court determines that Plaintiffs are *not* likely to succeed on the merits of their First Amendment claims, Plaintiffs have abandoned any argument on the public interest and balance of harms in the RLUIPA context. *Tree of Life Christian Schs.*; *Fresh Start Ctr.*, *supra*.

Courts are wary of enjoining the enactments of democratically elected representatives. *New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). And "the public interest lies in promoting public confidence in the integrity of local government." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002). "[S]tate and local zoning and land-use law is particularly the province of the State and ... federal courts should be wary of intervening in that area in the ordinary case . . . [because] [w]e can conceive of few matters of public concern more substantial than zoning and land-use laws" *Cmty. Treatment Centers, Inc. v. City of Westland*, 970 F. Supp. 1197, 1224 (E.D. Mich. 1997) (quoting *Mission Oaks Mobile Home Park v. City of Hollister*, 989 F.2d 359, 361 (9th Cir.1993)). Enjoining the Township while the ZBA considers Plaintiffs' appeal would set a dangerous precedent that undermines the Township's power to zone in the best interests of its residents.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Honorable Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully Submitted,

McGRAW MORRIS MASUD
Attorney for Defendants

Dated: November 3, 2026

BY: /s/ *Bogomir Rajsic, III*

Bogomir Rajsic, III (P79191)
44 Cesar E. Chavez Avenue SW, Ste 200
Grand Rapids, MI 49503
(616) 288-3703
brajsic@mcgrawmorris.com